# EXHIBIT 3

ERNEST J. CARDILLO   1/15/19

**Page 1**

COMMONWEALTH  OF  MASSACHUSETTS

Berkshire, ss.      Department of the Trial Court
                    Superior Court
                    Civil Action
                        No. 3:19-cv-10695-KAR
                    Pages 1-73

--------------------------------
**ERNEST J. CARDILLO, JR.**

vs.

**TOWN OF STOCKBRIDGE,
STOCKBRIDGE SELECT BOARD,
DONALD M. CHABON, and
TERENCE R. FLYNN, in their
Official Capacity as Selectmen**

--------------------------------

        DEPOSITION OF:  **ERNEST J.
CARDILLO, JR.**, taken before Heather J. Davis,
Registered Merit Reporter and Notary Public,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, at the
offices of Elizabeth J. Quigley, 27 Henry
Avenue, Pittsfield, Massachusetts on January 15,
2020, commencing at 10:51 AM.

APPEARANCES:

(SEE PAGE TWO)


              Heather J. Davis
              Registered Merit Reporter



        **DAVIS & MITCHELL REPORTING**
               P.O. Box 1367
             Pittsfield, MA 01202
            Tel. (413) 499-0035
        **DAVIS & MITCHELL REPORTING**
              **(413) 499-0035**

---

**Page 3**

I N D E X

------------------------------------------------
WITNESSES:            DIRECT  CROSS
------------------------------------------------

ERNEST J. CARDILLO, JR.      4

------------------------------------------------
EXHIBITS:      DESCRIPTION            PAGE
------------------------------------------------

Exhibit 1    Notice of Taking Deposition   4

Exhibit 2    Complaint                24

Exhibit 3    Fire Chief Contract        35

Exhibit 4    Amendment to contract        35

Exhibit 5    Document dated 11/27/18      46

              **DAVIS & MITCHELL REPORTING**
                   **(413) 499-0035**

---

**Page 2**

**A P P E A R A N C E S :**

LAW OFFICE OF ELIZABETH J. QUIGLEY, 27 Henry
Avenue, Pittsfield, Massachusetts, 01201,
representing the Plaintiff.
BY: ELIZABETH J. QUIGLEY, ESQUIRE

ROBINSON DONOVAN, P.C., 1500 Main Street, Suite
1600, Springfield, Massachusetts, 01115,
representing the Defendants.
BY: DAVID S. LAWLESS, ESQUIRE


Also Present:  Kathleen A. Ronchi




              **DAVIS & MITCHELL REPORTING**
                   **(413) 499-0035**

---

**Page 4**

1        **ERNEST J. CARDILLO, JR.,** the Deponent,
2   having first been properly identified by the
3   Notary Public through satisfactory evidence of
4   identification per Executive Order No. 455
5   (03-13) (Massachusetts driver's license) and
6   sworn, deposes and says as follows:
7                (Exhibit Number 1
                  offered and marked for
8                identification)
9
10       **DIRECT EXAMINATION BY MR. LAWLESS**
11   Q.   (BY MR. LAWLESS)  Hi.  Good
12   afternoon, Mr. Cardillo, my name is David
13   Lawless, I represent the Town of Stockbridge and
14   the other Defendants in the lawsuit you've
15   brought against them.  We're here today for your
16   deposition in this matter.  I'm just going to
17   note for the record and show you the notice of
18   today's deposition.
19            I just want to make sure that you
20   understand that I'm here today to ask you
21   questions about the lawsuit that's referenced in
22   that Notice of Deposition.
23   A.   Yes.
24   Q.   Could you state your full name for the
              **DAVIS & MITCHELL REPORTING**
                   **(413) 499-0035**

**5**

1  record, please?
2        MS. QUIGLEY:  May we stop for just
3  a moment?  Do you want to do stipulations?
4        MR. LAWLESS:  Yeah, the usual
5  stipulations.
6        MS. QUIGLEY:  Yeah.  Thank you.
7  Sorry.
8        MR. LAWLESS:  Thanks.
9        S T I P U L A T I O N S
10
11     It is agreed by and between the parties
12  that all objections, except objections as to the
13  form of the question, are reserved to be raised
14  at the time of trial for the first time.
15
16     It is further agreed by and between the
17  parties that all motions to strike unresponsive
18  answers are also reserved to be raised at the
19  time of trial for the first time.
20
21     It is further agreed that the deponent
22  will not waive the reading and signing of the
23  deposition and the sealing of said deposition
24  will be waived.

DAVIS & MITCHELL REPORTING
(413) 499-0035

**6**

1     It is further agreed by and between the
2  parties that notification to all parties of the
3  receipt of the original deposition transcript is
4  also hereby waived.
5
6     Q.  (BY MR. LAWLESS)  Could I ask you to
7  state your full name for the record, please,
8  sir?
9     A.  **It's Ernest John Cardillo, Junior.**
10    Q.  And what's your current address?
11    A.  **7A East Street, Stockbridge, Mass.**
12    Q.  Do you have any present plans of
13  moving from that address?
14    A.  **No.**
15    Q.  Okay.  And how long have you lived
16  there?
17    A.  **Twenty-five years.**
18    Q.  Are you currently employed?
19    A.  **Yes.**
20    Q.  Where are you employed?
21    A.  **Vanzandt Plumbing.**
22    Q.  Is that full-time employment?
23    A.  **It's full-time at this point.**
24    Q.  Okay.  And when did it become

DAVIS & MITCHELL REPORTING
(413) 499-0035

**7**

1  full-time employment?
2     A.  **November, I believe.**
3     Q.  Is that November of 2019?
4     A.  **Yes.**
5     Q.  Okay.  And are you paid hourly at
6  Vanzandt Plumbing?
7     A.  **Hourly.**
8     Q.  And how much are you paid an hour?
9     A.  **$25.**
10    Q.  Okay.  Do you receive health insurance
11  through --
12    A.  **No benefits there.**
13    Q.  No benefits.  Do you have health
14  insurance?
15    A.  **I have health insurance through my**
16  **ex-wife, which I pay a portion of.**
17    Q.  And what health insurance is that?
18    A.  **It's Blue Cross/Blue Shield.**
19    Q.  And do you reimburse her for the
20  portion of the premium that's --
21    A.  **Yes.**
22    Q.  I'm sorry.  One thing --
23    A.  **Sorry.  Finish your question.**
24    Q.  One thing I didn't do is just go over

DAVIS & MITCHELL REPORTING
(413) 499-0035

**8**

1  some ground rules with you.
2     A.  **Okay.**
3     Q.  Okay.  So the first, obviously, is we
4  both can't talk at once.
5     A.  **Okay.**
6     Q.  The second one is, if I ask you a
7  question and you answer it, I'm going to assume
8  that you understood the question.
9     A.  **Okay.**
10    Q.  If you don't understand the question,
11  please let me know right away.  You know, it's
12  my fault, you know, if you don't understand it,
13  it's because I've asked you a bad question.  So
14  just let me know and I'll try and rephrase it in
15  a way that makes sense.
16    A.  **Okay.  Thank you.**
17    Q.  If you don't hear anything I've said,
18  please let me know that too.  If you need to
19  take a break at any time, we can do that.  Those
20  are sort of the key ground rules.  We may hit
21  some more or we might find some more as we go
22  along.
23        So I was asking you, do you
24  reimburse your ex-wife for the portion of the

DAVIS & MITCHELL REPORTING
(413) 499-0035

9

1  Blue Cross/Blue Shield premium that's
2  attributable to your health insurance?
3      A.   Yes.
4      Q.   Okay.  And how much do you pay her a
5  month for that?
6      A.   I pay $130 a week.
7      Q.   And do you have any other employment,
8  other than Vanzandt Plumbing, at this time?
9      A.   No.
10     Q.   And what's your position at Vanzandt
11 Plumbing?
12     A.   I'm just a plumber's assistant.
13     Q.   Do you have any plans to continue in
14 your training as a plumber?
15     A.   Depending on the outcome.
16     Q.   Does that mean depending on whether or
17 not you like being a plumber's assistant or
18 depending on whether or not Vanzandt Plumbing
19 likes having you as an employee or --
20     A.   If they like me as a plumber, they
21 will keep me.
22     Q.   So what's the outcome you're referring
23 to?
24     A.   To the settlement of this case.

10

1      Q.   I see.  So if the settlement in this
2  case doesn't result in your becoming an employee
3  of the Town of Stockbridge in the future, it's
4  your intent to continue your training as a
5  plumber?
6      A.   It would be an option.
7      Q.   It would be an option, okay.  What
8  training as a plumber have you had to date?
9      A.   None.
10     Q.   Okay.  Do you have any plans to take
11 classes or engage in any other training as a
12 plumber, other than on-the-job training?
13     A.   Just on-the-job training at this
14 point.
15     Q.   Okay.  And you've never had any
16 training in the past for work as a plumber?
17     A.   Not official training.  I mean I've
18 done odds and ends as a handyman but not a
19 special plumber.
20     Q.   Have you had any conversations with
21 your employer about further training as a
22 plumber?
23     A.   No.
24     Q.   Okay.  How many employees does

11

1  Vanzandt Plumbing have?
2      A.   I believe he has eight at this point.
3      Q.   And is that just straight plumbing or
4  do you do plumbing and heating as well?
5      A.   Plumbing and heating, septic tank
6  pumping, sewer issues, some excavation.
7      Q.   Okay.  And of Vanzandt Plumbing's
8  eight employees, how many of them are licensed
9  plumbers?
10     A.   I believe three.
11     Q.   And the rest are plumbing assistants
12 or administrative employees?
13     A.   They're out in the field, so plumbing
14 assistants.
15     Q.   Who operates Vanzandt Plumbing?
16     A.   John Vanzandt.
17     Q.   Is he the sole owner of Vanzandt
18 Plumbing?
19     A.   I'm not sure if he's the sole owner or
20 not but he runs the business.  It's a family
21 business.
22     Q.   Were you employed prior to November of
23 2019?
24     A.   I worked as a -- I worked for First

12

1  Response Landscaping on an as-needed basis as a
2  subcontractor.
3      Q.   And what did you do as a subcontractor
4  for --
5      A.   Lawn mowing, tree work, some patio
6  work, some digging and construction work.
7      Q.   Okay.  And how long did you do that
8  for?
9      A.   I think from June to the November
10 date.
11     Q.   So June through November of 2019?
12     A.   Yes.
13     Q.   And I think you said you were an
14 independent contractor?
15     A.   He hired me as an independent, so yes.
16     Q.   Do you know how much income you
17 derived working as an independent contractor for
18 First Response Landscaping?
19     A.   It was $18 an hour.  And I don't have
20 a number at this point.
21     Q.   Okay.  Have you received any tax
22 documents from First Response Landscaping?
23     A.   Not at this point, no.
24     Q.   I'm just --

ERNEST J. CARDILLO  1/15/19

13

1      MR. LAWLESS: On the record, I'm
2  just going to ask your attorney, when he
3  receives anything to please supplement the
4  discovery.
5      MS. QUIGLEY: Sure.
6      Q.   (BY MR. LAWLESS)  Did you have any
7  other employment from June through November of
8  2019, other than working with First Response
9  Landscaping?
10     A.   **No.**
11     Q.   Prior to June of 2019 what was your
12  employment?
13     A.   **I was not employed.**
14     Q.   How long were you unemployed for?
15     A.   **From the February 5 date to the June**
16  **date.**
17     Q.   So from February 5, 2019 through --
18     A.   **Right around -- it might have been the**
19  **middle of May to June, somewhere in that range.**
20     Q.   Okay.  So through May or June of 2019
21  you were unemployed?
22     A.   **Yes.**
23     Q.   Okay.  And did you collect
24  unemployment assistance?

DAVIS & MITCHELL REPORTING
(413) 499-0035

14

1      A.   **I applied, I was denied.  I appealed**
2  **it.  And I collected about $700 worth of**
3  **unemployment at this point.**
4      Q.   I couldn't quite hear you.
5      A.   **I was sent about $700, right around**
6  **$700, from unemployment.**
7      Q.   You collected $700 total?
8      A.   **Yes.**
9      Q.   From February through June of 2019?
10     A.   **Yup.  Because they denied it, it was**
11  **appealed, and then it took a long time do the**
12  **appeal process.**
13     Q.   Okay.  When you appealed the original
14  denial of your application for benefits were you
15  granted benefits beginning as of the date of
16  your termination by the Town of Stockbridge?
17     A.   **Yes.**
18     Q.   And so how did it happen that you only
19  collected $700 in benefits?
20     A.   **Because I did not receive the backpay**
21  **at this point.  There was just a lot of red tape**
22  **and I never got to the bottom of it at this**
23  **point.**
24     Q.   Okay.  Do you plan to get to the

DAVIS & MITCHELL REPORTING
(413) 499-0035

15

1  bottom of it?
2      A.   **Eventually, yes.**
3      Q.   Okay.  Have you had communications --
4      A.   **I met with people in Pittsfield, I**
5  **made phone calls and stuff, and at this point**
6  **got nowhere with it.**
7      Q.   I'm just going to remind you that only
8  one of us can speak at a time.  You have to let
9  me finish my questions.
10     A.   **I'm sorry.**
11     Q.   It's a normal part of human
12  conversations, I know that you know what the end
13  of the question is going to be, I know that you
14  know what I'm asking you, but the court reporter
15  has to take it down.
16     A.   **Sorry.**
17     Q.   So when you say you met with people in
18  Pittsfield, were those people employees of the
19  Department of Unemployment Assistance?
20     A.   **Yes.  It was the unemployment office.**
21     Q.   And so the red tape you're referring
22  to, if I say DUA, you understand I mean the
23  Department of Unemployment Assistance?
24     A.   **Yes.**

DAVIS & MITCHELL REPORTING
(413) 499-0035

16

1      Q.   That's DUA red tape you're referring
2  to, correct?
3      A.   **Yes.**
4      Q.   Did you have any correspondence with
5  DUA about your efforts to secure benefits?
6      A.   **Yes.**
7      Q.   And I'm just going to ask that you
8  supplement your discovery to provide that
9  correspondence as well.
10     A.   **Okay.**
11     Q.   Okay.  Have you had any other sources
12  of income between February of 2019 and today,
13  other than the ones we've discussed?
14     A.   **No.**
15     Q.   Okay.  Do you have any investments, a
16  brokerage account anywhere?
17     A.   **I have a retirement account and an**
18  **investment, I think they call it, for like --**
19  **not a 401K but an investment for retirement.**
20     Q.   Okay.  Do you own any rental
21  properties?
22     A.   **No.**
23     Q.   Do you own any businesses?
24     A.   **No.**

DAVIS & MITCHELL REPORTING
(413) 499-0035

ERNEST J. CARDILLO  1/15/19

17

1      Q.   Okay.  Do you receive any form of
2  alimony or child support from your ex-wife?
3      A.   **No.**
4      Q.   So other than what we've talked about
5  today, no other sources of income in 2019?
6      A.   **Actually, I do have a house I take**
7  **care of, I get $300 a month.**
8      Q.   Where is that house located?
9      A.   **Yale Hill.  34 Yale Hill, Stockbridge.**
10     Q.   That you act as a caretaker for?
11     A.   **I'm a caretaker, yes.**
12     Q.   Okay.  Before we move on, let me ask
13  you, other than -- strike that.
14          How did you get the position
15  working as an independent contractor with First
16  Response Landscaping?
17     A.   **He was a friend of mine and he needed**
18  **help.**
19     Q.   What's his name?
20     A.   **Joe Gardino.**
21     Q.   Joe Cardino?
22     A.   **Gardino.  G.**
23     Q.   And he operates First Response
24  Landscaping?

DAVIS & MITCHELL REPORTING
(413) 499-0035

18

1      A.   **Yes.  It's a small little, very small**
2  **little landscape business.**
3      Q.   Okay.  And how did you secure the
4  position at Vanzandt Plumbing?
5      A.   **Working for Gardino, we did some**
6  **digging and stuff for him for sewer lines and**
7  **stuff.  And then it came November, where Joe**
8  **didn't have the work for me, he offered me a**
9  **job, full-time job, to work for him.**
10     Q.   Okay.  And did you know Mr. Vanzandt
11  before working for First Response Landscaping?
12     A.   **Yeah.  He installed the heating unit**
13  **in one of our stations, fire stations.**
14     Q.   So you had a previous relationship?
15     A.   **I knew who he was.**
16     Q.   Well, from 2019 through the present
17  have you applied for any other jobs, other than
18  working with First Response Landscaping and
19  Vanzandt Plumbing?
20     A.   **Just unemployment.**
21          MS. QUIGLEY:  You've got to wait
22  until he finishes.
23          THE WITNESS:  That's a bad habit
24  of mine.  I did apply for some, you know,

DAVIS & MITCHELL REPORTING
(413) 499-0035

19

1  through the unemployment regulations.
2      Q.   (BY MR. LAWLESS) Where did you apply?
3      A.   **Fire departments.  I believe some**
4  **highway jobs maybe.  I can't recall a lot of**
5  **them.**
6      Q.   Okay.  What fire departments did you
7  apply to?
8      A.   **Lenox and Lee.**
9      Q.   And did you submit an application and
10  a resume to the Lenox Fire Department?
11     A.   **It was verbal.**
12     Q.   Okay.  And was it also a verbal
13  application with respect to the Lee Fire
14  Department?
15     A.   **Yes.**
16     Q.   And so when you said you made a verbal
17  application, do you mean that you made an
18  inquiry as to whether or not they were hiring?
19     A.   **Yes.**
20     Q.   Okay.  And what did the Lenox Fire
21  Department tell you when you made an inquiry as
22  to whether or not they were hiring?
23     A.   **Not at that time.**
24     Q.   Okay.  And what did the Lee Fire

DAVIS & MITCHELL REPORTING
(413) 499-0035

20

1  Department tell you?
2      A.   **That they were fully staffed at that**
3  **time.**
4      Q.   Okay.  When you said you applied for
5  highway, do you mean you applied for jobs at
6  municipal highway departments?
7      A.   **I believe I did.**
8      Q.   Okay.  Do you recall which highway
9  departments you applied to?
10     A.   **I think I talked with Lenox.  That's**
11  **the only one I talked with.**
12     Q.   Lenox was the only one you talked
13  with?
14     A.   **Lenox, yes.**
15     Q.   And did you submit an application at
16  Lenox?
17     A.   **I did not submit an application.**
18     Q.   Okay.  So, again, you just asked if
19  they were hiring?
20     A.   **Yes.**
21     Q.   Okay.  And what was the answer?
22     A.   **Not at that time.**
23     Q.   And have you actually submitted any
24  physical applications for employment anywhere?

