# EXHIBIT 9

**Donald Chabon**
**March 4, 2020**

```
                                                    Page 1
 1              COMMONWEALTH OF MASSACHUSETTS

 2                   Civil Case No. 3:19CV-10695 KAR

 3

 4

 5   ********************************* *

 6   Ernest J. Cardillo, Jr.,            *

 7           Plaintiff                   *

 8      vs.                              *

 9   Town of Stockbridge, et al,         *

10           Defendant                   *

11   ********************************* *

12

13

14        DEPOSITION OF:  DONALD MICHAEL CHABON

15          ELIZABETH A. QUIGLEY & ASSOCIATES

16                27 Henry Avenue

17             Pittsfield, Massachusetts

18             March 4, 2020  2:21 P.M.

19

20

21

22              Sharon Waskiewicz

23               Court Reporter

24
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

---

Page 2

```
 1    APPEARANCES:
 2
 3    Representing the Plaintiff:
 4       ELIZABETH A. QUIGLEY & ASSOCIATES
 5       27 Henry Avenue
 6       Pittsfield, MA
 7       BY:  ELIZABETH QUIGLEY, ESQ.
 8       413-499-5476  FAX:  413-443-7754
 9
10    Representing the Defendant:
11       ROBINSON DONOVAN
12       1500 Main Street, Suite 1600
13       Springfield, MA 01115-5609
14       BY:  DAVID S. LAWLESS, ESQ.
15       413-732-2301  Fax:  413-785-4658
16       dlawless@robinsondonovan.com
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1              I N D E X
 2
 3    WITNESS:        DONALD MICHAEL CHABON
 4
 5    EXAMINATION BY:              PAGE:
 6    Ms. Quigley          4
 7
 8
 9
10
11
12
13    EXHIBIT:              PAGE:
14    Exhibit DC-1, newspaper article...............65
15
16      (Exhibit retained by Attorney Quigley)
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1        DONALD MICHAEL CHABON, Deponent, having first
 2    been satisfactorily identified and duly sworn,
 3    deposes and states as follows:
 4
 5    EXAMINATION BY MS. QUIGLEY:
 6        Q.    So sir, would you state your name for the
 7    record, please.
 8        A.    Donald Michael Chabon.
 9        Q.    Sir, how old are you?
10        A.    Seventy-four.
11        Q.    Where do you reside?
12        A.    8 Lake Drive in Stockbridge.
13        Q.    And how long have you resided there?
14        A.    Twenty-two or three years.
15        Q.    Would you describe your educational
16    background?
17        A.    I have a bachelors in business and a
18    masters in industrial labor relations.
19        Q.    And where did you get those degrees?
20        A.    Undergraduate was Western New Mexico
21    University in Silver City and  graduate was
22    University of Illinois in Champagne.
23        Q.    Would you describe your sort of work
24    background?
```

---

Page 5

```
 1        A.    Yes.  After college and the Army I did
 2    industrial labor relations for three corporations.
 3    Following that I went to Israel and lived on a
 4    kibbutz.  Following that I returned to the states and
 5    worked in the trades mostly as a cable technician.
 6        Q.    And when did you retire?
 7        A.    At the age of 70.  19 -- whatever that
 8    is.  That was four years ago.
 9        Q.    And from whence did you retire?
10        A.    From Time Warner Cable.
11        Q.    All right.  When you were in the
12    military, how long did you serve and in what branch?
13        A.    I served in the Army Reserves for six
14    years, inactive, and whatever the active training
15    period was, and I was a medic.
16        Q.    Were you ever in the actual Army proper?
17        A.    No.
18        Q.    And when did you serve in the Reserves,
19    what were the approximate years?
20        A.    1970 on.
21        Q.    And you were in there for how long?
22        A.    There was a six-year signup but you did
23    your training and you did weekends and summer.
24        Q.    So by '78 or so you were finished with
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

## Page 6

```
1        that, roughly?
2        A.     I would say so, yes.
3        Q.     If there is some type of discharge, were
4   you honorably discharged from that?
5        A.     Yes.
6        Q.     So directing your attention to your
7   situation, in terms of being a Stockbridge selectman,
8   I'm just going to ask you some questions about that.
9              So would you describe when you first were
10  elected selectman?
11       A.     It would be four years ago this May, so
12  that would be 2016.
13       Q.     And when you were elected, with whom did
14  you serve in the initial panel?
15       A.     With whom? Chuckie and Steve Schatz.
16       Q.     And when you are talking about Chuckie,
17  you are talking about Chuck Cardillo?
18       A.     That's correct.
19       Q.     And who is Steve Schatz?
20       A.     A citizen of the town and he has been a
21  member of the select board.
22       Q.     And do you know where he lives?
23       A.     Yes. North Church Street.
24       Q.     So when you were first elected to be on
```

## Page 7

```
1        the board of selectmen, did you serve for any period
2   of time and then have change in the complexion of the
3   board, meaning the membership on the board?
4        A.     Yes. Yes.
5        Q.     So when did that happen?
6        A.     Well, each year it changed.
7        Q.     Every year it changed?
8        A.     Yes.
9        Q.     All right. So would you just start, once
10  you joined the board, just describe who came on and
11  who came off the board up to the point that you
12  actually left the board.
13       A.     Okay. So when I came on the board, Steve
14  Schatz and Chuckie were on the board, then next year
15  Terry was on the board. And then the last year
16  Chuckie was reelected, so he stayed on the board. So
17  the board was the same for the last two years.
18       Q.     So for the last two years of your service
19  it was yourself, Mr. Cardillo, and Mr. Flynn?
20       A.     Right.
21       Q.     When did you first meet Chuck Cardillo?
22       A.     A long time ago. I don't remember.
23       Q.     Well, going to a more recent period of
24  time in your life, at some point in time did you and
```

## Page 8

```
1   Mr. Cardillo get to know each other threw the
2   politics of the town?
3        A.     Yes. Yes.
4        Q.     So why don't we start with that. When,
5   approximately, did you start dealing with them as far
6   as the politics of the town?
7        A.     Right. I would say in the fall of the
8   year that he was first elected, whatever that was. I
9   was chairman of the democratic committee and he came
10  to me and we started talking and I started meeting
11  with his team as a democrat to help him get elected.
12       Q.     So would you describe what the quality of
13  your relationship was at the time?
14       A.     I thought it was good.
15       Q.     Did you have any kind of social contact
16  with him outside of the professional dealings in
17  politics?
18       A.     No, not really.
19       Q.     In your role as part of the democratic
20  committee, were you the chairman of the democratic
21  committee?
22       A.     At the time.
23       Q.     And in your role as chairman of the
24  democratic committee, would you describe what type of
```

## Page 9

```
1   interactions you had with them?
2        A.     Yes. I provided information and support
3   of the committee to help him get elected.
4        Q.     So he was running as a democratic?
5        A.     He was running as a democratic against a
6   republican.
7        Q.     Okay. And who was the republican that he
8   was running against?
9        A.     Deb McManame. [Phonetic]
10       Q.     And to that end, what kind of support did
11  the committee, through your good offices, provide for
12  him?
13       A.     We endorsed him and I believe he was on
14  the ballad as the democratic caucus nominee.
15       Q.     And so, during that period of time, did
16  you have contact with him day to day or weekly? What
17  kind of contact did you have?
18       A.     Occasional. I don't recall. Not day to
19  day.
20       Q.     Did you have some contact with him,
21  though, interpersonally?
22       A.     Yes.
23       Q.     Did you also sponsor other candidates as
24  part of your role as the chairman of the democratic
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 10

1    committee?
2        A.    Yes.
3        Q.    Just to give us a quick idea, how many --
4    what other candidates did you support during that
5    period?
6        A.    We probably supported somebody for
7    planning board and maybe Sewer and Water Commission,
8    Board of Health, that kind of thing.  I don't recall
9    exactly which ones at the time.
10       Q.    Did the town democratic committee provide
11   financial assistance to Mr. Cardillo's election?
12       A.    No, I don't believe so.
13       Q.    Did it provide assistance in terms of
14   manpower, or anything else, in terms of getting him
15   elected?
16       A.    I don't remember that.
17       Q.    Is it typical for the town committee to
18   provide either manpower assistance or financial
19   assistance to people who are running on the
20   democratic ticket at the time?
21       A.    No.  No.  We sometimes might take out an
22   ad in the paper.  I don't believe we did.  We haven't
23   done it for years.
24       Q.    So once he was essentially the nominee

Page 11

1    for selectman, would you describe what, if anything,
2    you did as part of the democratic town committee, to
3    help him get elected?
4        A.    I think we wrote letters of support to
5    the members saying, you know, these are the people
6    running and you should support them.
7        Q.    And that would be the members of the
8    democratic --
9        A.    Correct.
10       Q.    Well, let me finish the question, okay?
11       A.    I'm sorry.
12       Q.    That's okay.
13             Would that be members of the democratic
14   town committee or would it be members of the general
15   community who were democratic?
16       A.    No.  I think we restricted it.  I don't
17   remember -- I don't remember how we did that at the
18   time.  We did it different ways at different times.
19       Q.    All right.  So could you do it either
20   way; meaning sending like a blanket letter to all of
21   the democratic members of the town versus selected
22   members that are members of the democratic town
23   committee?
24       A.    No.  We probably did not do a general ad

Page 12

1    or a general distribution to every democrat or every
2    member of the town.
3        Q.    Now, was there any specific reason why
4    you supported Mr. Cardillo running against Ms. McManame?
5        A.    I was looking for a democratic to run
6    against a republican.
7        Q.    Okay.  So it was a party affiliation
8    issue?
9        A.    It was.
10       Q.    At the time were you satisfied that
11   Mr. Cardillo had the qualities that would allow him
12   to serve as a good selectman?
13       A.    I don't know.  I don't know.
14       Q.    So did you have any kind of interaction
15   with him to have him make an impression upon you as
16   whether he would make a good selectman candidate?
17       A.    He seemed to be in touch with one segment
18   of the population or a given part of the population
19   in Stockbridge.
20       Q.    And what population would that have been?
21       A.    It's hard to say.  It's hard to say.
22       Q.    So when you say that he was in touch with
23   a certain segment of the population in Stockbridge,
24   would you agree that Stockbridge has somewhat of a

Page 13

1    stratified society?
2             MR. LAWLESS:  Objection.  You can go
3    ahead and answer the question.
4             THE WITNESS:  I wouldn't say
5    stratified.  I'd say there's factions and
6    groups.
7        Q.    (By Ms. Quigley)  All right.  So what
8    group did you think he had a good feel for?
9        A.    Like I'd say, it's hard to say.  He
10   crossed over and touched on different groups it would
11   be hard to define the groups.
12       Q.    So when you said that you felt he had a
13   good feel for a certain set of the population, what
14   did you mean by that?
15       A.    Just that.  Certain people seem to be
16   maybe attracted to him or in touch with him or
17   something.  I don't know.  I don't know.
18       Q.    Did you think he was a good candidate?
19       A.    Yeah, I thought he would be a good
20   candidate.
21       Q.    And eventually he was elected?
22       A.    Yes.
23       Q.    And did you make any kind contribution to
24   his election fund?

4 (Pages 10 to 13)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 14