DAVIS & MITCHELL REPORTING
(413) 499-0035

ERNEST J. CARDILLO   1/15/19

---

**21**

1    A.   I did not.  I was working for Joe at
2    that time, a lot of it, so I was --
3        Q.   And between February of 2019 and June
4    of 2019 you didn't submit any applications
5    anywhere?
6        A.   I did not submit any but I was
7    looking.
8        Q.   Other than the inquiries that you made
9    in Lenox and Lee, did you make any inquiries
10   anywhere else?
11       A.   I talked with a gentleman, I can't
12   recall the name, it's in the old KayBee building
13   in Lee, they were hiring there.
14       Q.   So was that -- did you just ask this
15   gentleman if he was hiring?
16       A.   Yes.
17       Q.   Okay.  And what was his name?
18       A.   I don't recall his name at this time.
19       Q.   Okay.  And what was his business?
20       A.   They're a medical packaging company, I
21   believe.
22       Q.   And how did that come about, did you
23   just walk in off the street?
24       A.   I was doing some work for the Busy

DAVIS & MITCHELL REPORTING
(413) 499-0035

---

**22**

1    Bee, the nursery/preschool there, I was helping
2    my daughter kind of rearrange her room, and I
3    ran into this gentleman in the warehouse.
4        Q.   And you asked him if he was hiring?
5        A.   Yes.
6        Q.   And he said no?
7        A.   He said they were possibly hiring.
8        Q.   Okay.  Did you offer to submit an
9    application?
10       A.   I did not.  Because then I started
11   working with Joe and outside work.
12       Q.   And the work you did for Busy Bee
13   Preschool, was that volunteer work?
14       A.   That was volunteer.
15       Q.   So did you make any other job-related
16   inquiries other than the ones we've discussed?
17       A.   I don't recall at this point.
18       Q.   Okay.
19       A.   It was a while ago.
20       Q.   Okay.  And I apologize if I asked you
21   this before, but you didn't submit any physical
22   applications anywhere between February of 2019
23   and today's date, correct?
24       A.   No.

DAVIS & MITCHELL REPORTING
(413) 499-0035

---

**23**

1        Q.   Is there anything else you did to look
2    for a job between February of 2019 and today?
3        A.   I looked in the papers, went online,
4    stuff like that.  But I haven't been looking,
5    because I have my job.  I haven't been looking
6    now because I have my job.
7        Q.   How many hours a week do you work for
8    Vanzandt Plumbing?
9        A.   It's averaging forty hours a week.
10       Q.   Okay.  Do you ever work overtime for
11   them?
12       A.   Some weeks there's overtime, some
13   weeks there's less.
14       Q.   Okay.  But on average you work forty
15   hours a week?
16       A.   My average is forty hours a week.
17       Q.   Okay.  And when you work overtime, I
18   assume you're paid time and a half?
19       A.   Correct.
20       Q.   Okay.  Is there any pay differential
21   for working weekends?
22       A.   Just the time and a half if it's over
23   forty.
24       Q.   Okay.  What do you do as a plumber

DAVIS & MITCHELL REPORTING
(413) 499-0035

---

**24**

1    assistant?
2        A.   I run pipes, I do a lot of sewer
3    drainage, do a lot of cleaning of clogged pipes,
4    pump sewer tanks, run water lines.  Everything
5    that doesn't, you know, need a license for.
6    Cleanup.
7        Q.   Okay.  Do you always work under the
8    direct supervision of a licensed plumber?
9        A.   Yes.
10            MR. LAWLESS:  Mark this as the
11   next exhibit.
12            (Exhibit Number 2
                 offered and marked for
13               identification)
14       Q.   (BY MR. LAWLESS)  Mr. Cardillo, I'm
15   going to show you what's been marked as Exhibit
16   2 and ask you if you recognize that document.
17       A.   Yes.
18       Q.   Okay.  Could you tell me what it is?
19       A.   It's a lawsuit brought to the town, I
20   believe.
21       Q.   Okay.  So this is the Complaint in the
22   lawsuit that brings us here today?
23       A.   Yes.
24       Q.   Okay.  And have you read this

DAVIS & MITCHELL REPORTING
(413) 499-0035

---

**25**

1 Complaint?
2     A.   Yes.
3     Q.   Okay.  Did you read it in preparation
4 for today's deposition?
5             MS. QUIGLEY:  Objection.  Do not
6 answer.
7             MR. LAWLESS:  I think he can
8 answer whether or not he read the Complaint.
9             MS. QUIGLEY:  I think that if he's
10 dealing with me to to prepare for this deposition
11 and something happens within the purview of the
12 attorney-client relationship, then I don't think
13 he can answer.
14             MR. LAWLESS:  Let me ask it this
15 way.
16     Q.   (BY MR. LAWLESS) Mr. Cardillo, did
17 you do anything to prepare for today's
18 deposition?
19             MS. QUIGLEY:  So, again, I, again,
20 don't want to be obstructionist --
21             MR. LAWLESS:  Can we go off the
22 record for a second?
23             MS. QUIGLEY:  Yes.
24             (Off record discussion)
             DAVIS & MITCHELL REPORTING
             (413) 499-0035

**26**

1             MR. LAWLESS:  Back on the record.
2     Q.   (BY MR. LAWLESS) Mr. Cardillo, did
3 you do anything to prepare for today's
4 deposition?
5     A.   Yes.
6     Q.   Okay.  What did you do?
7     A.   I met with my lawyer and we discussed
8 some stuff.
9     Q.   Okay.  Did you do anything else to
10 prepare for today's deposition, other than meet
11 with your lawyer?
12     A.   No.
13     Q.   Okay.  Please turn to page 6 of
14 Exhibit 2.  And I'd like you to look at
15 paragraph thirty-eight.
16     A.   Yes.
17     Q.   Do you allege in this lawsuit that you
18 were terminated from your position with the Town
19 of Stockbridge due to your political
20 affiliation?
21     A.   Yes.
22     Q.   Okay.  And what is your political
23 affiliation?  Or strike that.
24             What was your political
             DAVIS & MITCHELL REPORTING
             (413) 499-0035

**27**

1 affiliation during the time that you were
2 employed by the Town of Stockbridge?
3     A.   I was a member of the Board of
4 Selectmen.
5     Q.   Okay.  Is your membership on the Board
6 of Selectmen the basis for your claim of First
7 Amendment retaliation in this case?
8     A.   Yes.
9     Q.   Is there any other basis for your
10 claim of First Amendment retaliation in this
11 case?
12             MS. QUIGLEY:  Objection.  But you
13 can go ahead and answer.
14             THE WITNESS:  I believe so.
15     Q.   (BY MR. LAWLESS)  Okay.  So you don't
16 allege that your employment was terminated
17 because you're a member of a particular
18 political party, correct?
19     A.   Like a Democrat or Republican?
20     Q.   Those would be two examples, yes.
21     A.   No.
22     Q.   And you don't allege that you were
23 terminated from your position as Fire Chief for
24 the Town of Stockbridge because of any
             DAVIS & MITCHELL REPORTING
             (413) 499-0035

**28**

1 particular political position you might have
2 taken at any time, correct?
3             MS. QUIGLEY:  Objection.  You can
4 go ahead and answer.
5             THE WITNESS:  I don't believe so.
6     Q.   (BY MR. LAWLESS)  So, again, it's
7 just simply the fact that you were a member of
8 the Select Board, correct?
9     A.   Yes.
10     Q.   And your allegation is that you were
11 retaliated against because you were a member of
12 the Select Board, is that right?
13     A.   Yes.
14     Q.   And so I'm going to draw your
15 attention to paragraph forty-one.  And let me
16 know when you've had a chance to review it.
17     A.   Yes.
18     Q.   So paragraph forty-one references
19 Plaintiff's First Amendment speech and
20 activities.  And, again, I just want to be
21 clear, the First Amendment speech and activities
22 referenced in paragraph forty-one are comprised
23 of the fact that you were a member of the Select
24 Board, correct?
             DAVIS & MITCHELL REPORTING
             (413) 499-0035

29

1    A.   Correct.
2    Q.   Okay.  And there's no other First
3 Amendment speech or activities that are at issue
4 in this case, correct?
5    A.   Correct.
6    Q.   Okay.  What facts do you rely on to
7 allege that your membership on the Select Board
8 was a substantial or motivating factor in the
9 termination of your employment as Fire Chief?
10           MS. QUIGLEY:  Objection.  But you
11 can go ahead and answer.
12           THE WITNESS:  When they -- at one
13 of the first meetings they said I had to resign
14 as Selectman and as Fire Chief in order to
15 hopefully maintain a job with the town.
16    Q.   (BY MR. LAWLESS) Are you referring to
17 a Select Board meeting that occurred on December
18 6, 2018?
19    A.   It was a meeting, it was just the
20 three Select Board members.
21    Q.   Okay.  Was that an executive session
22 meeting?
23    A.   It was a -- I believe it was just an
24 executive but it was -- I don't think it was an

DAVIS & MITCHELL REPORTING
(413) 499-0035

30

1 advertised meeting.
2    Q.   So the three of you got together and
3 met?
4    A.   They asked me to get together to
5 straighten this out.
6    Q.   Okay.  And so they asked you to get
7 together to straighten it out, you said?
8    A.   Yes.
9    Q.   So what does that mean, to get
10 together to straighten it out?
11           MS. QUIGLEY:  Objection.  But you
12 can go ahead and answer.
13           THE WITNESS:  I met with Don
14 Chabon, who was the chairman of the board at
15 that time, we kind of crossed paths in the town
16 offices and he said he wanted to get together to
17 get this straightened out and move ahead.  And
18 that don't lose any sleep, everything is fine.
19 And he scheduled the meeting without the town
20 administrator.
21    Q.   (BY MR. LAWLESS) Okay.  And you were
22 present at that meeting, Mr. Chabon was present
23 at that meeting; was anybody else present at
24 that meeting?

DAVIS & MITCHELL REPORTING
(413) 499-0035

31

1    A.   Terry Flynn.
2    Q.   And nobody else was present at that
3 meeting?
4    A.   Nobody else was present.
5    Q.   Where did that meeting take place?
6    A.   The town offices.
7    Q.   Okay.  And you're aware that meeting
8 was recorded, aren't you?
9    A.   I don't recall if it was recorded or
10 not.
11    Q.   Okay.  Did you object at any time to
12 that meeting being recorded?
13    A.   I don't recall if it was recorded so I
14 had no objection.
15    Q.   Okay.  So was a proposal made to you
16 at that meeting?
17    A.   I believe it might have been the
18 second meeting.
19    Q.   Okay.
20    A.   A proposal was made, and I believe the
21 first line was that if I wanted any employment
22 in the town, I had to resign as Selectman and
23 the Fire Chief in that agreement.
24    Q.   And did you say you also had to resign

DAVIS & MITCHELL REPORTING
(413) 499-0035

32

1 as --
2    A.   And I believe resign as Fire Chief.  I
3 would have to think about it, I'm not positive.
4    Q.   So that the meeting that you talked
5 about where the only people present were you and
6 Mr. Flynn and Mr. Chabon, did that occur on
7 December 6, 2018?  Strike that.
8           Do you recall if the meeting that
9 you referenced where the only people present
10 were you and the other Select Board members, do
11 you recall if that occurred on December 6, 2018?
12    A.   I think it was around that time.  I
13 believe it was that date.
14    Q.   But it might not have been on December
15 6, 2018?
16    A.   I don't recall the exact date.
17    Q.   Okay.  And you said that was not a
18 noticed meeting of the Select Board?
19    A.   I believe it was not a noticed
20 meeting.
21    Q.   Just the three of you got together at
22 the town offices?
23    A.   Yes.
24    Q.   Okay.  And you were told at that

DAVIS & MITCHELL REPORTING
(413) 499-0035

33

1  meeting that you could maintain your employment
2  with the town if you resigned from both your
3  positions as Select Board member and Fire Chief?
4      A.   I'm sorry.
5      Q.   Hold on a second.
6      A.   Mr. Flynn offered that -- he said what
7  I did was -- you know, he actually even said
8  there was some criminal intent there, which kind
9  of got me a little riled up, I don't know, at
10 the time.  And he said, if I resign as Fire
11 Chief and Selectman that they would find some
12 employment for me to maintain my retirement.
13 And that he would also help me write my
14 resignation letter.
15     Q.   Okay.  So there was -- when Mr. Flynn
16 referred to criminal intent, was he referring to
17 your criminal intent or somebody else's?
18     A.   I believe he said what I did could be
19 criminal intent.
20     Q.   Okay.  So he said it could be?
21     A.   He made the impression that, you know,
22 they could pursue criminal actions against me.
23     Q.   And at any time were you offered any
24 type of resolution, where if you resigned your

34

1  position on the Select Board you could maintain
2  your position as Fire Chief?
3      A.   No.
4      Q.   So at all times it was made clear to
5  you that maintaining your position as Fire Chief
6  was not going to be an option?
7      A.   Was not an option.
8      Q.   Okay.
9      A.   They offered me -- well, we discussed,
10 I even suggested, you know, maybe the highway
11 department or something like that.  But the deal
12 was, doing anything with the fire department was
13 not on the table.
14     Q.   Okay.  At one point were you provided
15 with a draft amendment to your employment
16 contract?
17     A.   I'm not sure.  Did I get that?  I'm
18 not sure about that.
19     Q.   Let me ask you this way:  In your
20 position as Fire Chief did you have an
21 employment contract with the town?
22     A.   I had a contract, yes.
23     Q.   Okay.  At one time in late 2018 were
24 you provided with a draft amendment to that

35

1  contract?
2      A.   I don't recall.
3      Q.   Okay.
4      A.   Do you have that?
5      Q.   Well --
6      A.   I just don't recall it.
7               (Exhibit Numbers 3 & 4
                offered and marked for
8               identification)
9               THE WITNESS:  So this was the
10 renewal of my contract, correct?
11     Q.   (BY MR. LAWLESS) So is Exhibit 3 your
12 most recent Fire Chief contract with the Town of
13 Stockbridge?
14          MS. QUIGLEY:  Objection.  But you
15 can go ahead and answer.
16          THE WITNESS:  Yes, I believe so.
17     Q.   (BY MR. LAWLESS)  Okay.  And could
18 you take a look at Exhibit 4 for me, please?
19          Have you had an opportunity to
20 review Exhibit 4?
21     A.   Yeah.  For the most part.
22     Q.   Okay.  Do you know who prepared
23 Exhibit 4?
24     A.   I believe it was the two Select

36

1  Persons and the town attorney.
2      Q.   And have you seen Exhibit 4 before
3  today?
4      A.   Yes.  They gave it to me, I believe,
5  at the second meeting.
6      Q.   And was Exhibit 4 presented to you as
7  part of an offer by which you could maintain
8  your employment with the Town of Stockbridge?
9          MS. QUIGLEY:  Objection.  You can
10 go ahead and answer.
11          THE WITNESS:  They gave me this, I
12 believe, at the end of the meeting, and I don't
13 believe there was any discussion on it.
14     Q.   (BY MR. LAWLESS)  Okay.  And
15 essentially what was presented to you was that
16 you could maintain your employment if you
17 resigned both your position as Selectman and
18 Fire Chief, correct?
19     A.   That they would try to find me --
20          MS. QUIGLEY:  You've got to let
21 me -- I'm going to object, but you can go ahead
22 and answer.
23          THE WITNESS:  They said they would
24 try to find me a position with the town.