```
 1          A.    I don't remember.  I don't remember.  I
 2    may have.
 3          Q.    And did you talk to people to support
 4    him?
 5          A.    Yes.
 6          Q.    So eventually he got elected; is that
 7    right?
 8          A.    Yes.
 9          Q.    So eventually you made a decision to run
10    yourself; is that right?
11          A.    That's correct.
12          Q.    So, when that happened, who were you
13    running against?
14          A.    Nobody.
15          Q.    So it was just an open seat?
16          A.    An open seat and I was in a post.
17          Q.    And who had retired?
18          A.    Chuck Gillette.
19          Q.    And did you contact or get in touch with
20    Mr. Cardillo in supporting you in your quest to
21    become a selectman?
22          A.    I think I did.
23          Q.    And did he support you?
24          A.    I think he did.
```

Page 15

```
 1          Q.    And what kinds of things did he do to
 2    support you?
 3          A.    He made a speech at the caucus to endorse
 4    me and recommend that I be elected.
 5          Q.    That would be a caucus of the democratic
 6    committee?
 7          A.    Yes, it would.
 8          Q.    And just describe briefly what the caucus
 9    is and how often it meets?
10          A.    It meets once a year, prior to the
11    election, to select people to be the democratic
12    caucus nominee, which is an endorsement on the
13    ballad.
14          Q.    So he fully supported you?
15          A.    I believe so, yes.
16          Q.    When you were running for that empty
17    seat, who was then the remaining selectman besides
18    Mr. Cardillo?
19          A.    Steve Schatz.
20          Q.    And Mr. Schatz is a lawyer, is he not?
21          A.    I believe so, yes.
22          Q.    And where does he reside?
23          A.    North Church Street in Stockbridge.  I'd
24    said that.
```

Page 16

```
 1          Q.    I'm sorry about that.  Sorry.
 2                So eventually you got elected; is that
 3    right?
 4          A.    Right.
 5          Q.    And so you began to serve with
 6    Mr. Schatz, Mr. Cardillo, and you were the third
 7    member of the selectman, right?
 8          A.    That's right.
 9          Q.    Can you describe the circumstances
10    surrounding hiring Mr. Cardillo as the fire chief?
11          A.    That was before my time and I was not
12    involved in that.
13          Q.    All right.  And so, at the time you
14    became the selectman, he was already serving as the
15    fire chief; is that right?
16          A.    That's right.
17          Q.    Now, at any point in time prior to your
18    election as a selectman, did you register any
19    objection to him being both a fire chief and a
20    selectman?
21          A.    No.
22                MR. LAWLESS:  Objection.  You can
23    answer.
24                THE WITNESS:  No.  Sorry.  No.
```

Page 17

```
 1          Q.    (By Ms. Quigley)  At any point in time,
 2    when you were seeking his support to support you in
 3    your quest to become a selectman, did you register
 4    any objection to him serving as both a fire chief and
 5    a member of the board of selectman?
 6          A.    No.
 7          Q.    So once you were I elected, would you
 8    describe what your relationship was with
 9    Mr. Cardillo?
10                MR. LAWLESS:  Objection.  You can
11    answer.
12                THE WITNESS:  I thought it was good.
13          Q.    (By Ms. Quigley)  So the three of you
14    served together with Mr. Schatz, the two of you on
15    the board.  How long did the three of you serve
16    together, you and Mr. Schatz and Mr. Cardillo?
17          A.    A year.
18          Q.    And during that year did you have any
19    disputes with Mr. Cardillo?
20                MR. LAWLESS:  Objection.  You can
21    answer.
22                THE WITNESS:  I can't think of any.
23          Q.    (By Ms. Quigley)  Did you ever have any
24    issues, that you were concerned about, relative to
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 18

1  the way Mr. Cardillo was running the fire department?
2        MR. LAWLESS: Objection. You can
3     answer the question.
4        Q.   (By Ms. Quigley)  During that year?
5        A.   I don't remember anything.
6        Q.   All right.  At the time that you were
7     serving, with Mr. Schatz and Mr. Cardillo as the
8     selectman, who was the town administrator?
9        A.   It was changed.  It was first Georgia
10    Morrison and then Danielle Phillio.
11       Q.   All right.  Did that change sometime
12    midterm in your first year?
13       A.   I don't remember the time.
14       Q.   So did you start with Ms. Morrison?
15       A.   Yes.
16       Q.   And eventually it changed to Ms. Phillio;
17    is that right?
18       A.   Correct.
19       Q.   During your tenure, as a selectman when
20    Ms. Morrison was the town administrator, do you
21    recall ever having any conflict or problem regarding
22    Mr. Cardillo in his duties as the fire chief?
23       MR. LAWLESS: Objection. You can
24    answer.

Page 19

1        THE WITNESS: No.
2        Q.   (By Ms. Quigley)  And during that year,
3     once Ms. Phillio assumed her responsibility as the
4     town administer, during that year with the three
5     select people, you Mr. Cardillo and Mr. Schatz, do
6     you recall having any type of issue or conflict about
7     Mr. Cardillo's performance as the fire chief?
8        MR. LAWLESS: Objection. You can
9     answer.
10       THE WITNESS: I don't remember.  I
11    don't remember anything.
12       Q.   (By Ms. Quigley)  All right.  So I want
13    to go back to your initial involvement with becoming
14    a selectman.
15           During your tenure as a selectman, did
16    you ever have to deal with employee issues in terms
17    of discipline of employees?
18       MR. LAWLESS: Objection. You can
19    answer.
20       THE WITNESS: I don't -- I'm not
21    sure.
22       Q.   (By Ms. Quigley)  All right.  And you
23    would agree, would you not, that the role of the
24    selectman was essentially to be the supervisor or

Page 20

1     employer of the town employees, correct?
2        MR. LAWLESS: Objection. You can
3     answer.
4        THE WITNESS: Correct.
5        Q.   (By Ms. Quigley)  So if there were
6     problems that arose about an employee, eventually
7     that would be something that you, as a selectman,
8     would deal with together with your two colleagues,
9     correct?
10       A.   Not necessarily.  The town administrator
11    may deal with it beforehand.
12       Q.   Would the town administrator then report
13    to you about issues that had come up with employees?
14       A.   Not necessarily.
15       Q.   All right.  So could there be issues
16    surrounding discipline of employees that you were not
17    aware of?
18       A.   Yes.
19       Q.   Now, when the change took place between
20    the first town administrator and the second,
21    Ms. Phillio, do you recall any issues that came up
22    about the discipline of town employees during the
23    tenure when it was you, yourself, and Ms. Phillio?
24       MR. LAWLESS: Objection.

Page 21

1        THE WITNESS: Well, it's hard for
2     me to put things in a time frame for work.
3     So there were discipline issues that
4     Ms. Phillio and I dealt with, but I don't
5     know exactly when, in the span of time that
6     it was.
7        Q.   (By Ms. Quigley)  All right.  So let me
8     ask the question in a better way for you.
9           So during the course of your tenure --
10    you were a selectman for how long?
11       A.   I was a selectman for three years.
12       Q.   So during the three-year tenure, would
13    you describe any employee disciplinary issues that
14    you dealt with either with the selectman or with the
15    town administrator.
16       MR. LAWLESS: Objection. You can
17    answer.
18       THE WITNESS: Yes.  I can think of
19    two.  One we had an issue with the
20    accountant.  And another we had an issue
21    with the person who was over the compactor.
22    I don't know what you call him.  Well, the
23    person who watched the town dump, the
24    compactor and the disposal area.

6  (Pages 18 to 21)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 22

```
 1        Q.      (By Ms. Quigley)  So the issue with the
 2   accountant, what was that about?
 3        A.      I don't remember the specifics.  I don't
 4   remember specifics.
 5        Q.      Who was the accountant?
 6        A.      Elaine Markum.
 7        Q.      And do you remember whether she was
 8   disciplined?
 9        A.      No.  I don't believe she was.
10        Q.      And do you know when this would have
11   occurred?
12        A.      Well, it would have probably been the
13   second year of my tenure.
14        Q.      And how did the issues surrounding any
15   malfeasance or misfeasance on her part come to your
16   attention?
17        A.      It was brought to my attention by the
18   town administrator.
19        Q.      By that time was the town administrator
20   Ms. Phillio?
21        A.      Yes.
22        Q.      And what did she tell you?
23        A.      Well, I don't remember the specifics of
24   the situation.
```

Page 23

```
 1        Q.      Well, what was the general gist?
 2        A.      Maybe exceeding her authority.
 3        Q.      And how was it handled by the selectman?
 4        A.      It's a matter of the record.  I believe
 5   we were going to discipline her but she chose to
 6   retire beforehand.
 7        Q.      So she left the position; is that right?
 8        A.      Yes.
 9        Q.      Was she given any written warnings?
10        A.      I don't remember.
11        Q.      Do you know whether she was put on
12   formal notice of the discipline or the disciplinary
13   action?
14        A.      No.  I don't remember the procedures that
15   we used.  We were in touch with the town counsel at
16   the time.
17        Q.      Who was the town counsel at the time?
18        A.      Ray Meyeres.
19        Q.      Pardon me?
20        A.      Meyeres, Ray Meyeres.
21        Q.      Ray Meyeres.  Is that M-I-E-R-E-S?
22        A.      M-E-Y-E-R-E-S.  Meyeres and Harrington
23   was the firm.
24        Q.      All right.  And where are they out of?
```