37

1    **Q.**   (BY MR. LAWLESS)   And they presented
2  you with Exhibit 4?
3    **A.   Yes.**
4    **Q.**   And had you accepted Exhibit 4, you
5  would have retained a position with the town,
6  correct?
7              MS. QUIGLEY:  Objection.  You can
8  go ahead and answer.
9              THE WITNESS:  There was no job
10  opportunity at the time.  There was no job
11  offered.
12    **Q.**   (BY MR. LAWLESS)  Well, Exhibit 4 is an
13  amendment to Exhibit 3, correct?
14              MS. QUIGLEY:  Objection.  Go ahead
15  and answer.
16              THE WITNESS:  I believe so.
17    **Q.**   (BY MR. LAWLESS)  Okay.  And Exhibit 3
18  is your employment contract with the town,
19  correct?
20    **A.   Okay.  Yup.**
21    **Q.**   So nothing in Exhibit 4 -- nothing in
22  what was proposed to you would have changed your
23  salary, correct?
24              MS. QUIGLEY:  Objection.  You can

38

1  go ahead and answer.
2              THE WITNESS:  I do not know that.
3    **Q.**   (BY MR. LAWLESS)  You do not, okay.
4  If you had accepted the offer that was made to
5  you, do you know if your benefits would have
6  changed?
7              MS. QUIGLEY:  Objection.  Go ahead
8  and answer.
9              THE WITNESS:  That was not
10  discussed.
11    **Q.**   (BY MR. LAWLESS)  Okay.  If you had
12  accepted the offer that was made to you, do you
13  know if your pension benefits would have
14  changed?
15              MS. QUIGLEY:  Objection.  Go ahead
16  and answer.
17              THE WITNESS:  It was not
18  discussed.
19    **Q.**   (BY MR. LAWLESS)   Okay.  If you had
20  accepted the offer that was made to you and is
21  reflected in Exhibit 4, do you know if your
22  hours of work would have changed?
23              MS. QUIGLEY:  Objection.  You can
24  go ahead and answer.

39

1              THE WITNESS:  It was not
2  discussed.
3    **Q.**   (BY MR. LAWLESS)  And you did not
4  accept the offer that was made to you at the
5  second meeting, as reflected in Exhibit 4, did
6  you?
7    **A.   They gave it to me at the end of the
8  meeting to look at.  And I did not respond to
9  it.**
10    **Q.**   But you didn't -- generally speaking,
11  you didn't accept the offer to maintain
12  employment with the Town of Stockbridge but
13  resign your positions as Selectman and Fire
14  Chief, correct?
15    **A.   I maintained my position on the fire
16  department until February 5.**
17    **Q.**   So --
18              MS. QUIGLEY:  So may I just have a
19  moment with him?
20              MR. LAWLESS:  Yeah.
21              (Off record discussion)
22              MS. QUIGLEY:  All right.
23              MR. LAWLESS:  Back on the record.
24    **Q.**   (BY MR. LAWLESS)   Let me ask you this

40

1  way, sir.
2    **A.   Okay.**
3    **Q.**   So sometime in December of 2018 you
4  were offered a resolution whereby you could
5  maintain employment with the town, correct?
6    **A.   Correct.**
7    **Q.**   And in order to do that, part of that
8  resolution was going to be that you resigned
9  your positions as Selectman and as Fire Chief,
10  correct?
11    **A.   Correct.**
12    **Q.**   Okay.  But you don't know, as you sit
13  here today, what the terms of your employment
14  with the town would have been had you accepted
15  that offer, correct?
16    **A.   Correct.**
17    **Q.**   Okay.  And before we get too far down
18  the line here, I just want to ask you some
19  questions about what brought you to this point
20  in December of 2018.
21              So my understanding is that you,
22  and through you the town, was the victim of a
23  scam by which a supplier to the fire department
24  overcharged the town significantly for products

ERNEST J. CARDILLO   1/15/19

41

1  used by the fire department.  Is that a correct
2  summary, accurate summary?
3          MS. QUIGLEY:  Objection.  You can
4  go ahead and answer.
5          THE WITNESS:  I bought some
6  product from these companies.
7      Q.   (BY MR. LAWLESS)  Okay.  And who were
8  these companies?
9      A.   **Pioneer Product and Noble.**
10     Q.   And when was the first time you
11 purchased product from Pioneer Product?
12     A.   **I believe it was sometime in 2012.**
13     Q.   Okay.  And did you reach out to
14 Pioneer Product or did they reach out to you?
15     A.   **They called me.**
16     Q.   Okay.  And what do you recall about
17 that telephone call?
18     A.   **They called me with an offer of, I**
19 **think at that time it was, truck wash.**
20     Q.   They wanted to sell you truck wash?
21     A.   **Yes.**
22     Q.   Did you need truck wash at that time?
23     A.   **At that time we needed some truck**
24 **wash, yes.**

DAVIS & MITCHELL REPORTING
(413) 499-0035

42

1      Q.   Okay.  Did you do anything to research
2  Pioneer Product and its reputation?
3      A.   **No.  Not at that point.**
4      Q.   Did you do anything to research
5  whether or not the prices for truck wash that it
6  was charging were reasonable?
7      A.   **I felt the price was reasonable, from**
8  **what I knew was out there.**
9      Q.   You felt it was reasonable?  But did
10 you do any research to confirm that?
11     A.   **Not extensive research.  But just**
12 **knowing what I knew was out there, I felt it was**
13 **a reasonable price.**
14     Q.   So in 2012 you're contacted by Pioneer
15 Product and you bought some truck wash.
16     A.   **Correct.**
17     Q.   Okay.  What was the next contact that
18 you had with Pioneer Product?
19     A.   **I believe after that first shipment**
20 **was in, sometime later they called me and said**
21 **the second half of my order was ready to be**
22 **shipped.**
23     Q.   Okay.  And was there a second half of
24 your order?

DAVIS & MITCHELL REPORTING
(413) 499-0035

43

1      A.   **According to them there was.  They**
2  **would say like, if you don't take the second**
3  **half then we have to charge you X amount more**
4  **for your first order because it was based on a**
5  **certain amount.**
6      Q.   Okay.  And was that a pattern that
7  continued over the next six years?
8      A.   **Yes.**
9      Q.   Okay.  And so you would receive
10 telephone calls from Pioneer Product saying,
11 essentially, it's time to order more product; is
12 that accurate?
13     A.   **Yes.**
14     Q.   Okay.  And did they assert to you that
15 if you didn't purchase more product that they
16 were going to go back and charge additional
17 monies for product you had already purchased on
18 behalf of the town?
19     A.   **Yes.**
20     Q.   Okay.  So in a nutshell, I think we've
21 just described the scam that Pioneer Product
22 perpetrated on you and, through you, the town,
23 correct?
24         MS. QUIGLEY:  Objection.  You can

DAVIS & MITCHELL REPORTING
(413) 499-0035

44

1  go ahead and answer.
2          THE WITNESS:  Yes.
3      Q.   (BY MR. LAWLESS)  Okay.  And so that
4  was the circumstance that brought you to these
5  meetings in December of 2018, correct?
6      A.   **Yes.**
7      Q.   Okay.  And that was the situation that
8  was going to be resolved or that was offered to
9  be resolved through your resigning as Chief of
10 Police and Select Board member and continuing
11 employment with the town, correct?
12         MS. QUIGLEY:  Objection.  Go ahead
13 and answer.
14     Q.   (BY MR. LAWLESS)  Let me strike that
15 question, that was a terrible question.
16     A.   **Thank you.**
17         MS. QUIGLEY:  I didn't think it
18 was that bad.
19         MR. LAWLESS:  They get much worse.
20     Q.   (BY MR. LAWLESS)  So at some point in
21 2018 this series of purchases from Pioneer
22 Product and then Noble comes to the attention of
23 the other Select Board members, correct?
24         MS. QUIGLEY:  Objection.  You can

DAVIS & MITCHELL REPORTING
(413) 499-0035

45

1  go ahead and answer.
2        THE WITNESS:  It came to the
3  attention of the town administrator at the time.
4  We were working on -- me and her were working on
5  looking into this and resolving it.  She went on
6  a medical leave and told the accountant to let
7  this stand until she got back.  But the
8  accountant said something to the Select Board
9  and they took it and got to the point we were
10  at.
11       Q.   (BY MR. LAWLESS) And it was the
12  accountant who originally flagged some of these
13  transactions, right?
14       MS. QUIGLEY:  Objection.  Go ahead
15  and answer.
16       THE WITNESS:  I'm not sure.
17       Q.   (BY MR. LAWLESS)  Okay.  But the --
18  strike that.
19             It was the notification of the
20  other two Select Board members of these series
21  of purchases that led first to their looking
22  into what had happened with Pioneer Products,
23  and then Noble, and then meeting with you in
24  early December to discuss what your future was

DAVIS & MITCHELL REPORTING
(413) 499-0035

46

1  going to be with the town, correct?
2        MS. QUIGLEY:  Objection.  But you
3  can go ahead and answer.
4        THE WITNESS:  I believe so.
5        Q.   (BY MR. LAWLESS)  And I know you've
6  testified at length regarding Pioneer and Noble,
7  and I don't want to go back through all of that
8  testimony, but --
9        A.   **Thank you.  I see it in my sleep.**
10       Q.   I do just want to note a couple of
11  things.
12       MR. LAWLESS:  So if we could just
13  mark this as the next exhibit.
14            (Exhibit Number 5
              offered and marked for
15            identification)
16       Q.   (BY MR. LAWLESS)  I'm not going to
17  ask you a lot of detailed questions about
18  Exhibit 5.
19       A.   **Okay.**
20       Q.   So just take the time you need to
21  familiarize yourself with the document.  Have
22  you had a chance to review Exhibit 5?
23       A.   **I have.**
24       Q.   Do you recognize Exhibit 5?

DAVIS & MITCHELL REPORTING
(413) 499-0035

47

1        A.   **Yes.**
2        Q.   And what is Exhibit 5?
3        A.   **It's all the documentation of all the**
4  **invoices from Pioneer.**
5        Q.   Is it a report to the Stockbridge
6  Select Board from town counsel?
7        A.   **I believe it is, yes.**
8        Q.   Okay.  And at the February 5, 2019
9  Select Board hearing you told town counsel that
10  you didn't dispute anything in this document,
11  correct?
12       MS. QUIGLEY:  Objection.  But you
13  can go ahead and answer.
14       THE WITNESS:  I believe I did not.
15       Q.   (BY MR. LAWLESS)  Okay.  You believe
16  you did not dispute anything in the document?
17       A.   **Yes.**
18       Q.   And let me return your attention to
19  Exhibit 2, and I'll just have you take a look at
20  paragraph forty-one again.  So the second
21  sentence of paragraph forty-one says:
22  Leveraging adverse employment action against
23  Plaintiff unless he resigned as Selectman
24  derived Plaintiff of his First Amendment rights.

DAVIS & MITCHELL REPORTING
(413) 499-0035

48

1  Did I read that correctly?
2        A.   **Yes.**
3        Q.   And by the phrase "leveraging adverse
4  employment against the Plaintiff unless he
5  resigned as Selectman," is the Complaint
6  referring to this offer that was made to you in
7  December of 2018?
8        MS. QUIGLEY:  Objection.  But you
9  can go ahead and answer.
10       THE WITNESS:  Yes.  In the first
11  meeting we had in December.
12       Q.   (BY MR. LAWLESS) The first meeting
13  where you were told you could keep a job with
14  the town if you resigned as Selectman and Fire
15  Chief?
16       A.   **Yes.**
17       Q.   It was made clear to you at that
18  meeting, though, that there were no
19  circumstances under which you were going to keep
20  your job as Fire Chief, correct?
21       MS. QUIGLEY:  Objection.  You can
22  go ahead and answer.
23       THE WITNESS:  Repeat the question,
24  please?

DAVIS & MITCHELL REPORTING
(413) 499-0035

ERNEST J. CARDILLO   1/15/19

49

1    Q.   (BY MR. LAWLESS)  As we've discussed,
2  the deal that was offered to you was to resign
3  as both Selectman and Fire Chief, correct?
4    A.   **Correct.**
5    Q.   So you weren't offered the deal,
6  resign as Selectman and then you can keep the
7  job as Fire Chief, correct?
8    A.   **Correct.**
9    Q.   And once you resigned -- strike that.
10        Once you turned down the offer
11  that was made to you for keeping your employment
12  with the town --
13        MS. QUIGLEY:  Objection.
14    Q.   (BY MR. LAWLESS) -- the Select Board
15  held a formal hearing, correct?
16        MS. QUIGLEY:  Objection.
17        MR. LAWLESS:  Let me strike that.
18  That's a bad question.
19        I don't know why I feel the need
20  to say it out loud every time.
21        MS. QUIGLEY:  Okay.  It's not that
22  bad.
23    Q.   (BY MR. LAWLESS)  After you turned
24  down the offer that was made to you in December

50

1  of 2018 that would have led to your continued
2  employment by the town, albeit in a different
3  position, the Select Board then held a series of
4  additional meetings and a hearing to discuss
5  your employment, correct?
6    A.   **I was never offered a said job.**
7    Q.   So you were never offered a particular
8  position, you were just offered continued
9  employment by the town.
10    A.   **That they would try to find me**
11  **continued employment.  I was never offered any**
12  **position to negotiate with.**
13    Q.   Well, you were provided with a draft
14  amendment to your employment contract, correct?
15  That's Exhibit 4.
16    A.   **Correct.**
17    Q.   And it will speak for itself, but it
18  clearly contemplates continued employment by the
19  town and it doesn't change your salary, correct?
20        MS. QUIGLEY:  Objection.  You can
21  go ahead and answer.
22        THE WITNESS:  We did not discuss
23  salary.
24    Q.   (BY MR. LAWLESS) You didn't discuss

51

1  it.  But you were provided with this document as
2  part of discussions regarding your future with
3  the town, right?
4    A.   **But also resign as Selectman.**
5    Q.   Right.  But, again, there was never --
6  you were never offered a deal where you would
7  resign as Selectman but keep your job as Fire
8  Chief.
9    A.   **Not as Fire Chief.**
10    Q.   Okay.  Paragraph forty-two of your
11  Complaint alleges that:  Defendant's actions
12  have caused a chilling effect on Plaintiff's
13  First Amendment rights; is that accurate?
14    A.   **Correct.**
15    Q.   Okay.  Defendants' actions chilled
16  your exercise of your First Amendment rights and
17  exercise of First Amendment protected activity.
18        MS. QUIGLEY:  Objection.  But you
19  can go ahead and answer.
20        THE WITNESS:  I'm not quite sure
21  how to answer that.
22    Q.   (BY MR. LAWLESS)  Well, are you still
23  a member of the Select Board of the Town of
24  Stockbridge?

52

1    A.   **Yes.**
2    Q.   Okay.  When were you first elected to
3  that position?
4    A.   **Four years ago.**
5    Q.   Okay.  And how long are the terms?
6    A.   **Three years.**
7    Q.   So four years ago you were elected to
8  a three-year term?
9    A.   **Correct.**
10    Q.   So you've been reelected recently?
11    A.   **Twice.**
12    Q.   You've been reelected twice?
13    A.   **Yes.**
14    Q.   Okay.  So what years were you
15  reelected in?
16    A.   **The first year, and then they made me**
17  **resign as Fire Chief and the Selectmen, due to**
18  **some protocol thing, and I had to get**
19  **reappointed as Fire Chief in thirty days or run**
20  **again.  So it was like six months, maybe, or a**
21  **year after.**
22    Q.   So you're referring to what was
23  determined to be an ethics law requirement, --
24    A.   **Yes.**

ERNEST J. CARDILLO   1/15/19

53

1   Q.   -- that you resign from the Select
2   Board and then receive town meeting approval to
3   be both a Fire Chief and a Select Board member,
4   and then you could rerun.  And you did rerun,
5   right?
6   A.   **Correct.**
7   Q.   Okay.  And at any time did either
8   Mr. Chabon or Mr. Flynn try and stop you from
9   doing that?  Did they try and stop you from
10   holding the dual position in some way?
11          MS. QUIGLEY:  Objection.  But you
12   can go ahead and answer.
13          THE WITNESS:  Mr. Flynn in public
14   documents and at town meetings really opposed
15   any town employee being the town Selectman.
16   Q.   (BY MR. LAWLESS) So he didn't think it
17   was a good idea for a town employee to be a
18   Select Board member, correct?
19   A.   **Before he was Selectman.**
20   Q.   So before he was a Selectman, that was
21   a view he espoused?
22   A.   **Strongly had, yes.**
23   Q.   And when was he elected to the Select
24   Board?

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**

54

1   A.   **Two years ago.  He's on the end of his**
2   **third term, third year.**
3   Q.   Okay.  Other than publicly stating
4   that a town employee shouldn't be a Selectman --
5   well, strike that question.
6          Let's come back to paragraph
7   forty-two.  So there really hasn't been any
8   chilling effect on your exercise of your First
9   Amendment rights as a result of Defendants'
10   conduct, correct?
11          MS. QUIGLEY:  Objection.  You can
12   go ahead and answer.
13          THE WITNESS:  Chilling effects
14   meaning --
15   Q.   (BY MR. LAWLESS) Well, are you not
16   engaging in some conduct protected by the First
17   Amendment that you would have, but for the
18   Defendants' conduct?
19          MS. QUIGLEY:  Objection.  You can
20   go ahead and answer.
21          THE WITNESS:  I'm not sure.
22   Q.   (BY MS. QUIGLEY) Well, you're still a
23   Selectman, right?
24   A.   **Yes.  Because I didn't agree to their**

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**

55

1   **terms.**
2   Q.   Right.  But --
3   A.   **Is it affecting my job as Selectman,**
4   **are you saying?**
5   Q.   No.  I'm asking you, you know -- I
6   mean I don't like hypotheticals, but are you not
7   taking part in protests, are you not running for
8   higher office; is there something that you're
9   not doing as a result of Defendants' conduct?
10   A.   **At this point, no.  Because I have no**
11   **intention at this point to do any of that.**
12   Q.   Are you intending to run for
13   re-election at the end of your term?
14   A.   **I've got two years left and the**
15   **decision I'll make at that time.**
16   Q.   Okay.  And I ask you to look at
17   paragraph forty-five of your Complaint.  And do
18   you see that paragraph forty-five alleges that
19   Mr. Chabon and Mr. Flynn violated your right to
20   free speech?
21   A.   **I see that, yes.**
22   Q.   Okay.  And what facts do you rely on
23   for the allegation that they violated your right
24   to free speech?