Page 24

```
 1        A.      I don't remember.  Their town counsel is
 2   someplace close to Boston.  I don't remember the
 3   town.
 4        Q.      And what was the other employee that was
 5   disciplined, or who was it?
 6        A.      This was the overseer or the guard, I
 7   guess it would be, of the town compactor.
 8        Q.      And where was the town compactor located?
 9        A.      It's in the town garage area.
10        Q.      All right.  And who was this person?
11        A.      I forget his name.
12        Q.      So what was the issue there?
13        A.      We received a lot of complaints about him
14   being rude, I guess, and bossy to the citizens.
15        Q.      So what was the discipline that he
16   received?
17        A.      We talked to him.  I think it was a
18   verbal warning.
19        Q.      And was that memorialized in some kind of
20   employee file?
21        A.      I believe it was.
22        Q.      Was any other complaints brought to the
23   attention of the board that were not dealt with by
24   way of discipline meaning like claims of misfeasance
```

Page 25

```
 1   or malfeasance by town employees that were not dealt
 2   with by discipline?
 3            MR. LAWLESS:  Objection.  You can
 4   answer.
 5            THE WITNESS:  Well, that's hard to
 6   say.  I mean, there were always comments
 7   made.  I don't know how much would be
 8   complaints, yeah.  I mean, there was a
 9   constant stream of.
10        Q.      (By Ms. Quigley)  Complaints?
11        A.      Yes.  Comments and requests.
12        Q.      Did you ever receive complaints about
13   employees of the town stealing property of the town?
14        A.      I don't remember.
15        Q.      So directing your attention then to the
16   term of your tenure.  During the first year of your
17   tenure did you receive any complaints about
18   Mr. Cardillo and his role as the fire chief?
19        A.      I don't remember any.
20        Q.      All right.  So during the first year of
21   your tenure, confirming that it was you, Mr. Cardillo
22   and Mr. Schatz, once Mr. Schatz left was it Mr. Flynn
23   who replaced Mr. Schatz?
24        A.      Yes.
```

7 (Pages 22 to 25)

**Donald Chabon**
**March 4, 2020**

Page 26

1    Q.   How far into your three-year tenure did
2  that happen?
3    A.   After the first year.
4    Q.   All right.  So for the last two years of
5  your tenure it was --
6    A.   Wait.  Was it the first year?  Let me
7  see.  The first year it was (voice trailing off)
8         Then that's right.  It would be the
9  second year.
10   Q.   So in the second year Mr. Flynn took
11 over, took Mr. Schatz's position, after having been
12 elected; is that right?
13   A.   After the second year.
14   Q.   Okay.  After the second year or during
15 the second year?
16   A.   So who was there -- yeah.  Oh.  So it was
17 the three of us.  So during the second year.  Sorry.
18   Q.   So some time in the second year it was
19 you, Mr. Flynn, and Mr. Cardillo; is that right?
20   A.   (Witness shaking head)
21   Q.   Now, up to the point in time that
22 Mr. Flynn took over, had anyone raised any objection
23 to Mr. Cardillo serving as both the fire chief and
24 the selectman?

Page 27

1         MR. LAWLESS:  Objection.  You can
2  answer.
3         THE WITNESS:  No.
4    Q.   (By Ms. Quigley)  So eventually, when
5  Mr. Flynn came into office, would you describe
6  whether Mr. Flynn started to make objections, either
7  directly to you in meetings, or indirectly outside of
8  meetings, to Mr. Cardillo serving as the fire chief
9  and the selectman?
10        MR. LAWLESS:  Objection.  You can
11 answer.
12        THE WITNESS:  I don't remember that.
13   Q.   (By Ms. Quigley)  So is it your position
14 that he had no objection to this?
15        MR. LAWLESS:  Objection.  You can
16 answer.
17        THE WITNESS:  I don't know.  I don't know.
18   Q.   (By Ms. Quigley)  So in this time,
19 did you speak to Mr. Flynn outside of the context of
20 selectman meetings?
21        MR. LAWLESS:  Objection.  You can answer.
22        THE WITNESS:  No.
23   Q.   (By Ms. Quigley)  So you never talked to
24 him on the phone other than at a selectman meeting?

Page 28

1    A.   I don't remember.  I don't remember doing
2  that.
3    Q.   Did you ever talk to him in the hallway
4  of the town hall or any other location outside of the
5  hearing room where the selectmen meet?
6    A.   We would talk sometimes.
7    Q.   Did you ever hear Mr. Flynn express
8  objection to Mr. Cardillo serving as the police chief
9  and as a selectman?
10        MR. LAWLESS:  Objection.
11        THE WITNESS:  Fire chief.
12        MS. QUIGLEY:  Excuse me.  Fire
13 chief.  Excuse me.  Thank you.
14        THE WITNESS:  No.  I don't remember
15 him saying that.
16   Q.   (By Ms. Quigley)  So as you sat as a
17 selectman, for the three-year period that you served,
18 were you aware that Mr. Flynn had an objection to him
19 serving as a fire chief and the selectman?
20        MR. LAWLESS:  Objection.  You can
21 answer.
22        THE WITNESS:  Well, I had heard that
23 he wrote this letter to the editor, but it
24 never came up and I don't remember it ever

Page 29

1  coming up.
2    Q.   (By Ms. Quigley)  So you never spoke to
3  him privately about that?
4    A.   Not that I remember.
5    Q.   Did you ever speak to him during either
6  executive session or open meetings about any
7  objection to him serving as both fire chief and the
8  selectman?
9    A.   Well, when the hearing came and we were
10 discussing Chuckie's discipline, the subject of
11 Chuckie being -- not being a selectman came up.  But
12 prior to that, I don't recall.
13   Q.   So you had no discussions with him, to
14 the best of your knowledge?
15   A.   To the best of my knowledge, no.
16   Q.   Now, at some point in time it came to the
17 attention of the select board that there had been a
18 scam perpetrated on Mr. Cardillo from some purveyors
19 of, I guess, provisions for the fire department,
20 right?
21   A.   Right.
22   Q.   How did you learn about that?
23   A.   The town -- the assistant town
24 administrator told me that the accountant wanted to

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 30

1  talk to me and I went to see the accountant and he
2  explained the situation.
3    Q.  All right.  And who was the accountant?
4    A.  Ray -- I can't remember his last name.
5    Q.  Did he keep an office in the town ser --
6    A.  Yes.
7    Q.  And was that his full-time position?
8    A.  Yes, I think it was a full-time position.
9    Q.  And who was the assistant town
10  administrator?
11   A.  Theresa Zanetti.
12   Q.  And what did Theresa Zanetti say to you?
13   A.  She said that the town accountant wanted
14  to talk to me.
15   Q.  And what did you do?
16   A.  I came in and talked to the town
17  accountant.
18   Q.  And when did you do that?
19   A.  Well, i don't remember the date.  It was
20  a Friday.  I don't remember.
21   Q.  All right.  Up to that point in time had
22  you heard anything about any problems with materials
23  being purchased by the fire chief?
24   A.  No.

Page 31

1    Q.  So when you spoke with the town
2  accountant, was anybody else present?
3    A.  No.
4    Q.  So how long did that discussion last?
5    A.  I don't remember.  A half an hour, an
6  hour.
7    Q.  And what was said during that discussion?
8    A.  Well, he went over these purchases that
9  Mr. Cardillo made, identified monies that could have
10  been -- that were involved, relative costs of this
11  material that he found versus what we paid.  Those
12  are the main items that I remember.
13   Q.  Now, just a bit about the organizational
14  structure of the town at that point.
15       So would you agree that the fire chief
16  was not the requisition officer for the fire
17  department?
18       MR. LAWLESS:  Objection.  You can
19  answer.
20       THE WITNESS:  Yeah.  I don't know.
21  I don't remember the policy.  Who was the
22  requisitions officer?
23   Q.  (By Ms. Quigley)  All right.  Well, do
24  you know who was in charge for buying materials for

Page 32

1  the fire department?
2    A.  I would imagine that it would be Chuckie.
3    Q.  But do you know that?
4    A.  I don't know if I know that.
5    Q.  So in your role as a select person, did
6  you have any command of who was in charge of buying,
7  I guess, provisions or supplies for any particular
8  department?
9        MR. LAWLESS:  Objection.  You can
10  answer.
11       THE WITNESS:  I remember, at the
12  time, having a discussion with Tommy Muester
13  [phonetic], but I don't remember the exact
14  outcome of that discussion or the result of
15  that discussion.
16   Q.  (By Ms. Quigley)  So was a part of your
17  role as select person wasn't it your job to oversee
18  the financial life of the town?
19   A.  Yes, it was.
20   Q.  So as you sit here today, are you saying
21  you have no idea of who was in charge of the
22  requisitions of the fire department --
23       MR. LAWLESS:  Objection.
24   Q.  (By Ms. Quigley) -- during your period of

Page 33

1  time?
2    A.  I understood it to be monitored --
3  purchases to be monitored by the town administrator,
4  and the accountant, which it was.
5    Q.  All right.  So do you know of any kind of
6  bylaw or meeting or determination or ruling by the
7  selectmen that conferred upon the fire chief to make
8  requisitions for the fire department?
9    A.  No, I don't know that.
10   Q.  So is it your view that the town
11  administrator and the town accountant were in charge
12  of that responsibility?
13       MR. LAWLESS:  Objection.  You can
14  answer.
15       THE WITNESS:  Overseeing.  Checking
16  up on.
17   Q.  (By Ms. Quigley)  So why is it that you
18  do not know who was responsible for buying stuff for
19  the fire department?
20       MR. LAWLESS:  Objection.  You can
21  answer.
22       THE WITNESS:  I don't know why I
23  don't know.
24   Q.  (By Ms. Quigley)  All right.  So

9 (Pages 30 to 33)