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**

56

1          MS. QUIGLEY:  Objection.  But you
2   can go ahead and answer.
3          THE WITNESS:  I believe, and I
4   couldn't talk about this case, you know, at all,
5   what they did, I believe.  I'm not quite sure
6   what the answer is to that at this point.
7   Q.   (BY MR. LAWLESS) I'm not sure I
8   understand your answer.  What did they do that
9   violated your right to free speech?
10          MS. QUIGLEY:  Objection.  You can
11   go ahead and answer.
12          THE WITNESS:  I'm not quite sure
13   how to answer that.
14   Q.   (BY MR. LAWLESS) Okay.  What did
15   Mr. Chabon and Mr. Flynn do to violate your
16   equal protection rights?
17   A.   **That they, you know, forced me to**
18   **resign as Selectman.**
19   Q.   Okay.  Were there other people in
20   similar circumstances who weren't asked to
21   resign as Selectman?
22   A.   **Not that I know of.  I'm not privy to**
23   **that information.**
24   Q.   So really the fact that you were asked

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**

ERNEST J. CARDILLO   1/15/19

57

1  to resign from the Select Board forms the basis
2  for Counts I and II of your Complaint, correct?
3          MS. QUIGLEY:  Objection.  But you
4  can go ahead and answer.
5          THE WITNESS:  I believe so.
6      Q.   (BY MR. LAWLESS)  I'm going to ask you
7  to turn to page 10 of your Complaint.  Just take
8  a quick look at paragraph seventy.
9      A.   **Yes.**
10     Q.   Okay.  Paragraph seventy alleges:
11  Town breached its contract by firing Plaintiff
12  without cause.  Correct?
13     A.   **Correct.**
14     Q.   Okay.  Is there any other basis for
15  your claim of breach of contract, other than
16  that allegation?
17     A.   **I had progressive discipline in my**
18  **contract.**
19     Q.   Okay.  But does your breach of
20  contract claim arise solely from your
21  termination?
22          MS. QUIGLEY:  Objection.  But you
23  can go ahead and answer.
24          THE WITNESS:  Yes.
            DAVIS & MITCHELL REPORTING
                 (413) 499-0035

58

1          MR. LAWLESS:  Maybe we could take
2  a brief break.
3          (Break taken)
4          MR. LAWLESS:  I just have one or
5  two more questions for you.
6      Q.   (BY MR. LAWLESS)  Do you feel that you
7  were treated differently than any other town
8  employee?
9      A.   **Yes.**
10     Q.   Okay.  And who were those employees?
11     A.   **Chris Marsden, who is the facility**
12  **manager.**
13     Q.   Okay.  Anyone else?
14     A.   **Lenny Tisdale, who is the highway**
15  **superintendent.**
16     Q.   Anyone else?
17     A.   **Linden Searing, who is a town highway**
18  **employee.**
19     Q.   Could you spell that name for me?
20     A.   **S-E-A-R-I-N-G, I think.**
21     Q.   Okay.  In what way were you treated
22  differently than Chris Marsden?
23     A.   **He started as facility manager working**
24  **under his mother as town administrator, so that**
            DAVIS & MITCHELL REPORTING
                 (413) 499-0035

59

1  was kind of a rocky start.  **There was a project**
2  **that was done for security cameras, which was a**
3  **$20,000 project, and he did not get a**
4  **procurement, you know, three-vote prices, and at**
5  **the time the town procurement officer called the**
6  **vendor to split the bills.  I brought it to the**
7  **attention of Mr. Chabon and his comment was,**
8  **we're too busy, we're not going to deal with it.**
9      Q.   When did this happen?
10     A.   **This happened three, maybe four, years**
11  **ago.  And then recently he went out on workman's**
12  **comp for carpal tunnel surgery and he did not**
13  **secure any help to take care of the place.  And**
14  **we had a snowstorm and the town administrator**
15  **was doing the sidewalks and we asked to meet**
16  **with him.  And there was never a meeting set up**
17  **to discuss his not performing his job duties.**
18     Q.   So you weren't able to set up a
19  meeting with him while he was out on comp?
20     A.   **They would not allow a meeting with**
21  **him at all.**
22     Q.   Right.  While he was out on workman's
23  comp.
24     A.   **Even when he came back.**
            DAVIS & MITCHELL REPORTING
                 (413) 499-0035

60

1      Q.   When did he go out?
2      A.   **It was that last real major snowstorm**
3  **we had.**
4      Q.   So 2019, 2020?
5      A.   **Yes.  It was just right around --**
6  **before Christmas or somewhere around there.**
7      Q.   Okay.  Were you the person who picked
8  up on the fact that -- well, strike that.
9          Were you aware, when he purchased
10  the security cameras, that he was required to
11  get three prices for an expenditure over
12  $10,000?
13     A.   **Was I aware of that?**
14     Q.   Yeah.
15     A.   **When I looked at the bills and stuff**
16  **and seen the bills, it was almost like**
17  **$19,000-something.**
18     Q.   Okay.  And you were aware that it was
19  necessary to get three quotes for --
20     A.   **For the procurement of $10,000 or more**
21  **for a certain project, yes.**
22     Q.   And you were aware that it was
23  inappropriate to split bills to avoid that
24  requirement, correct?
            DAVIS & MITCHELL REPORTING
                 (413) 499-0035

ERNEST J. CARDILLO   1/15/19

61

1           MS. QUIGLEY:  Objection.  But you
2    can go ahead and answer it.
3           THE WITNESS:  Yes.
4       Q.   (BY MR. LAWLESS)  And in what way are
5    you similarly situated to Lenny Tisdale?
6       A.   **He did some policy violations with**
7    **hiring and stuff.  And we did have an issue with**
8    **the last snowstorm, with the sidewalks and**
9    **stuff, and we had fifteen/twenty e-mail**
10   **complaints.  And me and the third Selectman,**
11   **Roxanne, scheduled two meetings to meet with**
12   **him, and Terry Flynn canceled both, said there**
13   **was never an issue, which was a major issue that**
14   **we just wanted to get straightened out.  So that**
15   **there's policies that should be addressed but**
16   **were not addressed.**
17      Q.   So the policies you're talking about
18   are hiring policies?
19      A.   **Town policies.**
20      Q.   But they're town policies around
21   hiring?
22      A.   **Yes, sir.  Yes, there are.  Protocol**
23   **on how to do it and stuff.**
24      Q.   Okay.

DAVIS & MITCHELL REPORTING
(413) 499-0035

62

1       A.   **And --**
2       Q.   Sorry, continue.
3       A.   **I'm done.**
4       Q.   Okay.  And in terms of the sidewalk,
5    you referenced sidewalks, was it just that the
6    sidewalks weren't cleared?
7       A.   **It was the first time in forever that**
8    **the sidewalks were never cleared for three days**
9    **after the storm.  And we had multiple, multiple,**
10   **multiple complaints.  And all I wanted to do is**
11   **address the issue and straighten it out.  But it**
12   **was never brought forward.**
13      Q.   Okay.  And how are you similarly
14   situated to Linden Searing?
15      A.   **He is a member of the town highway and**
16   **he's been basically accused of taking town**
17   **property.  And we do have some information of**
18   **that in writing.  And any time you want to bring**
19   **that up to address that, that's always been shot**
20   **down.**
21      Q.   Who shot that down?
22      A.   **The Selectmen.  Terry Flynn.**
23      Q.   And what's Mr. Searing's title?
24      A.   **I believe he's just the head mechanic**

DAVIS & MITCHELL REPORTING
(413) 499-0035

63

1    of the highway department.
2       Q.   So he doesn't -- he's not in charge of
3    the highway department?
4       A.   **No.  But it's just town policy on town**
5    **things.**
6       Q.   What was he accused of taking?
7       A.   **He took some parts off a pickup truck**
8    **that was being reconditioned.  We had a chipper**
9    **that went out to bid, you know, went out to**
10   **surplus.  It sat there a couple years, because**
11   **it was buried in stuff, and then we finally got**
12   **it out.  And, actually, the highway**
13   **superintendent gave it to him, so it was both of**
14   **them.  And then when the person wanted to**
15   **reclaim it, it was a major issue, that, again,**
16   **wasn't really -- it's still being kind of swept**
17   **under the rug and never finalized.**
18      Q.   Well, who is the person who wanted to
19   reclaim it?
20      A.   **A gentleman in West Stockbridge, I**
21   **can't recall his name at this point.**
22      Q.   So the town put a chipper out to bid
23   as surplus, correct?
24      A.   **Yes.**

DAVIS & MITCHELL REPORTING
(413) 499-0035

64

1       Q.   And a gentleman in West Stockbridge
2    purchased it from the town, correct?
3       A.   **Yes.**
4       Q.   And when he went to go collect the
5    chipper it wasn't available?
6       A.   **It wasn't available, it was buried**
7    **behind the garage.  I mean really, it was really**
8    **buried.  So they took it out.  And just time**
9    **elapsed, and elapsed, and elapsed.  And when we**
10   **finally got it out, instead of notifying him**
11   **they just -- Lenny gave it to --**
12      Q.   So when they finally got it out, what
13   happened?
14      A.   **Lenny gave that chipper to Linden**
15   **Searing.  And then he parted a lot of it out.**
16   **So when the guy wanted it back, he put different**
17   **parts on it and sent it back down.**
18      Q.   So did they dig it out after the
19   gentleman had already purchased it?
20      A.   **It was quite a while after, but it was**
21   **the highway's -- it wasn't the gentleman's**
22   **issue, it was the highway's issue of getting it**
23   **out.**
24      Q.   So the gentleman purchased it, they

DAVIS & MITCHELL REPORTING
(413) 499-0035

ERNEST J. CARDILLO   1/15/19

65

1  took a long time digging it out of a pile of
2  other material, --
3      A.   Yeah.
4      Q.   -- and then instead of giving it to
5  him, it was given to Linden Searing?
6      A.   Yes.
7      Q.   Okay.  And who made the decision to
8  give it to Linden Searing?
9      A.   I believe it was Lenny Tisdale, the
10 highway superintendent.
11     Q.   Okay.  And to your knowledge has there
12 been any police investigation of these
13 allegations?
14     A.   I know there is a police report of the
15 truck parts.
16     Q.   Okay.  Has Mr. Searing been charged
17 with any crimes?
18     A.   No.
19     Q.   And it's your allegation that -- is it
20 your allegation that there hasn't been any
21 investigation of these allegations?
22     A.   There was a minor investigation of the
23 truck parts but there was no discipline or no
24 action taken.  And it wasn't finalized.  It just

DAVIS & MITCHELL REPORTING
(413) 499-0035

66

1  kind of stopped.
2      Q.   Okay.  Did you undertake that
3  investigation?
4      A.   I did not.  It might have been before
5  my time.  I was involved by talking to the
6  person who bought it and stuff, and kind of
7  being the middleman.  And then Terry took it
8  over at that point.
9      Q.   Okay.  So these allegations regarding
10 the truck parts and the chipper, when did that
11 conduct occur?
12     A.   I'm not sure about the truck parts, it
13 wasn't that long ago.  That was brought up at a
14 meeting when they were talking about trying to
15 get a foreman for the highway department.  He
16 was a candidate, and so that came up.  You know,
17 that it was there, out there.  But it wasn't
18 resolved yet.  But as far as him being a
19 foreman, that stuff coming up, that was an
20 issue.
21     Q.   So it was raised recently?
22     A.   It was raised recently, too, again.
23     Q.   Okay.  But when did it happen?
24     A.   Off the top of my head, I'm guessing

DAVIS & MITCHELL REPORTING
(413) 499-0035

67

1  two to three years ago.
2      Q.   And that's the truck parts which were
3  two or three years ago?
4      A.   Yes.
5      Q.   And how about the chipper?
6      A.   That was an ongoing process.  Probably
7  about five years.
8      Q.   Five years ago?
9      A.   I'm guessing.  Yeah, roughly.  Three,
10 four, five years.
11     Q.   Okay.  And what's the basis for your
12 information that Mr. Searing took some parts off
13 a town pickup truck?
14     A.   It's in writing through the police
15 report and documentation.
16     Q.   So you've read a police report that
17 contains allegations --
18     A.   It was verbally sent to us, plus it
19 was in writing.
20     Q.   Who sent it to you verbally?
21     A.   It was just highway, from the highway
22 guys talking, saying that this is what happened.
23     Q.   Okay.  And you received that
24 information in your role as a Selectman?

DAVIS & MITCHELL REPORTING
(413) 499-0035

68

1      A.   I received it when it came up to the
2  meeting, that it was in writing and there, yes.
3      Q.   That the meeting you're referring to
4  is the Selectman's meeting?
5      A.   Yes.
6      Q.   And you're not satisfied with the
7  action that was taken by the Select Board with
8  regard to those allegations, correct?
9      A.   There was no action taken.
10     Q.   Okay.
11     A.   Or even discussed to take action.
12     Q.   And with the chipper, what's the basis
13 of your information regarding the chipper?
14     A.   The information is that it was
15 well-known that it was sold and that you can't
16 give town property away, it's got to go through
17 the auction and stuff.  You can't just give
18 anybody town equipment, no matter what.
19     Q.   So you're familiar with the process
20 for disposing of excess property?
21     A.   Yes.
22     Q.   Surplus property, I should say.
23     A.   Surplus property.
24     Q.   Okay.  And you were aware that this

DAVIS & MITCHELL REPORTING
(413) 499-0035

69

1  gentleman in West Stockbridge had purchased the
2  chipper through the appropriate process?
3     A.   **Yes.**
4     Q.   And how were you aware of that?
5     A.   **It was all documented with the town**
6  **accountant and everything.**
7     Q.   And did the gentleman wind up with the
8  chipper?
9     A.   **Not at this point.**
10     Q.   He still doesn't have the chipper?
11     A.   **Still doesn't have it.**
12     Q.   Has his money been returned to him?
13     A.   **I'm not sure where it is at this**
14  **point.**
15     Q.   Okay.  All right.  So this is an issue
16  that arose five years ago but is ongoing?
17     A.   **It's just been kind of -- it's just a**
18  **leave-it-alone type of thing.**
19     Q.   So it's an issue that arose about five
20  years ago but it hasn't been addressed to your
21  satisfaction?
22     A.   **It hasn't been really addressed and**
23  **come to a conclusion.**
24     Q.   All right.  Are there any other

DAVIS & MITCHELL REPORTING
(413) 499-0035

70

1  employees that you allege are similarly situated
2  to you?
3     A.   **Not that I can recall at this point.**
4     Q.   All right.  And other than what we've
5  discussed here today, is there any other basis
6  for your claim of First Amendment retaliation in
7  this case?
8        MS. QUIGLEY:  Objection.  But you
9  can go ahead and answer.
10        THE WITNESS:  Not at this point.
11        MR. LAWLESS:  Okay.  I have no
12  further questions.
13        THE WITNESS:  Thank you.
14        MS. QUIGLEY:  So we will get you
15  the W-2s or 1099s from the first response for
16  2019 and any unemployment correspondence that my
17  client tendered to unemployment to deal with the
18  unpaid issues.
19        MR. LAWLESS:  Right.
20
21     (Deposition concluded at 12:11 PM)
22
23
24

DAVIS & MITCHELL REPORTING
(413) 499-0035

71

1  COMMONWEALTH OF MASSACHUSETTS
  COUNTY OF BERKSHIRE
2
3      I, Heather J. Davis, a Registered
Merit Reporter and Notary Public in and for the
4  State of Massachusetts do certify that the
foregoing deposition was taken before me on
5  January 15, 2020;
    That the witness named in the
6  deposition provided satisfactory evidence of
identification as prescribed by Executive Order
7  455 (03-13) issued by the Governor of the
Commonwealth of Massachusetts before being sworn
8  by me;
    That said deposition was taken
9  before me at the time and place therein set
forth and was taken down by me in shorthand and
10  thereafter transcribed into typewriting under my
direction and supervision;
11      That said deposition is a true
record of the testimony given by the witness and
12  of all objections made at the time of the
examination.
13      I further certify that I am
14  neither counsel for nor related to any party to
said action, nor in any way interested in the
15  outcome thereof.
16      IN WITNESS WHEREOF, I have
subscribed my name and affixed my seal this 27th
17  day of January 2020.
18
19        Heather J. Davis
      Registered Merit Reporter
20
21  My Commission expires:
  April 19, 2024
22  PLEASE NOTE:
23      THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY
24  REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
  CERTIFYING REPORTER