**Donald Chabon**
**March 4, 2020**

Page 34

```
1    eventually he was fired because you claim that he
2    inappropriately bought stuff for the fire department?
3         MR. LAWLESS:  Objection.
4         Q.    (By Ms. Quigley)  So why did you fire
5    him, and voted to fire him, if you did not know he
6    was in charge of the ordering of the requisitions?
7         MR. LAWLESS:  Objection.  You can
8    answer.
9         THE WITNESS:  Because in his role,
10   the purchases that he made, whether he was
11   in charge of it or not, he needed to be
12   responsible.  He needed to be -- he needed
13   to be responsible.
14        Q.    (By Ms. Quigley)  Okay.  Oh, I'm sorry.
15   I don't mean to interrupt you.  Would you like to say
16   anything else?
17        A.    Nope.
18        Q.    You would agree that there were two
19   levels of review of his purchases, correct?
20        MR. LAWLESS:  Objection.  You can
21   answer.
22        THE WITNESS:  Okay.  It was my
23   understanding that that's right, yes.
24        Q.    (By Ms. Quigley)  Ultimately it was the
```

Page 35

```
1    final say of the town administrator, as the
2    purchasing agent for the town, to determine whether
3    something was purchased or not, correct?
4         MR. LAWLESS:  Objection.  You can
5    answer.
6         THE WITNESS:  There was a transition
7    when the purchasing agent was the previous
8    account who was then -- who had retired.
9         Then there was a period, I
10   believe, when it was not defined until it
11   was defined as the town administrator.
12        Q.    (By Ms. Quigley)  So it was either the
13   town accountant --
14        A.    Prior town accountant.
15        Q.    -- prior town accountant or the town
16   administrator that was the purchasing agent,
17   correct?
18        A.    I think so.  I really don't remember.
19        Q.    And the deal for paying the bills for
20   these acquisitions was the bill would be submitted
21   and it would be approved by the accountant and the
22   town administrator, correct?
23        A.    I don't remember the procedure.  I think
24   that's right.
```

Page 36

```
1         Q.    Just a point of order, was either the
2    town administrator or the town accountant disciplined
3    for these actions?
4         MR. LAWLESS:  Objection.  You can
5    answer.
6         THE WITNESS:  No.
7         Q.    (By Ms. Quigley)  Now, you would agree
8    that eventually, after some investigation, it was
9    determined that the two business, that were doing
10   this, were committing scams on the Town of
11   Stockbridge, correct?
12        A.    Yes.
13        Q.    And through the investigation, through
14   the town, it was learned that they committed scams
15   upon many other departments and towns in the
16   Commonwealth of Massachusetts and the northeast,
17   correct?
18        A.    That's my understanding.
19        Q.    My question to you then is:  Why is it
20   that Mr. Cardillo was disciplined for this
21   circumstance and not the town administrator or the
22   town accountant who had the ultimate approval
23   authority?
24        MR. LAWLESS:  Objection.  You can
```

Page 37

```
1    answer.
2         THE WITNESS:  First of all, I'm not
3    sure that they had -- at the time -- what
4    the procedure was for the ultimate approval
5    authority.  I believe Mr. Cardillo was
6    relied upon to be responsible in his
7    purchases and that's why -- he was the
8    primary actor.  The other people were
9    checking and they eventually caught that
10   after many years.
11        Q.    (By Ms. Quigley)  All right.  So this
12   went on for several years, did it not?
13        A.    Yes.
14        Q.    And you would agree, would you not, that
15   Mr. Cardillo received no personal gain from these
16   acquisitions?
17        MR. LAWLESS:  Objection.  You can
18   answer.
19        THE WITNESS:  Well, I don't know.
20        Q.    (By Ms. Quigley)  So do you have any
21   evidence that he had any personal gain from buying
22   these items from these two companies?
23        A.    Well, there was a time when he was --
24   before my time -- when I think he was under pressure
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 38

1    for his job and I think he might have done this or
2    hidden it or not revealed this to keep his job at
3    that time.
4        Q.    All right.  So what evidence do you have
5    for that?
6        A.    Yeah.  I don't have evidence of that.
7        Q.    So would you agree then that, to the best
8    of your knowledge, based upon the information that
9    you had at the time that he was discharged, would you
10   that there was no evidence that he had any personal
11   gain from this whole acquisition?
12       A.    Financial gain?
13       Q.    Yes.
14       A.    No financial gain.
15       Q.    Now, would you agree that each bill that
16   he had submitted for payment to the town was
17   submitted by both the accountant and the town
18   administrator?
19           MR. LAWLESS:  Objection.  You can
20   answer.
21           THE WITNESS:  It probably was.
22       Q.    (By Ms. Quigley)  And would you agree the
23   town administrator and the town accountant had
24   oversight authority over those bills?

Page 39

1           MR. LAWLESS:  Objection.  You can
2    answer.
3           THE WITNESS:  Yes.  I would say so.
4        Q.    (By Ms. Quigley)  Now, during the course
5    of your interaction with Mr. Cardillo, as a member of
6    the board of selectman, especially in the first year,
7    would you agree you had a good relationship with him?
8        A.    Yes.
9        Q.    And would you agree that he presented
10   himself as a responsible member of the board?
11       A.    Yes.
12       Q.    Was there anything about his performance,
13   as a member of the board of selectman, in the first
14   year of your tenure with him, that made you believe
15   there was any issue with his performance as a
16   selectman?
17       A.    No.
18       Q.    And you would agree and acknowledge that
19   he was duly elected by the town?
20       A.    Yes.
21       Q.    Now, directing your attention to the
22   period of time between the first year and the second
23   year, how much into the second year did the change
24   take place between Mr. Schatz and Mr. Flynn?

Page 40

1        A.    At thesecond year.
2        Q.    Was it more like on the calendar year?
3        A.    Yeah.  It was the election.
4        Q.    So the election took place in sometime in
5    November and --
6        A.    In May.
7        Q.    In May?
8        A.    Yeah.
9        Q.    So when would the new select person take
10   charge?
11       A.    Right away.
12       Q.    So within a week, let's say?
13       A.    The next day.
14       Q.    So once Mr. Flynn was involved, would you
15   describe your relationship with Mr. Flynn.
16           MR. LAWLESS:  Objection.  You can
17   answer.
18           THE WITNESS:  Yes.  It was not
19   particularly good.
20       Q.    (By Ms. Quigley)  In what sense?
21       A.    We agreed to disagree and I don't think
22   we got along very well.
23       Q.    All right.  And how about your
24   relationship with Mr. Cardillo?

Page 41

1        A.    We always got along.
2        Q.    So once Mr. Flynn began his tenure, did
3    you observe anything about your interactions with
4    Mr. Cardillo that would lead you to believe he wasn't
5    acquitting himself as an appropriate selectman?
6        A.    No.  He was an appropriate selectman.
7        Q.    All right.  Did he show up for the
8    meetings on time?
9        A.    Of course he did.
10       Q.    Did he participate appropriately in the
11   meetings?
12       A.    Yes.
13       Q.    Would you agree that there was no issue
14   that you had with his performance as a selectman --
15       A.    Yes.
16       Q.    I'm just going to finish the question.
17           -- once the year began and Mr. Flynn
18   started?
19       A.    That's correct.
20       Q.    All right.  So then, after Mr. Flynn
21   started, you would agree you had, it sounds like, a
22   somewhat contentious relationship with Mr. Flynn in
23   the second year, correct?
24       A.    Correct.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 42

1     Q.     Did Mr. Cardillo have a contentious
2  relationship with him too during the selectman
3  meetings?
4           MR. LAWLESS:  Objection.  You can
5  answer.
6           THE WITNESS:  I don't know.
7        (By Ms. Quigley)  And did you observe any
8  problematic interactions during the meetings between
9  Mr. Cardillo and Mr. Flynn?  In the second year?
10    A.    I understand.  I don't remember.
11    Q.     So is it that you don't remember or that
12 there were none?
13    A.    I don't remember his interactions with
14 Terry Flynn very much.
15    Q.     So at some point in time it came to your
16 attention that these acquisitions had taken place.
17 Do you remember how that came to your attention?
18           MR. LAWLESS:  Objection.  You can
19 answer.
20           THE WITNESS:  Oh.  We're back to the
21 acquisitions.
22           Yes.  The accountant told me.
23    Q.    (By Ms. Quigley)  So do you need a break?
24    A.    No.

Page 43

1     Q.     All right.  So when was that
2  approximately?
3     A.    Well, it was -- you know, I can't
4  remember the dates.  Well, it was within the month
5  before the hearing started or the discussion with
6  Chuckie started.
7     Q.     All right.  So putting it another way,
8  once you were informed by the town accountant that
9  there were with issues with the requisitions, did you
10 immediately discuss it with Mr. Cardillo?
11    A.    I called the town counsel, and he
12 suggested that I meet with Mr. Cardillo and I did.
13    Q.     All right.  So did you meet with him one
14 on one?
15    A.    I did.
16    Q.     And what did you say to him?
17    A.    Well, I explained the situation and then
18 asked him what had happened.
19    Q.     All right.  And what did he say to you?
20    A.    I don't remember.  I remember the
21 conversation but I don't remember the details.
22    Q.     So what was the gist of the conversation?
23    A.    The conversation was:  This is what the
24 accountant told me and what do you know about it?

Page 44

1     Q.     And what did he say to you?
2     A.    I don't remember the conversation.
3     Q.     So what was the gist of what he told you?
4     A.    Okay.  I don't remember the gist of what
5  he told me.
6     Q.     So you have no memory of what he'd said?
7     A.    That's correct.
8     Q.     So what happened next with this issue?
9     A.    Then, at some point, I asked the town
10 counsel to look into that, to investigate it, I
11 think.
12    Q.     And was that still the original town
13 counsel that you referred to recently?
14    A.    Yes.
15    Q.     So after you did that, what happened
16 next?
17           MR. LAWLESS:  Objection.  But you
18 can answer.
19           THE WITNESS:  Well, he did.  And I
20 then decided that we needed to deal with the
21 subject, is the best way to put it.
22    Q.    (By Ms. Quigley)  So, as a result of
23 that decision, what did you do?
24    A.    As a result of that decision, I asked the

Page 45

1  town counsel to investigate it and I made an
2  announcement, at the town meeting, that it seemed we
3  had been subjected to this and I asked the town
4  counsel to look it into it.
5     Q.     During this period of time, did you have
6  any discussions with Mr. Flynn about this?
7     A.    No, I didn't.  But I did ask the town
8  accountant to advise Mr. Flynn of what was going on.
9     Q.     So is it your testimony that from the
10 point in time you were notified, by the town
11 accountant, until the town counsel began the
12 investigated, that you had no independent discussions
13 with Mr. Flynn about this issue?
14    A.    I don't remember any discussions about
15 the issue.
16    Q.     Did you deal with this at any kind of a
17 selectmen's meeting?
18    A.    I don't remember.  I don't remember how
19 we dealt with that.
20    Q.     So did you speak with the town
21 administrator about this?
22    A.    She was on sick leave and I did not.
23    Q.     And, at any point in time, once you were
24 notified about this issue, by the town accountant,

Catuogno Court Reporting - A Service of InfraWare
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

**Donald Chabon**
**March 4, 2020**

Page 46

1  did you speak to the town administrator about
2  Mr. Cardillo?
3      A.   Say that again.
4      Q.    At any point in time, after you were
5  notified by the town accountant about this issue, did
6  you speak to the town administrator about this issue?
7      A.   Until when? I mean ...
8      Q.    Any time?
9      A.   Well, eventually, yes, I did.
10     Q.    And what did you say to her?
11     A.   I don't remember that. I don't remember
12  what I said to her.
13     Q.    So when would you have had a conversation
14  with her?
15     A.   I don't remember. Either -- I don't
16  recall. Certainly when she came back, but I don't
17  remember when that was.
18     Q.   How long was she out for?
19     A.   She was out for several months.
20     Q.   So when she came back, at what stage was
21  the proceeding relative to Mr. Cardillo and his job?
22     A.   It was -- I would guess, shortly after it
23  started.
24     Q.    All right. So once she came back, would

Page 47

1  it be appropriate to discuss her involvement, if any,
2  with this issue?
3         MR. LAWLESS: Objection. You can
4  answer.
5         THE WITNESS: Yeah, I did. I am
6  sure that I did. The one thing I do recall
7  is that it was pointed out to me that she
8  was the one that flagged this to the
9  accountant.
10     Q.   (By Ms. Quigley) All right. And so how
11  long after these acquisitions had begun was this
12  picked up by the town administrator, or this town's
13  administrator?
14         MR. LAWLESS: Objection. You can
15  answer.
16         THE WITNESS: I don't know. I would
17  say -- I don't know. I don't know. I don't
18  know the time spans of things like that.
19     Q.   (By Ms. Quigley) So what was your
20  conversation with the town accountant, if any, about
21  this issue?
22     A.   Well, I didn't have a conversation with
23  him. He just reported to me what he found.
24     Q.    And what did he say that he found?

Page 48

1      A.   I said that previously. I'll say it
2  again.
3      Q.    Please say it again.
4      A.   Okay. Let me see. Excessive material,
5  for an extended period of time at a high price, at an
6  unusually high price. Was this the same accountant,
7  the town accountant that had been in place for the
8  entire period of the acquisitions?
9         MR. LAWLESS: Objection. You can
10  answer.
11         THE WITNESS: No.
12     Q.   (By Ms. Quigley) So did you consult with
13  the prior town accountant about this?
14     A.   No.
15     Q.    Approximately how many years had this
16  town accountant approved these acquisitions?
17     A.   The prior one?
18     Q.    No. The existing one. Over how many
19  years would he --
20     A.   Oh. It wouldn't be years. It would have
21  been -- he started recently.
22     Q.    So approximately how far into your tenure
23  as a selectman did this new town accountant start?
24     A.   I would guess after the first year or

Page 49

1  two.
2      Q.    All right. And what was his name again?
3      A.   Ray.
4      Q.    And you don't know his last name?
5      A.   Elseworth, I think.
6      Q.    Ray Elseworth. And was he completely
7  in-house?
8      A.   Yes.
9      Q.    Who was the prior town accountant?
10     A.   Elaine Markam.
11     Q.    And did you speak with Elaine Markam
12  about this situation?
13     A.   No.
14     Q.    So once this was brought to your
15  attention, you testified there was no disciplinary
16  action taken against the town accountant or the town
17  administrator for this action, correct?
18         MR. LAWLESS: Objection. You can
19  answer.
20         THE WITNESS: Correct, yes.
21     Q.   (By Ms. Quigley) What happened next
22  after the town counsel rendered his report?
23     A.   I can't remember the sequence of things.
24  I don't remember what happened next. I don't know if

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

Page 50