DAVIS & MITCHELL REPORTING
(413) 499-0035

72

1      SIGNATURE PAGE - ERRATA SHEET
2      (To be signed by deponent and returned
to counsel within thirty (30) days.
3
4      I, the undersigned, **ERNEST J.**
5  **CARDILLO, JR.,** do hereby certify that I have
read the foregoing transcript of my testimony
6  given in the matter of CARDILLO V. TOWN OF
STOCKBRIDGE, ET AL, and that to the best of my
7  knowledge said transcript is true and accurate
(with the exception of the following corrections
8  listed below:)
9  PAGE   LINE    CORRECTION
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  DEPONENT'S
  SIGNATURE_____DATE
24

DAVIS & MITCHELL REPORTING
(413) 499-0035

ERNEST J. CARDILLO   1/15/19

73

```
 1              * * * * * * * * * *

 2          INSTRUCTIONS TO DEPONENT

 3              * * * * * * * * * *

 4
            After reading this volume of your
 5  deposition, indicate any corrections or changes
    to your testimony and the reasons therefor on
 6  the Errata Sheet supplied to you and sign it.

 7          DO NOT MAKE MARKS OR NOTATIONS ON THE
            TRANSCRIPT VOLUME ITSELF:
 8
                * * * * * * * * *
 9
            ERRATA SHEET HANDLING/DISTRIBUTION
10
                * * * * * * * * *
11
            The original of the errata sheet has been
12  delivered to Elizabeth Quigley, Esquire.  When
    the Errata Sheet has been completed by the
13  deponent and signed, please provide it to David
    Lawless, Esquire, to whom the original
14  deposition transcript was delivered.

15
                * * * * * * * * *
16

17

18

19

20

21  ATTORNEY LAWLESS:
    PLEASE REPLACE THIS PAGE OF THE TRANSCRIPT WITH
22  THE COMPLETED AND SIGNED ERRATA SHEET WHEN YOU
    RECEIVE IT.
```

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**

**$**

**$10,000** [1] - 60:12, 60:20
**$130** [1] - 9:6
**$18** [1] - 12:19
**$20,000** [1] - 59:3
**$25** [1] - 7:9
**$300** [1] - 17:7
**$700** [5] - 14:2, 14:5, 14:6, 14:7, 14:19

**0**

**01115** [1] - 2:5
**01201** [1] - 2:2
**01202** [1] - 1:24
**03-13** [2] - 4:5, 71:6

**1**

**1** [2] - 3:7, 4:7
**1-73** [1] - 1:4
**10** [1] - 57:7
**1099s** [1] - 70:15
**10:51** [1] - 1:15
**11/27/18** [1] - 3:11
**12:11** [1] - 70:21
**1367** [1] - 1:23
**15** [2] - 1:14, 71:4
**1500** [1] - 2:4
**1600** [1] - 2:5
**19** [1] - 71:21
**19,000-something** [1] - 60:17

**2**

**2** [5] - 3:8, 24:12, 24:16, 26:14, 47:19
**2012** [2] - 41:12, 42:14
**2018** [11] - 29:18, 32:7, 32:11, 32:15, 34:23, 40:3, 40:20, 44:5, 44:21, 48:7, 50:1
**2019** [18] - 7:3, 11:23, 12:11, 13:8, 13:11, 13:17, 13:20, 14:9, 16:12, 17:5, 18:16, 21:3, 21:4, 22:22, 23:2, 47:8, 60:4, 70:16
**2020** [4] - 1:15, 60:4, 71:4, 71:17
**2024** [1] - 71:21

**24** [1] - 3:8
**27** [2] - 1:14, 2:2
**27th** [1] - 71:16

**3**

**3** [5] - 3:9, 35:7, 35:11, 37:13, 37:17
**30** [1] - 72:2
**34** [1] - 17:9
**35** [2] - 3:9, 3:10
**3:19-cv-10695-KAR** [1] - 1:3

**4**

**4** [16] - 3:4, 3:7, 3:10, 35:7, 35:18, 35:20, 35:23, 36:2, 36:6, 37:2, 37:4, 37:12, 37:21, 38:21, 39:5, 50:15
**401K** [1] - 16:19
**413** [1] - 1:24
**455** [2] - 4:4, 71:6
**46** [1] - 3:11
**499-0035** [1] - 1:24

**5**

**5** [10] - 3:11, 13:15, 13:17, 39:16, 46:14, 46:18, 46:22, 46:24, 47:2, 47:8

**6**

**6** [5] - 26:13, 29:18, 32:7, 32:11, 32:15

**7**

**7A** [1] - 6:11

**A**

**able** [1] - 59:18
**accept** [2] - 39:4, 39:11
**accepted** [5] - 37:4, 38:4, 38:12, 38:20, 40:14
**according** [1] - 43:1
**account** [2] - 16:16, 16:17
**accountant** [4] -

45:6, 45:8, 45:12, 69:6
**accurate** [4] - 41:2, 43:12, 51:13, 72:6
**accused** [2] - 62:16, 63:6
**act** [1] - 17:10
**Action** [1] - 1:3
**action** [6] - 47:22, 65:24, 68:7, 68:9, 68:11, 71:14
**actions** [3] - 33:22, 51:11, 51:15
**activities** [4] - 28:20, 28:21, 29:3
**activity** [1] - 51:17
**additional** [2] - 43:16, 50:4
**address** [4] - 6:10, 6:13, 62:11, 62:19
**addressed** [4] - 61:15, 61:16, 69:20, 69:22
**administrative** [1] - 11:12
**administrator** [4] - 30:20, 45:3, 58:24, 59:14
**adverse** [2] - 47:22, 48:3
**advertised** [1] - 30:1
**affecting** [1] - 55:3
**affiliation** [3] - 26:20, 26:23, 27:1
**affixed** [1] - 71:16
**afternoon** [1] - 4:12
**ago** [1] - 22:19, 52:4, 52:7, 54:1, 59:11, 66:13, 67:1, 67:3, 67:8, 69:16, 69:20
**agree** [1] - 54:24
**agreed** [4] - 5:11, 5:16, 5:21, 6:1
**agreement** [1] - 31:23
**ahead** [34] - 27:13, 28:4, 29:11, 30:12, 30:17, 35:15, 36:10, 36:21, 37:8, 37:14, 38:1, 38:7, 38:15, 38:24, 41:4, 44:1, 44:12, 45:1, 45:14, 46:3, 47:13, 48:9, 48:22, 50:21, 51:19, 53:12, 54:12, 54:20, 56:2, 56:11, 57:4, 57:23, 61:2, 70:9
**AL** [1] - 72:6
**albeit** [1] - 50:2

**alimony** [1] - 17:2
**allegation** [5] - 28:10, 55:23, 57:16, 65:19, 65:20
**allegations** [5] - 65:13, 65:21, 66:9, 67:17, 68:8
**allege** [5] - 26:17, 27:16, 27:22, 29:7, 70:1
**alleges** [3] - 51:11, 55:18, 57:10
**allow** [1] - 59:20
**almost** [1] - 60:16
**alone** [1] - 69:18
**AM** [1] - 1:15
**Amendment** [13] - 3:10, 27:7, 27:10, 28:19, 28:21, 29:3, 47:24, 51:13, 51:16, 51:17, 54:9, 54:17, 70:6
**amendment** [4] - 34:15, 34:24, 37:13, 50:14
**amount** [2] - 43:3, 43:5
**AND** [1] - 73:22
**AND/OR** [1] - 71:24
**answer** [42] - 8:7, 20:21, 25:6, 25:8, 25:13, 27:13, 28:4, 29:11, 30:12, 35:15, 36:10, 36:22, 37:8, 37:15, 38:1, 38:8, 38:16, 38:24, 41:4, 44:1, 44:13, 45:1, 45:15, 46:3, 47:13, 48:9, 48:22, 50:21, 51:19, 51:21, 53:12, 54:12, 54:20, 56:2, 56:6, 56:8, 56:11, 56:13, 57:4, 57:23, 61:2, 70:9
**answers** [1] - 5:18
**ANY** [2] - 71:23, 71:23
**apologize** [1] - 22:20
**appeal** [1] - 14:12
**appealed** [3] - 14:1, 14:11, 14:13
**APPEARANCES** [2] - 1:16, 2:1
**applicable** [1] - 1:13
**application** [7] - 14:14, 19:9, 19:13, 19:17, 20:15, 20:17, 22:9
**applications** [3] - 20:24, 21:4, 22:22

**applied** [5] - 14:1, 18:17, 20:4, 20:5, 20:9
**apply** [3] - 18:24, 19:2, 19:7
**APPLY** [1] - 71:23
**appropriate** [1] - 69:2
**approval** [1] - 53:2
**April** [1] - 71:21
**arise** [1] - 57:20
**arose** [2] - 69:16, 69:19
**as-needed** [1] - 12:1
**assert** [1] - 43:14
**Assistance** [2] - 15:19, 15:23
**assistance** [1] - 13:24
**assistant** [3] - 9:12, 9:17, 24:1
**assistants** [2] - 11:11, 11:14
**assume** [2] - 8:7, 23:18
**attention** [5] - 28:15, 44:22, 45:3, 47:18, 59:7
**attorney** [3] - 13:2, 25:12, 36:1
**ATTORNEY** [1] - 73:21
**attorney-client** [1] - 25:12
**attributable** [1] - 9:2
**auction** [1] - 68:17
**available** [2] - 64:5, 64:6
**Avenue** [1] - 1:14, 2:2
**average** [2] - 23:14, 23:16
**averaging** [1] - 23:9
**avoid** [1] - 60:23
**aware** [7] - 31:7, 60:9, 60:13, 60:18, 60:22, 68:24, 69:4

**B**

**backpay** [1] - 14:20
**bad** [5] - 8:13, 18:23, 44:18, 49:18, 49:22
**based** [1] - 43:4
**basis** [8] - 12:1, 27:6, 27:9, 57:1, 57:14, 67:11, 68:12, 70:5
**become** [1] - 6:24
**becoming** [1] - 10:2

Bee [2] - 22:1, 22:12
beginning [1] - 14:15
behalf [1] - 43:18
behind [1] - 64:7
below [1] - 72:7
benefits [8] - 7:12, 7:13, 14:14, 14:15, 14:19, 16:5, 38:5, 38:13
BERKSHIRE [1] - 71:1
Berkshire [1] - 1:2
best [1] - 72:6
between [7] - 5:11, 5:16, 6:1, 16:12, 21:3, 22:22, 23:2
bid [2] - 63:9, 63:22
bills [4] - 59:6, 60:15, 60:16, 60:23
Blue [2] - 7:18, 9:1
BOARD [1] - 1:8
board [1] - 30:14
Board [27] - 27:3, 27:5, 28:8, 28:12, 28:24, 29:7, 29:17, 29:20, 32:10, 32:18, 33:3, 34:1, 44:10, 44:23, 45:8, 45:20, 47:6, 47:9, 49:14, 50:3, 51:23, 53:2, 53:3, 53:18, 53:24, 57:1, 68:7
bottom [2] - 14:22, 15:1
bought [3] - 41:5, 42:15, 66:6
Box [1] - 1:23
breach [2] - 57:15, 57:19
breached [1] - 57:11
break [2] - 8:19, 58:2
Break [1] - 58:3
brief [1] - 58:2
bring [1] - 62:18
brings [1] - 24:22
brokerage [1] - 16:16
brought [7] - 4:15, 24:19, 40:19, 44:4, 59:6, 62:12, 66:13
building [1] - 21:12
buried [3] - 63:11, 64:6, 64:8
business [4] - 11:20, 11:21, 18:2, 21:19
businesses [1] - 16:23
busy [1] - 59:8
Busy [2] - 21:24, 22:12

**C**

cameras [2] - 59:2, 60:10
canceled [1] - 61:12
candidate [1] - 66:16
Capacity [1] - 1:9
Cardillo [5] - 4:12, 6:9, 24:14, 25:16, 26:2
CARDILLO [6] - 1:5, 1:12, 3:4, 4:1, 72:4, 72:5
Cardino [1] - 17:21
care [2] - 17:7, 59:13
caretaker [2] - 17:10, 17:11
carpal [1] - 59:12
case [7] - 9:24, 10:2, 27:7, 27:11, 29:4, 56:4, 70:7
caused [1] - 51:12
certain [2] - 43:5, 60:21
CERTIFICATION [1] - 71:22
certify [3] - 71:3, 71:13, 72:4
CERTIFYING [1] - 71:24
CHABON [1] - 1:8
Chabon [7] - 30:14, 30:22, 32:6, 53:8, 55:19, 56:15, 59:7
chairman [1] - 30:14
chance [2] - 28:16, 46:22
change [1] - 50:19
changed [4] - 37:22, 38:6, 38:14, 38:22
changes [1] - 73:5

charge [3] - 43:3, 43:16, 63:2
charged [1] - 65:16
charging [1] - 42:6
Chief [25] - 3:9, 27:23, 29:9, 29:14, 31:23, 32:2, 33:3, 33:11, 34:2, 34:5, 34:20, 35:12, 36:18, 39:14, 40:9, 44:9, 48:15, 48:20, 49:3, 49:7, 51:8, 51:9, 52:17, 52:19, 53:3
child [1] - 17:2
chilled [1] - 51:15
chilling [3] - 51:12, 54:8, 54:13
chipper [11] - 63:8, 63:22, 64:5, 64:14, 66:10, 67:5, 68:12, 68:13, 69:2, 69:8, 69:10
Chris [2] - 58:11, 58:22
Christmas [1] - 60:6
circumstance [1] - 44:4
circumstances [2] - 48:19, 56:20
Civil [2] - 1:3, 1:13
claim [5] - 27:6, 27:10, 57:15, 57:20, 70:6
classes [1] - 10:11
cleaning [1] - 24:3
cleanup [1] - 24:6
clear [3] - 28:21, 34:4, 48:17
cleared [2] - 62:6, 62:8
clearly [1] - 50:18
client [2] - 25:12, 70:17
clogged [1] - 24:3
collect [2] - 13:23, 64:4
collected [3] - 14:2, 14:7, 14:19
coming [1] - 66:19
commencing [1] - 1:15
comment [1] - 59:7
Commission [1] - 71:20
COMMONWEALTH [2] - 1:1, 71:1
Commonwealth [1] - 71:7
communications [1] - 15:3

comp [3] - 59:12, 59:19, 59:23
companies [2] - 41:6, 41:8
company [1] - 21:20
Complaint [9] - 3:8, 24:21, 25:1, 25:8, 48:5, 51:11, 55:17, 57:2, 57:7
complaints [2] - 61:10, 62:10
completed [1] - 73:12
COMPLETED [1] - 73:22
comprised [1] - 28:22
concluded [1] - 70:21
conclusion [1] - 69:23
conduct [5] - 54:10, 54:16, 54:18, 55:9, 66:11
confirm [1] - 42:10
construction [1] - 12:6
contact [1] - 42:17
contacted [1] - 42:14
contains [1] - 67:17
contemplates [1] - 50:18
continue [3] - 9:13, 10:4, 62:2
continued [5] - 43:7, 50:1, 50:8, 50:11, 50:18
continuing [1] - 44:10
Contract [1] - 3:9
contract [13] - 3:10, 34:16, 34:21, 34:22, 35:1, 35:10, 35:12, 37:18, 50:14, 57:11, 57:15, 57:18, 57:20
contractor [2] - 12:14, 12:17, 17:15
CONTROL [1] - 71:24
conversations [2] - 10:20, 15:12
correct [53] - 16:2, 22:23, 23:19, 27:18, 28:2, 28:8, 28:24, 29:1, 29:4, 29:5, 35:10, 36:18, 37:6, 37:13, 37:19, 37:23, 39:14, 40:5, 40:6, 40:10, 40:11, 40:15, 40:16, 41:1, 42:16,

43:23, 44:5, 44:11, 44:23, 46:1, 47:11, 48:20, 49:3, 49:4, 49:7, 49:8, 49:15, 50:5, 50:14, 50:16, 50:19, 51:14, 52:9, 53:6, 53:18, 54:10, 57:2, 57:12, 57:13, 60:24, 63:23, 64:2, 68:8
CORRECTION [1] - 72:8
corrections [2] - 72:7, 73:5
correctly [1] - 48:1
correspondence [3] - 16:4, 16:9, 70:16
counsel [4] - 47:6, 47:9, 71:14, 72:2
Counts [1] - 57:2
COUNTY [1] - 71:1
couple [2] - 46:10, 63:10
court [1] - 15:14
Court [2] - 1:2, 1:2
crimes [1] - 65:17
criminal [5] - 33:8, 33:16, 33:17, 33:19, 33:22
CROSS [1] - 3:2
Cross/Blue [2] - 7:18, 9:1
crossed [1] - 30:15
current [1] - 6:10

**D**

date [8] - 10:8, 12:10, 13:15, 13:16, 14:15, 22:23, 32:13, 32:16
dated [1] - 3:11
daughter [1] - 22:2
David [2] - 4:12, 73:13
DAVID [1] - 2:6
Davis [4] - 1:12, 1:19, 71:2, 71:19
DAVIS [1] - 1:23
days [3] - 52:19, 62:8, 72:2
deal [6] - 34:11, 49:2, 49:5, 51:6, 59:8, 70:17
dealing [1] - 25:10
December [11] - 29:17, 32:7, 32:11, 32:14, 40:3, 40:20, 44:5, 45:24, 48:7,