```
 1    that's the time we started talking with Chuckie or
 2    before or after.  I don't remember.
 3         Q.     But, at some point in time, after you had
 4    asked for the report by town counsel, you started
 5    to have private conversations with Mr. Cardillo; is
 6    that right?
 7              MR. LAWLESS:  Objection.  You can
 8         answer.
 9              THE WITNESS:  They were not private.
10         They were on the record.  They were
11         executive sessions.
12         Q.     (By Ms. Quigley)  So is it your testimony
13    today that there were no conversations with
14    Mr. Cardillo that were not either executive session
15    or open sessions?
16              MR. LAWLESS:  Objection.  You can
17         answer.
18              THE WITNESS:  I don't remember any.
19         Q.     (By Ms. Quigley)  Did you have any
20    conversation with Mr. Flynn and Mr. Cardillo and
21    yourself, at the town hall, when there was no
22    selectmen meeting called?
23              MR. LAWLESS:  Objection.  You can
24         answer.
```

Page 51

```
 1              THE WITNESS:  I do not remember that
 2         and I don't believe that would happen.
 3         Q.     (By Ms. Quigley)  So is it your testimony
 4    that you never had any kind of meeting with
 5    Mr. Cardillo, with Mr. Flynn, yourself and
 6    Mr. Cardillo, that was not either part of an open
 7    session or a selectmen meeting?
 8         A.     I don't remember anything like that.
 9         Q.     So putting aside what the context was, in
10    terms of it being a private meeting, a selectmen's
11    meeting or executive session, putting that aside for
12    a moment, can you describe your meeting with
13    Mr. Cardillo about this issue?
14              MR. LAWLESS:  Objection.  You can
15         answer.
16              THE WITNESS:  My meetings?  Say that
17         again.
18         Q.     (By Ms. Quigley)  So you would agree that
19    you had meetings with Mr. Cardillo and Mr. Flynn
20    about how to resolve this issue?
21         A.     Yes.
22         Q.     All right.  And so putting aside the
23    issue of what the context was, whether it was part of
24    a selectmen's meeting, part of an executive session
```

Page 52

```
 1    of a selectmen's meeting, or a private meeting --
 2         A.     Um-hmm.
 3         Q.     -- putting that issue aside for a moment,
 4    when did those meetings take place?
 5         A.     When?  I would say they took place
 6    leading up to the hearing.
 7         Q.     All right.  So what did you say to
 8    Mr. Cardillo and what did Mr. Flynn say to
 9    Mr. Cardillo?
10         A.     Well, they would be on the record.  I
11    don't remember the exact exchanges.  I don't remember
12    the exchanges.  Yeah.  I don't remember the
13    exchanges.
14         Q.     So you don't remember any private
15    meetings at all with Mr. Cardillo or the content of
16    the exchanges?
17              MR. LAWLESS:  Objection.  You can
18         answer.
19              THE WITNESS:  When you say "private
20         meetings," you mean?
21         Q.     (By Ms. Quigley)  Irrespective of whether
22    it was on the record, in executive meeting or
23    executive session or a private meeting, irrespective
24    of any of those issues, when you were talking to
```

Page 53