48:11, 49:24
**decision** [2] - 55:15, 65:7
**Defendant's** [1] - 51:11
**Defendants** [2] - 2:5, 4:14
**Defendants'** [4] - 51:15, 54:9, 54:18, 55:9
**delivered** [2] - 73:12, 73:14
**Democrat** [1] - 27:19
**denial** [1] - 14:14
**denied** [2] - 14:1, 14:10
**department** [8] - 34:11, 34:12, 39:16, 40:23, 41:1, 63:1, 63:3, 66:15
**Department** [7] - 1:2, 15:19, 15:23, 19:10, 19:14, 19:21, 20:1
**departments** [4] - 19:3, 19:6, 20:6, 20:9
**Deponent** [1] - 4:1
**deponent** [3] - 5:21, 72:7, 73:13
**DEPONENT** [1] - 73:2
**DEPONENT'S** [1] - 72:23
**deposes** [1] - 4:6
**DEPOSITION** [1] - 1:11
**deposition** [16] - 4:16, 4:18, 5:23, 6:3, 25:4, 25:10, 25:18, 26:4, 26:10, 71:4, 71:5, 71:8, 71:11, 73:5, 73:14
**Deposition** [3] - 3:7, 4:22, 70:21
**derived** [2] - 12:17, 47:24
**described** [1] - 43:21
**DESCRIPTION** [1] - 3:5
**detailed** [1] - 46:17
**determined** [1] - 52:23
**different** [2] - 50:2, 64:16
**differential** [1] - 23:20
**differently** [1] - 58:7, 58:22
**dig** [1] - 64:18
**digging** [3] - 12:6, 18:6, 65:1

**DIRECT** [3] - 3:2, 4:10, 71:24
**direct** [1] - 24:8
**direction** [1] - 71:10
**DIRECTION** [1] - 71:24
**discipline** [2] - 57:17, 65:23
**discovery** [2] - 13:4, 16:8
**discuss** [5] - 45:24, 50:4, 50:22, 50:24, 59:17
**discussed** [10] - 16:13, 22:16, 26:7, 34:9, 38:10, 38:18, 39:2, 49:1, 68:11, 70:5
**discussion** [3] - 25:24, 36:13, 39:21
**discussions** [1] - 51:2
**disposing** [1] - 68:20
**dispute** [2] - 47:10, 47:16
**DO** [1] - 73:7
**Document** [3] - 3:11
**document** [5] - 24:16, 46:21, 47:10, 47:16, 51:1
**documentation** [2] - 47:3, 67:15
**documented** [1] - 69:5
**documents** [2] - 12:22, 53:14
**DOES** [1] - 71:23
**Don** [1] - 30:13
**DONALD** [1] - 1:8
**done** [3] - 10:18, 59:2, 62:3
**DONOVAN** [1] - 2:4
**down** [6] - 15:15, 40:17, 49:10, 49:24, 62:20, 62:21, 64:17, 71:9
**draft** [3] - 34:15, 34:24, 50:13
**drainage** [1] - 24:3
**draw** [1] - 28:14
**driver's** [1] - 4:5
**DUA** [3] - 15:22, 16:1, 16:5
**dual** [1] - 53:10
**due** [2] - 26:19, 52:17
**during** [1] - 27:1
**duties** [1] - 59:17

**E**

**e-mail** [1] - 61:9
**early** [1] - 45:24
**East** [1] - 6:11
**effect** [2] - 51:12, 54:8
**effects** [1] - 54:13
**efforts** [1] - 16:5
**eight** [3] - 11:2, 11:8, 26:15
**either** [1] - 53:7
**elapsed** [3] - 64:9
**elected** [2] - 52:2, 52:7, 53:23
**election** [1] - 55:13
**Elizabeth** [2] - 1:14, 73:12
**ELIZABETH** [2] - 2:2, 2:3
**employed** [5] - 6:18, 6:20, 11:22, 13:13, 27:2
**employee** [7] - 9:19, 10:2, 53:15, 53:17, 54:4, 58:8, 58:18
**employees** [6] - 10:24, 11:8, 11:12, 15:18, 58:10, 70:1
**employer** [1] - 10:21
**employment** [29] - 6:22, 7:1, 9:7, 13:7, 13:12, 20:24, 27:16, 29:9, 31:21, 33:1, 33:12, 34:15, 34:21, 36:8, 36:16, 37:18, 39:12, 40:5, 40:13, 44:11, 47:22, 48:4, 49:11, 50:2, 50:5, 50:9, 50:11, 50:14, 50:18
**end** [6] - 15:12, 36:12, 39:7, 54:1, 55:13
**ends** [1] - 10:18
**engage** [1] - 10:11
**engaging** [1] - 54:16
**equal** [1] - 56:16
**equipment** [1] - 68:18
**Ernest** [1] - 6:9
**ERNEST** [5] - 1:5, 1:11, 3:4, 4:1, 72:4
**ERRATA** [2] - 72:1, 73:9, 73:22
**Errata** [2] - 73:6, 73:12
**errata** [1] - 73:11
**espoused** [1] - 53:21

**ESQUIRE** [2] - 2:3, 2:6
**Esquire** [2] - 73:12, 73:13
**essentially** [2] - 36:15, 43:11
**ET** [1] - 72:6
**ethics** [1] - 52:23
**eventually** [1] - 15:2
**evidence** [2] - 4:3, 71:5
**ex** [3] - 7:16, 8:24, 17:2
**ex-wife** [3] - 7:16, 8:24, 17:2
**exact** [1] - 32:16
**examination** [1] - 71:12
**EXAMINATION** [1] - 4:10
**examples** [1] - 27:20
**excavation** [1] - 11:6
**except** [1] - 5:12
**exception** [1] - 72:7
**excess** [1] - 68:20
**executive** [2] - 29:21, 29:24
**Executive** [2] - 4:4, 71:6
**exercise** [2] - 51:16, 51:17, 54:8
**Exhibit** [31] - 3:7, 3:8, 3:9, 3:10, 3:11, 4:7, 24:12, 24:15, 26:14, 35:7, 35:11, 35:18, 35:20, 35:23, 36:2, 36:6, 37:2, 37:4, 37:12, 37:13, 37:17, 37:21, 38:21, 39:5, 46:14, 46:18, 46:22, 46:24, 47:2, 47:19, 50:15
**exhibit** [2] - 24:11, 46:13
**EXHIBITS** [1] - 3:5
**expenditure** [1] - 60:11
**expires** [1] - 71:20
**extensive** [1] - 42:11

**F**

**facility** [2] - 58:11, 58:23
**fact** [4] - 28:7, 28:23, 56:24, 60:8
**factor** [1] - 29:8
**facts** [2] - 29:6, 55:22

**familiar** [1] - 68:19
**familiarize** [1] - 46:21
**family** [1] - 11:20
**far** [2] - 40:17, 66:18
**fault** [1] - 8:12
**February** [9] - 13:15, 13:17, 14:9, 16:12, 21:3, 22:22, 23:2, 39:16, 47:8
**felt** [3] - 42:7, 42:9, 42:12
**field** [1] - 11:13
**fifteen/twenty** [1] - 61:9
**finalized** [2] - 63:17, 65:24
**finally** [2] - 63:11, 64:10, 64:12
**fine** [1] - 30:18
**finish** [2] - 7:23, 15:9
**finishes** [1] - 18:22
**fire** [7] - 18:13, 19:3, 19:6, 34:12, 39:15, 40:23, 41:1
**Fire** [28] - 3:9, 19:10, 19:13, 19:20, 19:24, 27:23, 29:9, 29:14, 31:23, 32:2, 33:3, 33:10, 34:2, 34:5, 34:20, 35:12, 36:18, 39:13, 40:9, 48:14, 48:20, 49:3, 49:7, 51:7, 51:9, 52:17, 52:19, 53:3
**firing** [1] - 57:11
**First** [20] - 11:24, 12:18, 12:22, 13:8, 17:15, 17:23, 18:11, 18:18, 27:6, 27:10, 28:19, 28:21, 29:2, 47:24, 51:13, 51:16, 51:17, 54:8, 54:16, 70:6
**first** [16] - 4:2, 5:14, 5:19, 8:3, 29:13, 31:21, 41:10, 42:19, 43:4, 45:21, 48:10, 48:12, 52:2, 52:16, 62:7, 70:15
**five** [8] - 6:17, 55:17, 55:18, 67:7, 67:8, 67:10, 69:16, 69:19
**flagged** [1] - 45:12
**Flynn** [10] - 31:1, 32:6, 33:6, 33:15, 53:8, 53:13, 55:19, 56:15, 61:12, 62:22
**FLYNN** [1] - 1:9
**following** [1] - 72:7

**follows** [1] - 4:6
**forced** [1] - 56:17
**foregoing** [2] - 71:4, 72:5
**FOREGOING** [1] - 71:22
**foreman** [2] - 66:15, 66:19
**forever** [1] - 62:7
**form** [2] - 5:13, 17:1
**formal** [1] - 49:15
**forms** [1] - 57:1
**forth** [1] - 71:9
**forty** [13] - 23:9, 23:14, 23:16, 23:23, 28:15, 28:18, 28:22, 47:20, 47:21, 51:10, 54:7, 55:17, 55:18
**forty-five** [2] - 55:17, 55:18
**forty-one** [5] - 28:15, 28:18, 28:22, 47:20, 47:21
**forty-two** [2] - 51:10, 54:7
**forward** [1] - 62:12
**four** [4] - 52:4, 52:7, 59:10, 67:10
**free** [3] - 55:20, 55:24, 56:9
**friend** [1] - 17:17
**full** [6] - 4:24, 6:7, 6:22, 6:23, 7:1, 18:9
**full-time** [4] - 6:22, 6:23, 7:1, 18:9
**fully** [1] - 20:2
**future** [3] - 10:3, 45:24, 51:2

**G**

**garage** [1] - 64:7
**Gardino** [3] - 17:20, 17:22, 18:5
**generally** [1] - 39:10
**gentleman** [9] - 21:11, 21:15, 22:3, 63:20, 64:1, 64:19, 64:24, 69:1, 69:7
**gentleman's** [1] - 64:21
**given** [3] - 65:5, 71:11, 72:5
**Governor** [1] - 71:6
**granted** [1] - 14:15
**ground** [2] - 8:1, 8:20
**guessing** [2] - 66:24, 67:9

**guy** [1] - 64:16
**guys** [1] - 67:22

**H**

**habit** [1] - 18:23
**half** [5] - 23:18, 23:22, 42:21, 42:23, 43:3
**HANDLING/ DISTRIBUTION** [1] - 73:9
**handyman** [1] - 10:18
**head** [2] - 62:24, 66:24
**health** [5] - 7:10, 7:13, 7:15, 7:17, 9:2
**hear** [2] - 8:17, 14:4
**hearing** [4] - 47:9, 49:15, 50:4
**Heather** [4] - 1:12, 1:19, 71:2, 71:19
**heating** [3] - 11:4, 11:5, 18:12
**held** [2] - 49:15, 50:3
**help** [3] - 17:18, 33:13, 59:13
**helping** [1] - 22:1
**Henry** [2] - 1:14, 2:2
**hereby** [2] - 6:4, 72:4
**hi** [1] - 4:11
**higher** [1] - 55:8
**highway** [15] - 19:4, 20:5, 20:6, 20:8, 34:10, 58:14, 58:17, 62:15, 63:1, 63:3, 63:12, 65:10, 66:15, 67:21
**highway's** [2] - 64:21, 64:22
**Hill** [2] - 17:9
**hired** [1] - 12:15
**hiring** [10] - 19:18, 19:22, 20:19, 21:13, 21:15, 22:4, 22:7, 61:7, 61:18, 61:21
**hit** [1] - 8:20
**hold** [1] - 33:5
**holding** [1] - 53:10
**hopefully** [1] - 29:15
**hour** [2] - 7:8, 12:19
**hourly** [2] - 7:5, 7:7
**hours** [5] - 23:7, 23:9, 23:15, 23:16, 38:22
**house** [2] - 17:6, 17:8
**human** [1] - 15:11

**hypotheticals** [1] - 55:6

**I**

**idea** [1] - 53:17
**identification** [6] - 4:4, 4:8, 24:13, 35:8, 46:15, 71:6
**identified** [1] - 4:2
**II** [1] - 57:2
**impression** [1] - 33:21
**IN** [1] - 71:16
**inappropriate** [1] - 60:23
**income** [3] - 12:16, 16:12, 17:5
**independent** [4] - 12:14, 12:15, 12:17, 17:15
**indicate** [1] - 73:5
**information** [6] - 56:23, 62:17, 67:12, 67:24, 68:13, 68:14
**inquiries** [3] - 21:8, 21:9, 22:16
**inquiry** [3] - 19:18, 19:21
**installed** [1] - 18:12
**instead** [2] - 64:10, 65:4
**INSTRUCTIONS** [1] - 73:2
**insurance** [5] - 7:10, 7:14, 7:15, 7:17, 9:2
**intending** [1] - 55:12
**intent** [5] - 10:4, 33:8, 33:16, 33:17, 33:19
**intention** [1] - 55:11
**interested** [1] - 71:14
**investigation** [4] - 65:12, 65:21, 65:22, 66:3
**investment** [2] - 16:18, 16:19
**investments** [1] - 16:15
**invoices** [1] - 47:4
**involved** [1] - 66:5
**issue** [11] - 29:3, 61:7, 61:13, 62:11, 63:15, 64:22, 66:20, 69:15, 69:19
**issued** [1] - 71:6
**issues** [2] - 11:6, 70:18
**IT** [1] - 73:22

**ITSELF** [1] - 73:7
**itself** [1] - 50:17

**J**

**January** [3] - 1:14, 71:4, 71:17
**job** [18] - 10:12, 10:13, 18:9, 22:15, 23:2, 23:5, 23:6, 29:15, 37:9, 37:10, 48:13, 48:20, 49:7, 50:6, 51:7, 55:3, 59:17
**job-related** [1] - 22:15
**jobs** [3] - 18:17, 19:4, 20:5
**Joe** [5] - 17:20, 17:21, 18:7, 21:1, 22:11
**John** [2] - 6:9, 11:16
**JR** [5] - 1:5, 1:12, 3:4, 4:1, 72:4
**June** [9] - 12:9, 12:11, 13:7, 13:11, 13:15, 13:19, 13:20, 14:9, 21:3
**Junior** [1] - 6:9

**K**

**Kathleen** [1] - 2:7
**KayBee** [1] - 21:12
**keep** [5] - 9:21, 48:13, 48:19, 49:6, 51:7
**keeping** [1] - 49:11
**key** [1] - 8:20
**kind** [8] - 22:2, 30:15, 33:8, 59:1, 63:16, 66:1, 66:6, 69:17
**knowing** [1] - 42:12
**knowledge** [2] - 65:11, 72:6
**known** [1] - 68:15

**L**

**landscape** [1] - 18:2
**Landscaping** [8] - 12:1, 12:18, 12:22, 13:9, 17:16, 17:24, 18:11, 18:18
**last** [2] - 60:2, 61:8
**late** [1] - 34:23
**LAW** [1] - 2:2

**law** [1] - 52:23
**Lawless** [2] - 4:13, 73:13
**LAWLESS** [64] - 2:6, 4:10, 4:11, 5:4, 5:8, 6:6, 13:1, 13:6, 19:2, 24:10, 24:14, 25:7, 25:14, 25:16, 25:21, 26:1, 26:2, 27:15, 28:6, 29:16, 30:21, 35:11, 35:17, 36:14, 37:1, 37:12, 37:17, 38:3, 38:11, 38:19, 39:3, 39:20, 39:23, 39:24, 41:7, 44:3, 44:14, 44:19, 44:20, 45:11, 45:17, 46:5, 46:12, 46:16, 47:15, 48:12, 49:1, 49:14, 49:17, 49:23, 50:24, 51:22, 53:16, 54:15, 56:7, 56:14, 57:6, 58:1, 58:4, 58:6, 61:4, 70:11, 70:19, 73:21
**lawn** [1] - 12:5
**lawsuit** [5] - 4:14, 4:21, 24:19, 24:22, 26:17
**lawyer** [2] - 26:7, 26:11
**leave** [2] - 45:6, 69:18
**leave-it-alone** [1] - 69:18
**led** [2] - 45:21, 50:1
**Lee** [5] - 19:8, 19:13, 19:24, 21:9, 21:13
**left** [1] - 55:14
**length** [1] - 46:6
**Lenny** [5] - 58:14, 61:5, 64:11, 64:14, 65:9
**Lenox** [8] - 19:8, 19:10, 19:20, 20:10, 20:12, 20:14, 20:16, 21:9
**less** [2] - 23:13
**letter** [1] - 33:14
**leveraging** [2] - 47:22, 48:3
**license** [2] - 4:5, 24:5
**licensed** [2] - 11:8, 24:8
**Linden** [5] - 58:17, 62:14, 64:14, 65:5, 65:8
**line** [2] - 31:21, 40:18
**LINE** [1] - 72:8
**lines** [2] - 18:6, 24:4
**listed** [1] - 72:7

lived [1] - 6:15
located [1] - 17:8
look [7] - 23:1,
26:14, 35:18, 39:8,
47:19, 55:16, 57:8
looked [2] - 23:3,
60:15
looking [5] - 21:7,
23:4, 23:5, 45:5,
45:21
lose [1] - 30:18
loud [1] - 49:20