```
 1    Mr. Cardillo, prior to a selectmen's meeting, let's
 2    say, what was the content of the meeting?
 3              MR. LAWLESS:  Objection.  You can
 4         answer.
 5              THE WITNESS:  Okay.  I mean, the
 6         contents would have been what happened and
 7         if we could work out some sort of
 8         arrangement or understanding or agreement
 9         that would be satisfactory.
10         Q.     (By Ms. Quigley)  So what was the
11    proposal?
12         A.     There were several proposals.  One was
13    that Chuckie be -- I think it was an EMT doing
14    inspections and some other functions.
15         Q.     And what would happen to his position as
16    a selectman?
17         A.     Right.  That was he was to give up his
18    position as a selectman.
19         Q.     And why did you suggest that?
20         A.     I was seeking a way to give Chuckie the
21    option of still working for the town.
22         Q.     Why did he have to give up his position
23    as selectman to do that?
24         A.     That war Terry, Terry Flynn's item, and I
```

14 (Pages 50 to 53)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 54

1    had to have his agreement to work things out.  So I
2    went along with those side of things in order to give
3    him the opportunity to have a good job with the town.
4        Q.    And what type of remediation was offered
5    as part of the job?
6              MR. LAWLESS:  Objection.  You can
7    answer.
8              THE WITNESS:  I don't recall.  I
9    believe it was comparable.
10       Q.    (By Ms. Quigley)  What actual job was
11   offered?
12       A.    As I'd said, I think there was some
13   functions including EMT and inspections and there may
14   have been some other functions as well.
15       Q.    So you don't remember?
16       A.    Well, I remember what I remember.
17       Q.    How about him continuing in his position
18   as chief of the fire department?
19       A.    No.
20       Q.    Why is that?
21       A.    I didn't feel he could after what had
22   happened.
23       Q.    And why was that?
24       A.    Because he was responsible and there was

Page 55

1    too much over too long a period of time; even though
2    it was known, with ample resources to report it and
3    many opportunities and sympathetic people; and, yet,
4    it wasn't reported and it wasn't dealt with.  And it
5    clear it was wrong and he knew it was wrong.
6        Q.    So let's back up a little bit.  Was there
7    ever an acquisition that he didn't report to the
8    town?
9        A.    I don't know that.  I don't know that.
10       Q.    Do you know whether anybody can get paid
11   by the town without having it being approved by the
12   town accountant or town administrator?
13       A.    I believe not.
14       Q.    So, to the best of your knowledge, as you
15   sit here today, was there ever any bill, he
16   submitted, that wasn't paid by the town --
17             MR. LAWLESS:  Objection.
18       Q.    (By Ms. Quigley) -- to the best of your
19   knowledge?
20       A.    I believe there were.  I believe there
21   were, yes, I think at the end.
22       Q.    Meaning bills that were not paid because
23   there was then an objection lodged to paying them?
24       A.    Yeah.  There was recognition that there

Page 56

1    was a problem.
2        Q.    But up to that point in time, was there
3    ever a bill submitted by him that was paid that
4    wasn't approved by the town --
5        A.    No.  Not to my knowledge.
6        Q.    You have to let me finish.  Sorry about
7    that.
8        A.    I'm sorry.
9        Q.    (By Ms. Quigley)  -- by the town
10   administrator and the town accountant?
11             MR. LAWLESS:  Objection.  You can
12   answer.
13             THE WITNESS:  Not that I know of.
14       Q.    (By Ms. Quigley)  Now, other than this,
15   would you agree that there were no other complaints
16   about his performance as the town fire chief?
17             MR. LAWLESS:  Objection.  You can answer.
18             THE WITNESS:  I don't know any.
19       Q.    (By Ms. Quigley)  All right.  And up to
20   that point in time, to the best of your knowledge,
21   had he ever been disciplined, by the town, for his
22   performance as the fire chief?
23       A.    No.
24       Q.    As part of your duties as a selectman and

Page 57

1    dealing, addressing this case, are you familiar with
2    Mr. Cardillo's contract?
3        A.    Yes.
4        Q.    And are you familiar with a term in the
5    contract that requires, quote, progressive
6    discipline, unquote?
7              MR. LAWLESS:  Objection.  You can
8    answer.
9              THE WITNESS:  Yes.
10       Q.    (By Ms. Quigley)  So what progressive
11   discipline was employed on behalf of Mr. Cardillo in
12   this matter?
13             MR. LAWLESS:  Objection.  You can
14   answer.
15             THE WITNESS:  It was my
16   understanding that there was another
17   position allowed, under certain
18   circumstances, and that this was acceptable
19   within the contract.
20       Q.    (By Ms. Quigley)  So would you agree
21   there was no progressive discipline in this case?
22       A.    Yeah, that's right.
23       Q.    And would you agree the people above
24   Mr. Cardillo were not disciplined?

15 (Pages 54 to 57)

**Donald Chabon**
**March 4, 2020**

Page 58

1    MR. LAWLESS: Objection. You can
2  answer.
3    THE WITNESS: Well, Mr. Cardillo
4  reported to the select board.
5    Q.   (By Ms. Quigley) Well, I guess I'm going
6  to talk about the approval chain for the payment of
7  the requisitions.
8    A.   No, they were not. They were not
9  disciplined.
10   Q.   Now, if your issue was his performance,
11 as a fire chief, why did he even have to -- was
12 it linked to his retirement or, I guess, resignation
13 as a member of the select board?
14   MR. LAWLESS: Objection. You can
15 answer.
16   THE WITNESS: I don't understand the
17 question.
18   Q.   (By Ms. Quigley) Why did you link his
19 discipline, of being fired, to his retirement as a
20 member of the select board?
21   MR. LAWLESS: Objection.
22   THE WITNESS: Terry was of the
23 opinion that you couldn't, that you
24 shouldn't be qualified.

Page 59

1    Q.   (By Ms. Quigley) And you were aware,
2  were you not, there had been an ethics approval for
3  Mr. Cardillo to perform in these two functions?
4    A.   Yes.
5    Q.   So the ethics commission had approved his
6  ability to serve as both the selectman and the fire
7  chief, correct?
8    MR. LAWLESS: Objection.
9    THE WITNESS: Yes.
10   Q.   (By Ms. Quigley) So I'm asking you
11 about you, and your opinion, irrespective of what
12 Mr. Flynn thinks.
13     So why did you believe that it was
14 inappropriate for him to serve in those two
15 functions?
16   A.   Well, I didn't.
17   Q.   Okay. So why did you link his continued
18 employment with the town, in some other position, to
19 his resignation as a selectman?
20   A.   I was interested in negotiating a
21 position that would give him an opportunity to have a
22 job with the town. And that was the proposal put by
23 Mr. Flynn and I was attempting to work something out.
24   Q.   All right. Do you think he should have

Page 60

1  had to retire?
2    A.   Did I what?
3    Q.   Strike that question.
4      Do you think that he should have had to
5  resign his position as a selectman, in this regard,
6  on top of losing his job?
7    MR. LAWLESS: Objection. You can
8  answer.
9    THE WITNESS: Personally, I didn't
10 think that it was necessary.
11   Q.   (By Ms. Quigley) But you still
12 acquiesced to Mr. Flynn on this point?
13   A.   Yes.
14   Q.   Now, as part of the investigation in this
15 case, did you learn that Mr. Cardillo had kept a
16 personal accounting of his expenditures as part of
17 his personal paperwork in this case?
18   MR. LAWLESS: Objection. You can
19 answer.
20   THE WITNESS: Yes.
21   Q.   (By Ms. Quigley) And where did you learn
22 he kept this information?
23   A.   I believe it came out in -- I don't
24 remember. Did it come out of -- I don't remember

Page 61

1  where I learned it from.
2    Q.   So you would agree that he was not
3  required to keep any formal record as part of his
4  job, correct?
5    MR. LAWLESS: Objection.
6    THE WITNESS: I did not know that.
7    Q.   (By Ms. Quigley) So do you know either
8  way whether he was required to do that?
9    A.   I did not know that.
10   Q.   Eventually did you learn, at his other
11 full-time job, he kept notes, a spreadsheet, for his
12 own use to try to keep track of his expenses?
13   A.   I did understand he kept something like
14 that.
15   MR. LAWLESS: Can we take a break?
16   (Recess taken)
17   MS. QUIGLEY: Back on the record.
18   Q.   (By Ms. Quigley) Just a question. So
19 when the town counsel rendered his report, that
20 became a matter of public record, correct?
21   A.   Correct.
22   Q.   And you would agree that the town counsel
23 recommended that Mr. Cardillo not be fired, correct?
24   MR. LAWLESS: Objection. You can answer.

16 (Pages 58 to 61)

**Donald Chabon**
**March 4, 2020**

Page 62

1         THE WITNESS:  The town counsel did
2    not address that subject.
3         Q.    (By Ms. Quigley)  So is it your
4    understanding that they did not recommend that he be
5    fired?
6         MR. LAWLESS:  Objection.  You can
7    answer.
8         THE WITNESS:  That's correct.
9         Q.    (By Ms. Quigley)  So there was a report
10   that was rendered by the town counsel.  So if that
11   report stated in it that the recommendations was that
12   he not be fired, would you agree that that was his
13   recommendation?
14        MR. LAWLESS:  Objection.  You can
15   answer.
16        THE WITNESS:  No.  His
17   recommendation did not discuss discipline
18   with regard to Mr. Cardillo.
19        Q.    (By Ms. Quigley)  So it is your
20   testimony, here today, that at no point in time did
21   the town counsel recommend that he not be fired?
22        A.    At no point did he recommend that he not
23   be fired.
24        So, in other words, at some point did he

Page 63

1    recommend to be fired; is that what you're saying.
2         Q.    No.  At no point did he recommend --
3    strike that.
4         Is it your testimony that he recommended
5    that he not be fired?
6         MR. LAWLESS:  Objection.  You can answer.
7         THE WITNESS:  He did not recommend
8    that he not be fired.
9         Q.    (By Ms. Quigley)  Did he recommend that
10   he be fired?
11        A.    No.
12        Q.    So would you agree that Mr. Flynn
13   basically had a negative view of Mr. Cardillo about
14   serving as a fire chief and a selectman?
15        MR. LAWLESS:  Objection.  You can
16   answer.
17        THE WITNESS:  Yes.
18        Q.    (By Ms. Quigley)  Now, have you talked to
19   Mr. Flynn about this case since Mr. Cardillo has been
20   fired?
21        MR. LAWLESS:  Objection.  You can
22   answer.
23        THE WITNESS:  I don't remember
24   having done that.

Page 64

1         Q.    (By Ms. Quigley)  Have you talked to any
2    third party, other than your attorney, regarding the
3    fact that Mr. Cardillo could have worked for the town
4    if he resigned as a selectman?
5         MR. LAWLESS:  Objection.  You can
6    answer.
7         THE WITNESS:  No.  I don't remember
8    that.  I don't remember talking -- no, I
9    don't remember that.
10        Q.    (By Ms. Quigley)  Now, as part of the,
11   quote, investigation of the circumstance, Mr. Cardillo
12   turned over his private records, that he kept at his
13   place of work, to the town administrator regarding
14   these expenditures.  Correct?
15        MR. LAWLESS:  Objection.
16        THE WITNESS:  I don't know that they
17   were private and I don't know what he turned
18   over.
19        Q.    (By Ms. Quigley)  So you don't any idea
20   what he turned over to the town?
21        A.    No.  No.
22        Q.    So that being said, you wouldn't have any
23   idea as to whether they were, quote, falsified, or
24   hiding anything, correct?

Page 65

1         MR. LAWLESS:  Objection.  You can
2    answer.
3         THE WITNESS:  Only what has been
4    reported to me through the town counsel's
5    report.
6         Q.    (By Ms. Quigley)  All right.  So what
7    was reported to you about these records?
8         A.    It was reported that these purchases were
9    not entered correctly in a spreadsheet, in such a way
10   that it wasn't apparent what was done.
11        Q.    All right.  So this spreadsheet, was this
12   something that Mr. Cardillo was required to keep as
13   part of his duties as a fire chief?
14        MR. LAWLESS:  Objection.  You can
15   answer.
16        THE WITNESS:  I don't know that.
17        Q.    (By Ms. Quigley)  So at some point in
18   time, this case got some publicity, did it not?
19        A.    Yes.
20        Q.    And, at some point in time, you gave a
21   interview to a reporter at the Springfield
22   Republican?
23        A.    I don't remember, but maybe.
24        Q.    Did you speak with a reporter named

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Donald Chabon
March 4, 2020

---

Page 66

1   Patrick Johnson?
2       A.   I don't remember.
3       Q.   So you would agree that there was some
4   publicity about this in the newspapers, correct?
5       A.   Oh, yes.  Yes.
6       Q.   Do you recall speaking to any reporters
7   whatsoever about --
8       A.   I talked to several reporters.
9       Q.   You have to let me finish the question,
10  though.
11           -- with any reporters whatsoever about
12  this case?
13      A.   Yes, I spoke to reporters about this
14  case.
15      Q.   And would one of them been Patrick
16  Johnson from the Springfield Republican?
17      A.   It could have been.
18      Q.   So do you recall telling Patrick Johnson
19  that Mr. Cardillo had changed the books and exposed
20  the town to a lot of vulnerabilities?
21           MR. LAWLESS:  Objection.  You can answer.
22           THE WITNESS:  I don't remember saying that.
23           MS. QUIGLEY:  So I will show you a
24  newspaper article, and I'm going to ask this

---

Page 67

1   be marked as Exhibit 1, please.
2           (Exhibit DC-1, newspaper article, marked)
3       Q.   So in terms of your statement to Patrick
4   Johnson, who was the reporter from the Springfield
5   Republican, did you tell him that Mr. Cardillo tried
6   to conceal, from the town, these expenditures and
7   that he, quote, changed the books?
8           MR. LAWLESS:  Objection.
9       Q.   (By Ms. Quigley)  Did you say that?
10      A.   That is what it says.
11      Q.   So did you say it?
12      A.   I don't remember saying it.
13      Q.   Did you ever object, when this was
14  printed, or call the reporter to say:  I didn't say
15  that?
16      A.   No, I didn't.
17      Q.   So is it fair to say that you said that
18  to him?
19           MR. LAWLESS:  Objection.  You can
20  answer.
21           THE WITNESS:  Again, I don't remember
22  saying it.
23      Q.   (By Ms. Quigley)  So you don't know
24  whether you said it or not?

---

Page 68

1       A.   Again, I don't remember.
2       Q.   But there it was in black and white in
3   the newspaper.
4           So do you think you said it?
5       A.   I don't remember.  I could have.
6       Q.   If you did say it, what evidence do you
7   have that he changed the books?
8           MR. LAWLESS:  Objection.  You can answer.
9           THE WITNESS:  Well, the books were
10  recorded incorrectly.
11      Q.   (By Ms. Quigley)  What books?
12      A.   The ones that -- the spreadsheet.
13      Q.   And whose spreadsheet was this?
14           MR. LAWLESS:  Objection.  You can
15  answer.
16           THE WITNESS:  Well, I think that it
17  was the town's.
18      Q.   (By Ms. Quigley)  But do you know that?
19      A.   No.
20   *Q.   So if it was his own personal records,
21  that he was keeping privately, would you agree there
22  was no problem with him keeping his own private
23  records?
24           MR. LAWLESS:  Objection.

---

Page 69

1           THE WITNESS:  Why would he keep his
2   own private records of town materials?
3       Q.   (By Ms. Quigley)  You don't get to ask
4   the questions, sir.  The question is simple.
5       A.   I am sorry.  I am repeating it to myself.
6       Q.   I am sorry about that then.
7           MR. LAWLESS:  Please read the