## M

MA [1] - 1:24
mail [1] - 61:9
Main [1] - 2:4
maintain [8] - 29:15,
33:1, 33:12, 34:1,
36:7, 36:16, 39:11,
40:5
maintained [1] -
39:15
maintaining [1] -
34:5
major [3] - 60:2,
61:13, 63:15
MAKE [1] - 73:7
manager [2] - 58:12,
58:23
mark [2] - 24:10,
46:13
marked [5] - 4:7,
24:12, 24:15, 35:7,
46:14
MARKS [1] - 73:7
Marsden [2] - 58:11,
58:22
Mass [1] - 6:11
MASSACHUSETTS
[2] - 1:1, 71:1
Massachusetts [7] -
1:13, 1:14, 2:2, 2:5,
4:5, 71:3, 71:7
material [1] - 65:2
matter [3] - 4:16,
68:18, 72:5
mean [8] - 9:16,
10:17, 15:22, 19:17,
20:5, 30:9, 55:6, 64:7
meaning [1] - 54:14
MEANS [1] - 71:23
mechanic [1] - 62:24
medical [2] - 21:20,
45:6
meet [3] - 26:10,
59:15, 61:11
meeting [35] - 29:17,

29:19, 29:22, 30:1,
30:19, 30:22, 30:23,
30:24, 31:3, 31:5,
31:7, 31:12, 31:16,
31:18, 32:4, 32:8,
32:18, 32:20, 33:1,
36:5, 36:12, 39:5,
39:8, 45:23, 48:11,
48:12, 48:18, 53:2,
59:16, 59:19, 59:20,
66:14, 68:2, 68:3,
68:4
meetings [5] - 29:13,
44:5, 50:4, 53:14,
61:11
member [1] - 27:3,
27:17, 28:7, 28:11,
28:23, 33:3, 44:10,
51:23, 53:3, 53:18,
62:15
members [4] - 29:20,
32:10, 44:23, 45:20
membership [2] -
27:5, 29:7
Merit [4] - 1:12, 1:20,
71:3, 71:19
met [5] - 15:4, 15:17,
26:7, 30:3, 30:13
middle [1] - 13:19
middleman [1] - 66:7
might [8] - 8:21,
13:18, 28:1, 31:17,
32:14, 66:4
mine [2] - 17:17,
18:24
minor [1] - 65:22
MITCHELL [1] - 1:23
moment [2] - 5:3,
39:19
money [1] - 69:12
monies [1] - 43:17
month [2] - 9:5, 17:7
months [1] - 52:20
most [2] - 35:12,
35:21
mother [1] - 58:24
motions [1] - 5:17
motivating [1] - 29:8
move [2] - 17:12,
30:17
moving [1] - 6:13
mowing [1] - 12:5
MR [62] - 4:10, 4:11,
5:4, 5:8, 6:6, 13:1,
13:6, 19:2, 24:10,
24:14, 25:7, 25:14,
25:16, 25:21, 26:1,
26:2, 27:15, 28:6,
29:16, 30:21, 35:11,
35:17, 36:14, 37:1,

37:12, 37:17, 38:3,
38:11, 38:19, 39:3,
39:20, 39:23, 39:24,
41:7, 44:3, 44:14,
44:19, 44:20, 45:11,
45:17, 46:5, 46:12,
46:16, 47:15, 48:12,
49:1, 49:14, 49:17,
49:23, 50:24, 51:22,
53:16, 54:15, 56:7,
56:14, 57:6, 58:1,
58:4, 58:6, 61:4,
70:11, 70:19
MS [49] - 5:2, 5:6,
13:5, 18:21, 25:5,
25:9, 25:19, 25:23,
27:12, 28:3, 29:10,
30:11, 35:14, 36:9,
36:20, 37:7, 37:14,
37:24, 38:7, 38:15,
38:23, 39:18, 39:22,
41:3, 43:24, 44:12,
44:17, 44:24, 45:14,
46:2, 47:12, 48:8,
48:21, 49:13, 49:16,
49:21, 50:20, 51:18,
53:11, 54:11, 54:19,
54:22, 56:1, 56:10,
57:3, 57:22, 61:1,
70:8, 70:14
multiple [3] - 62:9,
62:10
municipal [1] - 20:6

## N

name [10] - 4:12,
4:24, 6:7, 17:19,
21:12, 21:17, 21:18,
58:19, 63:21, 71:16
named [1] - 71:5
necessary [1] -
60:19
need [5] - 8:18, 24:5,
41:22, 46:20, 49:19
needed [3] - 12:1,
17:17, 41:23
negotiate [1] - 50:12
never [12] - 10:15,
14:22, 50:6, 50:7,
50:11, 51:5, 51:6,
59:16, 61:13, 62:8,
62:12, 63:17
next [4] - 24:11,
42:17, 43:7, 46:13
Noble [4] - 41:9,
44:22, 45:23, 46:6
nobody [1] - 31:2,
31:4
none [1] - 10:9

normal [1] - 15:11
NOT [2] - 71:23, 73:7
Notary [3] - 1:12,
4:3, 71:3
NOTATIONS [1] -
73:7
NOTE [1] - 71:22
note [2] - 4:17, 46:10
nothing [2] - 37:21
Notice [2] - 3:7, 4:22
notice [1] - 4:17
noticed [2] - 32:18,
32:19
notification [2] - 6:2,
45:19
notifying [1] - 64:10
November [7] - 7:2,
7:3, 11:22, 12:9,
12:11, 13:7, 18:7
nowhere [1] - 15:6
number [1] - 12:20
Number [4] - 4:7,
24:12, 46:14
Numbers [1] - 35:7
nursery/preschool
[1] - 22:1
nutshell [1] - 43:20

## O

object [2] - 31:11,
36:21
objection [36] - 25:5,
27:12, 28:3, 29:10,
30:11, 31:14, 35:14,
36:9, 37:7, 37:14,
37:24, 38:7, 38:15,
38:23, 41:3, 43:24,
44:12, 44:24, 45:14,
46:2, 47:12, 48:8,
48:21, 49:13, 49:16,
50:20, 51:18, 53:11,
54:11, 54:19, 56:1,
56:10, 57:3, 57:22,
61:1, 70:8
objections [3] - 5:12,
71:12
obstructionist [1] -
25:20
obviously [1] - 8:3
occur [2] - 32:6,
66:11
occurred [2] - 29:17,
32:11
odds [1] - 10:18
OF [11] - 1:1, 1:7,
1:11, 2:2, 71:1, 71:1,
71:22, 71:23, 71:24,
72:5, 73:21

offer [12] - 22:8,
36:7, 38:4, 38:12,
38:20, 39:4, 39:11,
40:15, 41:18, 48:6,
49:10, 49:24
offered [18] - 4:7,
18:8, 24:12, 33:6,
33:23, 34:9, 35:7,
37:11, 40:4, 44:8,
46:14, 49:2, 49:5,
50:6, 50:7, 50:8,
50:11, 51:6
office [2] - 15:20,
55:8
OFFICE [1] - 2:2
officer [1] - 59:5
offices [4] - 1:14,
30:16, 31:6, 32:22
official [1] - 10:17
Official [1] - 1:9
old [1] - 21:12
ON [1] - 73:7
on-the-job [2] -
10:12, 10:13
once [3] - 8:4, 49:9,
49:10
one [16] - 7:22, 7:24,
8:6, 15:8, 18:13,
20:11, 20:12, 28:15,
28:18, 28:22, 29:12,
34:14, 34:23, 47:20,
47:21, 58:4
ones [2] - 16:13,
22:16
ongoing [2] - 67:6,
69:16
online [1] - 23:3
operates [2] - 11:15,
17:23
opportunity [2] -
35:19, 37:10
opposed [1] - 53:14
option [4] - 10:6,
10:7, 34:6, 34:7
OR [1] - 73:7
Order [2] - 4:4, 71:6
order [6] - 29:14,
40:7, 42:21, 42:24,
43:4, 43:11
original [4] - 6:3,
14:13, 73:11, 73:13
originally [1] - 45:12
outcome [3] - 9:15,
9:22, 71:15
outside [1] - 22:11
overcharged [1] -
40:24
overtime [3] - 23:10,
23:12, 23:17
own [2] - 16:20,

16:23
owner [2] - 11:17, 11:19

**P**

P.C [1] - 2:4
P.O [1] - 1:23
packaging [1] - 21:20
page [2] - 26:13, 57:7
PAGE [5] - 1:17, 3:5, 72:1, 72:8, 73:21
Pages [1] - 1:4
paid [3] - 7:5, 7:8, 23:18
papers [1] - 23:3
paragraph [12] - 26:15, 28:15, 28:18, 28:22, 47:20, 47:21, 51:10, 54:6, 55:17, 55:18, 57:8, 57:10
part [6] - 15:11, 35:21, 36:7, 40:7, 51:2, 55:7
parted [1] - 64:15
particular [3] - 27:17, 28:1, 50:7
parties [4] - 5:11, 5:17, 6:2
parts [8] - 63:7, 64:17, 65:15, 65:23, 66:10, 66:12, 67:2, 67:12
party [2] - 27:18, 71:14
past [1] - 10:16
paths [1] - 30:15
patio [1] - 12:5
pattern [1] - 43:6
pay [4] - 7:16, 9:4, 9:6, 23:20
pension [1] - 38:13
people [6] - 15:4, 15:17, 15:18, 32:5, 32:9, 56:19
per [1] - 4:4
performing [1] - 59:17
perpetrated [1] - 43:22
person [4] - 60:7, 63:14, 63:18, 66:6
Persons [1] - 36:1
phone [1] - 15:5
phrase [1] - 48:3
physical [2] - 20:24, 22:21

picked [1] - 60:7
pickup [2] - 63:7, 67:13
pile [1] - 65:1
Pioneer [12] - 41:9, 41:11, 41:14, 42:2, 42:14, 42:18, 43:10, 43:21, 44:21, 45:22, 46:6, 47:4
pipes [2] - 24:2, 24:3
Pittsfield [5] - 1:14, 1:24, 2:2, 15:4, 15:18
place [3] - 31:5, 59:13, 71:8
Plaintiff [5] - 2:3, 47:23, 47:24, 48:4, 57:11
Plaintiff's [2] - 28:19, 51:12
plan [1] - 14:24
plans [3] - 6:12, 9:13, 10:10
PLEASE [2] - 71:22, 73:21
plumber [10] - 9:14, 9:20, 10:5, 10:8, 10:12, 10:16, 10:19, 10:22, 23:24, 24:8
plumber's [2] - 9:12, 9:17
plumbers [1] - 11:9
Plumbing [11] - 6:21, 7:6, 9:8, 9:11, 9:18, 11:1, 11:15, 11:18, 18:4, 18:19, 23:8
plumbing [5] - 11:3, 11:4, 11:5, 11:11, 11:13
Plumbing's [1] - 11:7
plus [1] - 67:18
PM [1] - 70:21
point [24] - 6:23, 10:14, 11:2, 12:20, 12:23, 14:3, 14:21, 14:23, 15:5, 22:17, 34:14, 40:19, 42:3, 44:20, 45:9, 55:10, 55:11, 56:6, 63:21, 66:8, 69:9, 69:14, 70:3, 70:10
Police [1] - 44:10
police [4] - 65:12, 65:14, 67:14, 67:16
policies [5] - 61:15, 61:17, 61:18, 61:19, 61:20
policy [2] - 61:6, 63:4
political [5] - 26:19,

26:22, 26:24, 27:18, 28:1
portion [3] - 7:16, 7:20, 8:24
position [19] - 9:10, 17:14, 18:4, 26:18, 27:23, 28:1, 34:1, 34:2, 34:5, 34:20, 36:17, 36:24, 37:5, 39:15, 50:3, 50:8, 50:12, 52:3, 53:10
positions [3] - 33:3, 39:13, 40:9
positive [1] - 32:3
possibly [1] - 22:7
premium [2] - 7:20, 9:1
preparation [1] - 25:3
prepare [4] - 25:10, 25:17, 26:3, 26:10
prepared [1] - 35:22
Preschool [1] - 22:13
prescribed [1] - 71:6
Present [1] - 2:7
present [9] - 6:12, 18:16, 30:22, 30:23, 31:2, 31:4, 32:5, 32:9
presented [3] - 36:6, 36:15, 37:1
previous [1] - 18:14
price [2] - 42:7, 42:13
prices [3] - 42:5, 59:4, 60:11
privy [1] - 56:22
Procedure [1] - 1:13
process [4] - 14:12, 67:6, 68:19, 69:2
procurement [3] - 59:4, 59:5, 60:20
product [5] - 41:6, 41:11, 43:11, 43:15, 43:17
Product [9] - 41:9, 41:11, 41:14, 42:2, 42:15, 42:18, 43:10, 43:21, 44:22
Products [1] - 45:22
products [1] - 40:24
progressive [1] - 57:17
project [3] - 59:1, 59:3, 60:21
properly [1] - 4:2
properties [1] - 16:21
property [5] - 62:17, 68:16, 68:20, 68:22,

68:23
proposal [2] - 31:15, 31:20
proposed [1] - 37:22
protected [2] - 51:17, 54:16
protection [1] - 56:16
protests [1] - 55:7
protocol [2] - 52:18, 61:22
provide [2] - 16:8, 73:13
provided [5] - 34:14, 34:24, 50:13, 51:1, 71:5
provisions [1] - 1:13
public [1] - 53:13
Public [3] - 1:12, 4:3, 71:3
publicly [1] - 54:3
pump [1] - 24:4
pumping [1] - 11:6
purchase [1] - 43:15
purchased [7] - 41:11, 43:17, 60:9, 64:2, 64:19, 64:24, 69:1
purchases [1] - 44:21, 45:21
pursuant [1] - 1:13
pursue [1] - 33:22
purview [1] - 25:11
put [2] - 63:22, 64:16

**Q**

questions [6] - 4:21, 15:9, 40:19, 46:17, 58:5, 70:12
quick [1] - 57:8
QUIGLEY [51] - 2:2, 2:3, 5:2, 5:6, 13:5, 18:21, 25:5, 25:9, 25:19, 25:23, 27:12, 28:3, 29:10, 30:11, 35:14, 36:9, 36:20, 37:7, 37:14, 37:24, 38:7, 38:15, 38:23, 39:18, 39:22, 41:3, 43:24, 44:12, 44:17, 44:24, 45:14, 46:2, 47:12, 48:8, 48:21, 49:13, 49:16, 49:21, 50:20, 51:18, 53:11, 54:11, 54:19, 54:22, 56:1, 56:10, 57:3, 57:22, 61:1, 70:8, 70:14

Quigley [2] - 1:14, 73:12
quite [5] - 14:4, 51:20, 56:5, 56:12, 64:20
quotes [1] - 60:19

**R**

raised [4] - 5:13, 5:18, 66:21, 66:22
ran [1] - 22:3
range [1] - 13:19
re [1] - 55:13
re-election [1] - 55:13
reach [2] - 41:13, 41:14
read [6] - 24:24, 25:3, 25:8, 48:1, 67:16, 72:5
reading [2] - 5:22, 73:4
ready [1] - 42:21
real [1] - 60:2
really [7] - 53:14, 54:7, 56:24, 63:16, 64:7, 69:22
reappointed [1] - 52:19
rearrange [1] - 22:2
reasonable [4] - 42:6, 42:7, 42:9, 42:13
reasons [1] - 73:5
receipt [1] - 6:3
RECEIVE [1] - 73:22
receive [5] - 7:10, 14:20, 17:1, 43:9, 53:2
received [3] - 12:21, 67:23, 68:1
receives [1] - 13:3
recent [1] - 35:12
recently [4] - 52:10, 59:11, 66:21, 66:22
reclaim [2] - 63:15, 63:19
recognize [2] - 24:16, 46:24
reconditioned [1] - 63:8
record [10] - 4:17, 5:1, 6:7, 13:1, 25:22, 25:24, 26:1, 39:21, 39:23, 71:11
recorded [4] - 31:8, 31:9, 31:12, 31:13
red [3] - 14:21,

15:21, 16:1
**reelected** [3] - 52:10, 52:12, 52:15
**referenced** [4] - 4:21, 28:22, 32:9, 62:5
**references** [1] - 28:18
**referred** [1] - 33:16
**referring** [8] - 9:22, 15:21, 16:1, 29:16, 33:16, 48:6, 52:22, 68:3
**reflected** [2] - 38:21, 39:5
**regard** [1] - 68:8
**regarding** [4] - 46:6, 51:2, 66:9, 68:13
**Registered** [4] - 1:12, 1:20, 71:2, 71:19
**regulations** [1] - 19:1
**reimburse** [2] - 7:19, 8:24
**related** [2] - 22:15, 71:14
**relationship** [2] - 18:14, 25:12
**rely** [2] - 29:6, 55:22
**remind** [1] - 15:7
**renewal** [1] - 35:10
**rental** [1] - 16:20
**repeat** [1] - 48:23
**rephrase** [1] - 8:14
**REPLACE** [1] - 73:21
**report** [4] - 47:5, 65:14, 67:15, 67:16
**Reporter** [4] - 1:12, 1:20, 71:3, 71:19
**REPORTER** [1] - 71:24
**reporter** [1] - 15:14
**REPORTING** [1] - 1:23
**represent** [1] - 4:13
**representing** [2] - 2:3, 2:5
**REPRODUCTION** [1] - 71:23
**Republican** [1] - 27:19
**reputation** [1] - 42:2
**required** [1] - 60:10
**requirement** [2] - 52:23, 60:24
**rerun** [2] - 53:4
**research** [4] - 42:1, 42:4, 42:10, 42:11
**reserved** [2] - 5:13,