8   question back to him.  Thank you.
9           *(question read)
10          THE WITNESS:  Yeah.  I don't know.
11      Q.   (By Ms. Quigley)  So you stated that he
12  changed the books, correct?
13      A.   That's what he said.
14      Q.   And you would agree that there were no
15  books that he changed, correct?
16           MR. LAWLESS:  Objection.  You can
17  answer.
18           THE WITNESS:  Well, that depends if
19  you consider the spreadsheet the books.
20      Q.   (By Ms. Quigley)  All right.  So let's
21  take it from the top.  Would you agree he changed the
22  town's records?
23           MR. LAWLESS:  Objection.
24           THE WITNESS:  I don't know that.

18 (Pages 66 to 69)

**Donald Chabon**
**March 4, 2020**

Page 70

1    Q.    (By Ms. Quigley) So when you refer to
2  the books, do you mean town records here?
3       MR. LAWLESS: Objection. You can
4  answer.
5       THE WITNESS: Yes. Okay.
6    Q.    (By Ms. Quigley) All right. So you
7  would agree that, as you sit here today, you don't
8  know whether he changed any town records or books,
9  correct?
10      MR. LAWLESS: Objection.
11      THE WITNESS: I'm not sure.
12   Q.    (By Ms. Quigley) So what did you mean
13 when you said that he changed the books?
14   A.    Well, I'm not sure I said he changed the
15 books. But, if the books were changed, I would
16 presume that he referred to the spreadsheet.
17   Q.    All right. And have you learned that the
18 spreadsheet was kept by him privately --
19      MR. LAWLESS: Objection.
20   Q.    (By Ms. Quigley) -- in his own personal
21 computer offsite?
22      MR. LAWLESS: Objection.
23      THE WITNESS: I don't know that.
24   Q.    (By Ms. Quigley) So you don't know what

Page 71

1  he was referring to there?
2    A.    It was my belief that it was a town
3  document and not a personal thing.
4    Q.    So that being said, you would agree that,
5  to the best of your knowledge, it's a criminal
6  offense to change corporate records or town records,
7  correct?
8       MR. LAWLESS: Objection.
9       THE WITNESS: I don't know.
10   Q.    (By Ms. Quigley) You don't know whether
11 it is a criminal offense or not?
12   A.    I imagine that it would be.
13   Q.    So would you agree that by stating that
14 he changed the books, in a publication like this,
15 that you're accusing him of a crime?
16      MR. LAWLESS: Objection.
17      THE WITNESS: I did not know that.
18   Q.    (By Ms. Quigley) Would you agree that
19 both you and Mr. Flynn told Mr. Cardillo that you
20 were considering having him prosecuted for a crime?
21      MR. LAWLESS: Objection. You can
22 answer.
23      THE WITNESS: No. I don't remember
24 ever saying that to him.

Page 72

1    Q.    (By Ms. Quigley) All right. Were you
2  ever present when Mr. Flynn said that to him?
3    A.    Not that I remember.
4    Q.    You'd agree that there was a tremendous
5  outpouring of support for Mr. Cardillo after he was
6  fired by the fire department, correct?
7    A.    There was support. I don't know if it
8  was tremendous or not.
9    Q.    Would you agree there was a major walk
10 out of fire fighters?
11   A.    There was a walkout strike. Yes.
12   Q.    And, to the best of your knowledge, did
13 that include every member of the fire department?
14   A.    It did not.
15   Q.    Who didn't walk out?
16   A.    I don't remember their names.
17   Q.    How many didn't walk out?
18   A.    I don't know the numbers.
19   Q.    Now, the other thing you said to this
20 reporter, according to the article newspaper article,
21 was the result over a six-year period, Mr. Cardillo's
22 actions cost the town around $83,000.
23       Do you remember saying that to the
24 reporter?

Page 73

1    A.    I don't remember really saying that to
2  the reporter.
3    Q.    I'm going to show you this document,
4  which is a quotation, and if you can read that and
5  see if it refreshes your memory as to whether you
6  said to the reporter.
7    A.    Again, I don't remember speaking to this
8  reporter and I don't remember who this reporter is.
9    Q.    So if that newspaper article says that
10 you said that --
11      MR. LAWLESS: Objection.
12   Q.    (By Ms. Quigley) -- do you object to the
13 newspaper article?
14   A.    At the time it may have been accurate, or
15 it might have been an accurate reflection of my
16 understanding.
17   Q.    So do you understand that the gross
18 amount that was paid out was $83,000 and that the
19 town got certain items in exchange, whether they were
20 paying inflated prices or not, correct?
21      MR. LAWLESS: Objection. You can answer.
22      THE WITNESS: Yes. Correct.
23   Q.    (By Ms. Quigley) So it didn't actually
24 cost the town $83,000 and they got some benefit from

19 (Pages 70 to 73)

**Donald Chabon**
**March 4, 2020**

Page 74

1    the $83,000?
2          MR. LAWLESS: Objection.
3          THE WITNESS: Yes.
4      Q.    (By Ms. Quigley) You also talked to the
5    Berkshire Eagle, didn't you?
6      A.    I don't remember talking to them but I
7    may have.
8          MS. QUIGLEY: May I have minute,
9    please.
10          MR. LAWLESS: Sure.
11          (Recess taken)
12          MS. QUIGLEY: Back on the record.
13      Q.    (By Ms. Quigley) So I want to just
14    clarify something that was asked, and it was probably
15    my mistake so I want to clarify something.
16          So I was asking you questions about the
17    computer that the records were kept on, by
18    Mr. Cardillo, and I'm going to just clarify and say I
19    am informed, it was the fire department's computer
20    that these records were kept on and not his personal
21    computer. So with that in mind, and that factual
22    clarification, I'm just going to ask a couple of
23    follow-up questions on that.
24          Would you agree, or do you know, whether

Page 75

1    he was required to keep this spreadsheet as part of
2    his job?
3          MR. LAWLESS: Objection. You can
4    answer.
5          THE WITNESS: I don't know if it was
6    a requirement.
7      Q.    (By Ms. Quigley) So it could have been
8    just his private notes or private records that he was
9    producing for the town voluntarily?
10          MR. LAWLESS: Objection. You can
11    answer.
12          THE WITNESS: It could have been.
13      Q.    (By Ms. Quigley) Now, during this whole
14    transaction where Mr. Cardillo was fired, you were
15    coming up for reelection with the town; is that
16    right?
17      A.    That's correct.
18      Q.    So when was your re-election bid?
19      A.    It would have been -- you mean the
20    election date?
21      Q.    Yes.
22      A.    It was May.
23      Q.    May of 2000 -- what year?
24      A.    Last -- '19.

Page 76

1      Q.    2019. So just last May?
2      A.    Yes.
3      Q.    Okay. So this issue with Mr. Cardillo
4    came up on February 8th and January of 2019; is that
5    right?
6          MR. LAWLESS: Objection. You can
7    answer.
8          THE WITNESS: Okay. I think so. I
9    thought it was earlier, actually, but maybe
10    not.
11      Q.    (By Ms. Quigley) Well, could it have
12    been earlier than that -- like January or February of
13    2019?
14      A.    Yeah.
15      Q.    But certainly the, the article that was
16    published in the Springfield Republican, was
17    published, according to Exhibit 1, on or about
18    February 8th, 2019, correct?
19      A.    Yes.
20      Q.    So that would be in or around the time
21    this issue was being addressed, right?
22      A.    No.
23      Q.    So this issue of firing Mr. Cardillo
24    created a lot of town controversy, did it not?

Page 77

1      A.    It did.
2      Q.    And from your point of view, you were
3    seeking re-election, correct?
4      A.    Yes.
5      Q.    And you had aligned yourself with
6    Mr. Flynn in firing Mr. Cardillo, correct?
7          MR. LAWLESS: Objection. You can
8    answer.
9          THE WITNESS: Yes. Correct.
10      Q.    (By Ms. Quigley) And would you agree
11    that the firing of Mr. Cardillo turned out not to be
12    a poplar decision in the town?
13      A.    Yes, that's right.
14      Q.    And, in fact, you were not reelected; is
15    that right?
16      A.    That's correct.
17      Q.    Were you -- did you ever tell people, in
18    your bid to be reelected, that you were trying to,
19    quote, clean up the town by firing Mr. Cardillo?
20      A.    No.
21      Q.    Did you think you were trying to clean up
22    the town in firing Mr. Cardillo?
23      A.    No.
24      Q.    So in firing Mr. Cardillo, what goal was

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 78

1  accomplished, from your perspective, as a selectman,
2  by having him leave as selectman rather than simply
3  being disciplined?
4        MR. LAWLESS:  Objection.
5        THE WITNESS:  I can't -- if there
6  was a goal, it might have been that you need
7  to be responsible.  if you're responsible,
8  you need to be responsible.
9     Q.    (By Ms. Quigley)  All right.  Prior to
10  Mr. Cardillo being fired, had you contacted any
11  member of the fire department to take his position?
12        MR. LAWLESS:  Objection.  You can
13  answer.
14        THE WITNESS:  Prior to him being
15  fired, wasn't he suspended?  And, if he was
16  suspended, I think we contacted the
17  assistant or deputy chiefs.
18     Q.    (By Ms. Quigley)  So when did you first
19  contact the assistant or deputy chief about taking
20  this position over?
21     A.    I don't.  I didn't.  I wasn't the first
22  one to contact them.  Terry was, and I don't remember
23  the time.
24     Q.    When did Terry contact them?

Page 79

1     A.    I'm not sure.
2     Q.    So what did Terry tell you about
3  contacting him?
4     A.    I'm sorry?
5     Q.    What did Terry tell you about contacting
6  him?
7     A.    About contacting the deputy chiefs.
8     Q.    Yes.
9     A.    I don't know what he told me, but I think
10  he was just giving them a heads up that this was
11  something that was afoot.
12     Q.    And was this before he was fired?
13     A.    Before he was fired, I believe there was
14  a suspension period prior to the firing.  And, at
15  time they were contacted.  I think.  I'm not sure.
16     Q.    Do you know whether he was contacted
17  before the suspension?
18     A.    That I don't know.
19     Q.    Okay.  So did you ever have any direct
20  contact with the assistant fire chief before he was
21  fired?
22     A.    Before he was fired.  Before he was
23  fired?
24     Q.    Um-hmm.

Page 80

1     A.    I don't know.  I believe I did.  I don't
2  remember exactly.
3     Q.    And what did you say to him?
4     A.    Well, I was interested in -- the things
5  that I regularly said to the replacements was --
6     Q.    Well, I'm going to just stop you right
7  there.  I want you to testify about what you actually
8  said and not what you regularly said to people.  So
9  let's focus --
10     A.    I actually said to them that -- I
11  actually wanted to get from them a report on how the
12  fire department was doing and whether it was able to
13  perform its function.  That's what I was doing.
14     Q.    And did you discuss Mr. -- strike that.
15        -- the assistant fire chief's role as
16  potentially serving as fire chief prior to firing
17  Mr. Cardillo?
18     A.    I can't remember whether it was before.
19  I can't remember the time that we spoke to him.  But
20  certainly we spoke to him about filling in as chief
21  in the interim.
22     Q.    And certainly you do not know whether
23  that was before he got fired or not?
24     A.    I don't remember.  I believe it was, but

Page 81

1  I don't remember.
2     Q.    And what is your party affiliation?
3     A.    You mean Democrat/Republican?
4     Q.    Right.
5     A.    Democrat.
6     Q.    And what's Mr. Flynn's party affiliation?
7     A.    I think it's -- I think it's Democrat.
8  But I'm not sure.  It might be Independent.
9     Q.    And when you did run for reelection,
10  eventually you were not reelected, correct?
11     A.    That's correct.
12     Q.    Do you know why?
13     A.    I think there were a number of reasons,
14  yes.
15     Q.    What were they?
16     A.    One was the situation with Mr. Cardillo.
17  Another was I was opposed to -- I wasn't a supporter
18  of some of the development.
19     Q.    Who took your place?
20     A.    Her name was Roxanne McCaffrey.
21     Q.    Did you ever say to Mr. Flynn:  No, we
22  shouldn't fire him; that's too extreme?
23        MR. LAWLESS:  Objection.
24        THE WITNESS:  No, I don't remember

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 82

1     saying that.
2          Q.     (By Ms. Quigley)  But initially, in your
3     testimony in this deposition, you indicated that you
4     went along with Mr. Flynn, that you didn't think he
5     should be fired.
6               MR. LAWLESS:  Objection.  That is
7     not an accurate characterization.
8               MS. QUIGLEY:  Well, he can
9     characterize what he said.
10         Q.     (By Ms. Quigley)  Please characterize why
11    you went along with Mr. Flynn on that?
12              MR. LAWLESS:  Objection.
13              THE WITNESS:  I was interested in
14    trying to see if we could offer Chuckie a
15    position in the town.  And it was my belief
16    that Mr. Flynn, Terry Flynn, came up with
17    this proposal and I was willing to consider
18    that in order to get a position for Chuckie.
19         Q.     (By Ms. Quigley)  And that included him
20    resigning as selectman?
21         A.     That's was Terry's proposal.
22         Q.     All right.  But that part of it you
23    didn't support?
24         A.     I went along with it.

Page 83

1          Q.     But did you support it?
2          A.     Did I vote for it?
3          Q.     Did you support it?  Did you think it was
4     the right thing to do?
5          A.     Ahh, I was not comfortable with it.
6          Q.     Okay.  Why?
7          A.     Because they were separate functions and
8     I didn't feel they had to be included together.
9               MS. QUIGLEY:  All right.  We're
10    done.
11              MR. LAWLESS:  Okay.  No questions
12    from me.
13
14              (Deposition concluded at 4:15 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 84

1          I, SHARON WASKIEWICZ, Notary Public, do hereby
2     certify that DONALD MICHAEL CHABON appeared before me
3     and satisfactorily identified himself on the 4th day
4     of March, 2020, at the offices of ELIZABETH A.
5     QUIGLEY & ASSOCIATES, 27 Henry Avenue, Pittsfield,
6     Massachusetts, and was by me duly sworn to testify to
7     the truth and nothing but the truth as to his
8     knowledge touching and concerning the matters in
9     controversy in this case; that he was thereupon
10    examined upon his oath and said examination reduced
11    to writing by me; and that the statement is a true
12    record of the testimony given by the witness, to the
13    best of my knowledge and ability.
14         I further certify that I am not a relative or
15    employee of counsel/attorney for any of the parties,
16    nor a relative or employee of such parties, nor am I
17    financially interested in the outcome of the action.
18         WITNESS MY HAND this 17th day of March, 2020.
19
20
21         ------------------------
22
23    Sharon Waskiewicz     My Commission expires:
24    Notary Public          July 26, 2024

Page 85

1     Today's date:    March 17, 2020
2     To:           David Lawless, Esq.
3     Copied to:      Elizabeth Quigley, Esq.
4     From:         Sharon Waskiewicz
5     Deposition of:  Donald Michael Chabon
6     Taken:         March 4, 2020
7     Action:        Ernest Cardillo vs Town of
8                    Stockbridge, et al
9
10        Enclosed is a copy of the deposition of Donald
11    Michael Chabon.  Pursuant to the Rules of Civil
12    Procedure, Mr. Chabon has thirty days to sign the
13    deposition from today's date.
14        Please have Mr. Chabon sign the enclosed
15    signature page.  If there are any errors, please have
16    him mark the page, line, and error on the enclosed
17    correction sheet.  He should not mark the transcript
18    itself.  This addendum should be forwarded to all
19    interested parties.
20        Thank you for your cooperation in this matter.
21
22
23
24

22 (Pages 82 to 85)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Donald Chabon**
**March 4, 2020**

Page 86