5:18
**resign** [15] - 29:13, 31:22, 31:24, 32:2, 33:10, 39:13, 49:2, 49:6, 51:4, 51:7, 52:17, 53:1, 56:18, 56:21, 57:1
**resignation** [1] - 33:14
**resigned** [8] - 33:2, 33:24, 36:17, 40:8, 47:23, 48:5, 48:14, 49:9
**resigning** [1] - 44:9
**resolution** [3] - 33:24, 40:4, 40:8
**resolved** [3] - 44:8, 44:9, 66:18
**resolving** [1] - 45:5
**respect** [1] - 19:13
**respond** [1] - 39:8
**response** [1] - 70:15
**Response** [8] - 12:1, 12:18, 12:22, 13:8, 17:16, 17:23, 18:11, 18:18
**rest** [1] - 11:11
**result** [3] - 10:2, 54:9, 55:9
**resume** [1] - 19:10
**retained** [1] - 37:5
**retaliated** [1] - 28:11
**retaliation** [3] - 27:7, 27:10, 70:6
**retirement** [3] - 16:17, 16:19, 33:12
**return** [1] - 47:18
**returned** [2] - 69:12, 72:2
**review** [3] - 28:16, 35:20, 46:22
**rights** [5] - 47:24, 51:13, 51:16, 54:9, 56:16
**riled** [1] - 33:9
**ROBINSON** [1] - 2:4
**rocky** [1] - 59:1
**role** [1] - 67:24
**Ronchi** [1] - 2:7
**room** [1] - 22:2
**roughly** [1] - 67:9
**Roxanne** [1] - 61:11
**rug** [1] - 63:17
**Rules** [1] - 1:13
**rules** [2] - 8:1, 8:20
**run** [4] - 24:2, 24:4, 52:19, 55:12
**running** [1] - 55:7
**runs** [1] - 11:20

## S

**salary** [2] - 37:23, 50:19, 50:23
**SAME** [1] - 71:23
**sat** [1] - 63:10
**satisfaction** [1] - 69:21
**satisfactory** [2] - 4:3, 71:5
**satisfied** [1] - 68:6
**scam** [2] - 40:23, 43:21
**scheduled** [2] - 30:19, 61:11
**seal** [1] - 71:16
**sealing** [1] - 5:23
**SEARING** [1] - 58:20
**Searing** [7] - 58:17, 62:14, 64:15, 65:5, 65:8, 65:16, 67:12
**Searing's** [1] - 62:23
**second** [10] - 8:6, 25:22, 31:18, 33:5, 36:5, 39:5, 42:21, 42:23, 43:2, 47:20
**secure** [3] - 16:5, 18:3, 59:13
**security** [2] - 59:2, 60:10
**SEE** [1] - 1:17
**see** [4] - 10:1, 46:9, 55:18, 55:21
**Select** [26] - 28:8, 28:12, 28:23, 29:7, 29:17, 29:20, 32:10, 32:18, 33:3, 34:1, 35:24, 44:10, 44:23, 45:8, 45:20, 47:6, 47:9, 49:14, 50:3, 51:23, 53:1, 53:3, 53:18, 53:23, 57:1, 68:7
**SELECT** [1] - 1:8
**Selectman** [23] - 29:14, 31:22, 33:11, 36:17, 39:13, 40:9, 47:23, 48:5, 48:14, 49:3, 49:6, 51:4, 51:7, 53:15, 53:19, 53:20, 54:4, 54:23, 55:3, 56:18, 56:21, 61:10, 67:24
**Selectman's** [1] - 68:4
**Selectmen** [5] - 1:9, 27:4, 27:6, 52:17, 62:22
**sell** [1] - 41:20

**sense** [1] - 8:15
**sent** [4] - 14:5, 64:17, 67:18, 67:20
**sentence** [1] - 47:21
**septic** [1] - 11:5
**series** [3] - 44:21, 45:20, 50:3
**session** [1] - 29:21
**set** [3] - 59:16, 59:18, 71:8
**settlement** [2] - 9:24, 10:1
**seventy** [2] - 57:8, 57:10
**sewer** [4] - 11:6, 18:6, 24:2, 24:4
**SHEET** [2] - 72:1, 73:9, 73:22
**Sheet** [2] - 73:6, 73:12
**sheet** [1] - 73:11
**Shield** [2] - 7:18, 9:1
**shipment** [1] - 42:19
**shipped** [1] - 42:22
**shorthand** [1] - 71:9
**shot** [2] - 62:19, 62:21
**show** [2] - 4:17, 24:15
**sidewalk** [1] - 62:4
**sidewalks** [5] - 59:15, 61:8, 62:5, 62:6, 62:8
**sign** [1] - 73:6
**SIGNATURE** [1] - 72:1
**SIGNATURE_____**

**_____dATE** [1] - 72:23
**signed** [2] - 72:2, 73:13
**SIGNED** [1] - 73:22
**significantly** [1] - 40:24
**signing** [1] - 5:22
**similar** [1] - 56:20
**similarly** [3] - 61:5, 62:13, 70:1
**simply** [1] - 28:7
**sit** [1] - 40:12
**situated** [2] - 61:5, 62:14, 70:1
**situation** [1] - 44:7
**six** [2] - 43:7, 52:20
**sleep** [2] - 30:18, 46:9
**small** [2] - 18:1
**snowstorm** [2] - 59:14, 60:2, 61:3

**sold** [1] - 68:15
**sole** [2] - 11:17, 11:19
**solely** [1] - 57:20
**sometime** [3] - 40:3, 41:12, 42:20
**somewhere** [2] - 13:19, 60:6
**sorry** [7] - 5:7, 7:22, 7:23, 15:10, 15:16, 33:4, 62:2
**sort** [1] - 8:20
**sources** [2] - 16:11, 17:5
**speaking** [1] - 39:10
**special** [1] - 10:19
**speech** [6] - 28:19, 28:21, 29:3, 55:20, 55:24, 56:9
**spell** [1] - 58:19
**split** [2] - 59:6, 60:23
**Springfield** [1] - 2:5
**ss** [1] - 1:2
**staffed** [1] - 20:2
**stand** [1] - 45:7
**start** [1] - 59:1
**started** [2] - 22:10, 58:23
**state** [2] - 4:24, 6:7
**State** [1] - 71:3
**stating** [1] - 54:3
**stations** [2] - 18:13
**still** [5] - 51:22, 54:22, 63:16, 69:10, 69:11
**stipulations** [2] - 5:3, 5:5
**STOCKBRIDGE** [3] - 1:7, 1:8, 72:6
**Stockbridge** [16] - 4:13, 6:11, 10:3, 14:16, 17:9, 26:19, 27:2, 27:24, 35:13, 36:8, 39:12, 47:5, 51:24, 63:20, 64:1, 69:1
**stop** [3] - 5:2, 53:8, 53:9
**stopped** [1] - 66:1
**storm** [1] - 62:9
**straight** [1] - 11:3
**straighten** [4] - 30:5, 30:7, 30:10, 62:11
**straightened** [2] - 30:17, 61:14
**street** [1] - 21:23
**Street** [2] - 2:4, 6:11
**strike** [10] - 5:17, 17:13, 26:23, 32:7, 44:14, 45:18, 49:9,

49:17, 54:5, 60:8
**strongly** [1] - 53:22
**stuff** [13] - 15:5,
18:6, 18:7, 23:4, 26:8,
60:15, 61:7, 61:9,
61:23, 63:11, 66:6,
66:19, 68:17
**subcontractor** [2] -
12:2, 12:3
**submit** [7] - 19:9,
20:15, 20:17, 21:4,
21:6, 22:8, 22:21
**submitted** [1] - 20:23
**subscribed** [1] -
71:16
**substantial** [1] - 29:8
**suggested** [1] -
34:10
**Suite** [1] - 2:4
**summary** [2] - 41:2
**superintendent** [3] -
58:15, 63:13, 65:10
**Superior** [1] - 1:2
**supervision** [2] -
24:8, 71:10
**supplement** [2] -
13:3, 16:8
**supplied** [1] - 73:6
**supplier** [1] - 40:23
**support** [1] - 17:2
**surgery** [1] - 59:12
**surplus** [4] - 63:10,
63:23, 68:22, 68:23
**swept** [1] - 63:16
**sworn** [2] - 4:6, 71:7

### T

**table** [1] - 34:13
**tank** [1] - 11:5
**tanks** [1] - 24:4
**tape** [3] - 14:21,
15:21, 16:1
**tax** [1] - 12:21
**Tel** [1] - 1:24
**telephone** [2] -
41:17, 43:10
**tendered** [1] - 70:17
**TERENCE** [1] - 1:9
**term** [3] - 52:8, 54:2,
55:13
**terminated** [3] -
26:18, 27:16, 27:23
**termination** [3] -
14:16, 29:9, 57:21
**terms** [4] - 40:13,
52:5, 55:1, 62:4
**terrible** [1] - 44:15
**Terry** [4] - 31:1,

61:12, 62:22, 66:7
**testified** [1] - 46:6
**testimony** [4] - 46:8,
71:11, 72:5, 73:5
**THE** [42] - 18:23,
27:14, 28:5, 29:12,
30:13, 35:9, 35:16,
36:11, 36:23, 37:9,
37:16, 38:2, 38:9,
38:17, 39:1, 41:5,
44:2, 45:2, 45:16,
46:4, 47:14, 48:10,
48:23, 50:22, 51:20,
53:13, 54:13, 54:21,
56:3, 56:12, 57:5,
57:24, 61:3, 70:10,
70:13, 71:22, 71:23,
71:24, 73:7, 73:21,
73:22
**thereafter** [1] - 71:9
**therefor** [1] - 73:5
**therein** [1] - 71:8
**thereof** [1] - 71:15
**third** [3] - 54:2, 61:10
**thirty** [3] - 26:15,
52:19, 72:2
**thirty-eight** [1] -
26:15
**THIS** [2] - 71:22,
73:21
**three** [14] - 11:10,
29:20, 30:2, 32:21,
52:6, 52:8, 59:4,
59:10, 60:11, 60:19,
62:8, 67:1, 67:3, 67:9
**three-vote** [1] - 59:4
**three-year** [1] - 52:8
**Tisdale** [3] - 58:14,
61:5, 65:9
**title** [1] - 62:23
**TO** [2] - 71:23, 73:2
**today** [9] - 4:15,
4:20, 16:12, 17:5,
23:2, 24:22, 36:3,
40:13, 70:5
**today's** [6] - 4:18,
22:23, 25:4, 25:17,
26:3, 26:10
**together** [6] - 30:2,
30:4, 30:7, 30:10,
30:16, 32:21
**took** [7] - 14:11,
45:9, 63:7, 64:8, 65:1,
66:7, 67:12
**top** [1] - 66:24
**total** [1] - 14:7
**town** [4] - 24:19,
29:15, 30:15, 30:19,
31:6, 31:22, 32:22,
33:2, 34:21, 36:1,

36:24, 37:5, 37:18,
40:5, 40:14, 40:22,
40:24, 43:18, 43:22,
44:11, 45:3, 46:1,
47:6, 47:9, 48:14,
49:12, 50:2, 50:9,
50:19, 51:3, 53:2,
53:14, 53:15, 53:17,
54:4, 57:11, 58:7,
58:17, 58:24, 59:5,
59:14, 61:19, 61:20,
62:15, 62:16, 63:4,
63:22, 64:2, 67:13,
68:16, 68:18, 69:5
**TOWN** [2] - 1:7, 72:5
**Town** [10] - 4:13,
10:3, 14:16, 26:18,
27:2, 27:24, 35:12,
36:8, 39:12, 51:23
**training** [9] - 9:14,
10:4, 10:8, 10:11,
10:12, 10:13, 10:16,
10:17, 10:21
**transactions** [1] -
45:13
**transcribed** [1] -
71:9
**transcript** [4] - 6:3,
72:5, 72:6, 73:14
**TRANSCRIPT** [3] -
71:23, 73:7, 73:21
**treated** [2] - 58:7,
58:21
**tree** [1] - 12:5
**trial** [2] - 5:14, 5:19
**Trial** [1] - 1:2
**truck** [13] - 41:19,
41:20, 41:22, 41:23,
42:5, 42:15, 63:7,
65:15, 65:23, 66:10,
66:12, 67:2, 67:13
**true** [2] - 71:11, 72:6
**try** [6] - 8:14, 36:19,
36:24, 50:10, 53:8,
53:9
**trying** [1] - 66:14
**tunnel** [1] - 59:12
**turn** [2] - 26:13, 57:7
**turned** [2] - 49:10,
49:23
**twenty** [1] - 6:17
**twenty-five** [1] - 6:17
**twice** [2] - 52:11,
52:12
**TWO** [1] - 1:17
**two** [11] - 27:20,
35:24, 45:20, 51:10,
54:1, 54:7, 55:14,
58:5, 61:11, 67:1,
67:3

**type** [2] - 33:24,
69:18
**typewriting** [1] - 71:9

### U

**UNDER** [1] - 71:24
**under** [6] - 24:7,
48:19, 58:24, 63:17,
71:9
**undersigned** [1] -
72:4
**understood** [1] - 8:8
**undertake** [1] - 66:2
**unemployed** [2] -
13:14, 13:21
**Unemployment** [2] -
15:19, 15:23
**unemployment** [8] -
13:24, 14:3, 14:6,
15:20, 18:20, 19:1,
70:16, 70:17
**unit** [1] - 18:12
**unless** [2] - 47:23,
48:4
**UNLESS** [1] - 71:23
**unpaid** [1] - 70:18
**unresponsive** [1] -
5:17
**up** [10] - 33:9, 59:16,
59:18, 60:8, 62:19,
66:13, 66:16, 66:19,
68:1, 69:7
**usual** [1] - 5:4

### V

**Vanzandt** [14] - 6:21,
7:6, 9:8, 9:10, 9:18,
11:1, 11:7, 11:15,
11:16, 11:17, 18:4,
18:10, 18:19, 23:8
**vendor** [1] - 59:6
**verbal** [3] - 19:11,
19:12, 19:16
**verbally** [2] - 67:18,
67:20
**victim** [1] - 40:22
**view** [1] - 53:21
**violate** [1] - 56:15
**violated** [2] - 55:19,
55:23, 56:9
**violations** [1] - 61:6
**volume** [1] - 73:4
**VOLUME** [1] - 73:7
**volunteer** [2] - 22:13,
22:14
**vote** [1] - 59:4

**vs** [1] - 1:6

### W

**W-2s** [1] - 70:15
**wait** [1] - 18:21
**waive** [1] - 5:22
**waived** [2] - 5:24, 6:4
**walk** [1] - 21:23
**warehouse** [1] - 22:3
**wash** [6] - 41:19,
41:20, 41:22, 41:24,
42:5, 42:15
**water** [1] - 24:4
**week** [6] - 9:6, 23:7,
23:9, 23:15, 23:16
**weekends** [1] - 23:21
**weeks** [2] - 23:12,
23:13
**well-known** [1] -
68:15
**West** [3] - 63:20,
64:1, 69:1
**WHEN** [1] - 73:22
**whereby** [1] - 40:4
**WHEREOF** [1] -
71:16
**wife** [3] - 7:16, 8:24,
17:2
**wind** [1] - 69:7
**WITH** [1] - 73:21
**WITNESS** [36] -
18:23, 27:14, 28:5,
29:12, 30:13, 35:9,
35:16, 36:11, 36:23,
37:9, 37:16, 38:2,
38:9, 38:17, 39:1,
41:5, 44:2, 45:2,
45:16, 46:4, 47:14,
48:10, 48:23, 50:22,
51:20, 53:13, 54:13,
54:21, 56:3, 56:12,
57:5, 57:24, 61:3,
70:10, 70:13, 71:16
**witness** [2] - 71:5,
71:11
**WITNESSES** [1] - 3:2
**workman's** [2] -
59:11, 59:22
**worse** [1] - 44:19
**worth** [1] - 14:2
**write** [1] - 33:13
**writing** [4] - 62:18,
67:14, 67:19, 68:2

### Y

**Yale** [2] - 17:9

ERNEST J. CARDILLO   1/15/19

9

**year** [4] - 52:8, 52:16, 52:21, 54:2
**years** [17] - 6:17, 43:7, 52:4, 52:6, 52:7, 52:14, 54:1, 55:14, 59:10, 63:10, 67:1, 67:3, 67:7, 67:8, 67:10, 69:16, 69:20
**YOU** [1] - 73:22
**yourself** [1] - 46:21
**yup** [2] - 14:10, 37:20

**DAVIS & MITCHELL REPORTING**
**(413) 499-0035**