```
 1          COMMONWEALTH OF MASSACHUSETTS
 2            Civil Case No. 3:19CV-10695 KAR
 3
 4
 5    *********************************** *
 6   Ernest J. Cardillo, Jr.,        *
 7         Plaintiff           *
 8         vs.                *
 9   Town of Stockbridge, et al,      *
10         Defendant          *
11   *********************************** *
12
13
14
15       I, DONALD MICHAEL CHABON, do hereby certify,
16   under the pains and penalties of perjury, that the
17   foregoing testimony is true and accurate, to the best
18   of my knowledge and belief.
19       WITNESS MY HAND, this    day of    , 2020.
20
21       _____
22            Donald Michael Chabon
23
24   sw
```

Page 87

```
 1              CORRECTION SHEET
 2   DEPONENT:   Donald Michael Chabon
 3   CASE:      Ernest Cardillo vs Town of Stockbridge,
 4            et al
 5   DATE TAKEN:  March 4, 2020
 6   ****************************************************
 7   PAGE / LINE /   CHANGE OR CORRECTION AND REASON
 8   ****************************************************
 9   -----/------/-------------------------------------
10   -----/------/-------------------------------------
11   -----/------/-------------------------------------
12   -----/------/-------------------------------------
13   -----/------/-------------------------------------
14   -----/------/-------------------------------------
15   -----/------/-------------------------------------
16   -----/------/-------------------------------------
17   -----/------/-------------------------------------
18   -----/------/-------------------------------------
19   -----/------/-------------------------------------
20   -----/------/-------------------------------------
21   -----/------/-------------------------------------
22   -----/------/-------------------------------------
23   -----/------/-------------------------------------
24   -----/------/-------------------------------------
```

23 (Pages 86 to 87)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**